IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BERISH BERGER, KILBRIDE INVESTMENTS LIMITED, BUSYSTORE LIMITED IN LIQUIDATION, TOWERSTATES LIMITED, BERGFELD CO. LIMITED and ARDENLINK LIMITED,<br>        Plaintiffs,<br><br>    v.<br><br>CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., BLANK ROME LLP and COZEN O'CONNOR, P.C.,<br>        Defendants, | Civil Action No.   2:13-CV-05195-JD |
| CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC.,<br>        Third-Party Plaintiff,<br><br>    v.<br><br>CHAIM ZEV LEIFER,<br>CHESKY HESKEL KISH and<br>JFK BLVD ACQUISITION GP, LLC,<br>        Third-Party Defendants. | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANTS, BLANK ROME LLP, COZEN O'CONNOR, P.C., AND CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT AS TO THE CLAIMS OF PLAINTIFFS BERISH BERGER, ARDENLINK LIMITED, AND TOWERSTATES LIMITED FOR LACK OF <u>SUBJECT-MATTER JURISDICTION BASED UPON WANT OF STANDING</u>**

Pursuant to Federal Rule of Civil Procedure 56, defendants, by and through undersigned counsel, submit this Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment as to the Claims of Plaintiffs Berish Berger, Ardenlink Limited, and Towerstates Limited for Lack of Subject-Matter Jurisdiction Based Upon Want of Standing.[1]

---

[1] To make this Statement manageable and readable, defendants have included a list of the exhibits, attached hereto as Exhibit "A." Defendants also have organized the facts by subheadings and sought to categorize facts under the most relevant heading.

## UNDISPUTED FACTS

**I.    THE PARTIES**

1.     Plaintiff Berish Berger is a foreign national of considerable family wealth, with an estimated net worth of over $100 million. Ex. 2, Berger Cross (07/23/10) p. 59:9-14; Ex. 9, Berger Dep. (09/05/07) pp. 29:22-32:4. Berger's vocation is that of a real estate investor. Ex. 19, Berger Decl. (07/20/07) ¶ 5.

2.     Plaintiff Kilbride Investments Limited ("Kilbride") is a corporate entity, incorporated under the laws of Gibraltar, owned by a discretionary family trust set up by Berger's late father. Berger is a potential beneficiary of the trust. Ex. 16, Kilbride Dep. (05/18/16) pp. 12:12-18, 14:17-21. Berger has no legal or director role with Kilbride. Ex. 8, Berger Direct (09/10/07) p. 63:15-25; Ex. 9, Berger Dep. (09/05/07) p. 333:4-8; Ex. 16, Kilbride Dep. (05/18/16) p. 14:17-21.

3.     Plaintiff Busystore Limited in Liquidation ("Busystore") is a U.K. company formed by Berger and his wife, Pessie Berger, for real estate business. Ex. 15, Busystore Dep. (05/18/16) p. 12:4-12. Busystore currently is in liquidation. Ex. 15, Busystore Dep. (05/18/16) p. 80:21-24. Berger is a director of Busystore along with his wife and son, Getzel a/k/a Gershon Berger. Ex. 15, Busystore Dep. (05/18/16) pp. 12:15-17, 13:21-23, 15:6-10, 56:17-57:1.

4.     Plaintiff Ardenlink Limited ("Ardenlink") is a U.K. corporation created by Berger, operating for charitable purposes. Ex. 12, Ardenlink Dep. (05/19/16) pp. 11:23-12:3. Berger, Pessie Berger and Getzel Berger act as the directors of Ardenlink. Ex. 12, Ardenlink Dep. (05/19/16) pp. 12:17-24, 13:12-22, 15:21-22.

5.     Plaintiff Towerstates Limited ("Towerstates") is a U.K. corporation started by

Berger and his wife, Pessie Berger, for real estate business in the U.K.  Ex. 14, Towerstates Dep. (05/19/16) pp. 10:24-11:16.  Berger, his wife and his son are the directors of Towerstates.  Ex. 14, Towerstates Dep. (05/19/16) pp. 11:21-12:3.

6. Plaintiff Bergfeld Co. Limited ("Bergfeld") is a U.K. company engaged in the real estate business in the U.K.  Ex. 13, Bergfeld Dep. (05/19/16) p. 10:11-21.  Berger is one of Bergfeld's nine directors, along with certain of his brothers, brothers-in-law and sisters.  Ex. 13, Bergfeld Dep. (05/19/16) pp. 11:19-12:11.

7. Defendant/third-party plaintiff Cushman & Wakefield of Pennsylvania, Inc. is a real estate appraisal firm.

8. Defendant Cozen O'Connor, P.C. ("Cozen") is a law firm.

9. Defendant Blank Rome LLP ("Blank Rome") is a law firm.

10. Third-party defendant Chaim Zev Leifer, a/k/a Rabbi Leifer, lived and worked as an independent businessman in London in 2006 and 2007.  Ex. 10, Leifer Dep. (01/10/17) pp. 23:1-7, 31:20-32:5, 50:12-51:3.

11. During 2006 and 2007, third-party defendant Chesky Heskel Kish was employed by Rabbi Leifer as his office assistant and served as his "local errand boy."  Ex. 1, Berger Dep. (05/17/16) pp. 72:11-15, 73:14-24, 74:22-75:5, 352:5-14; Ex. 10, Leifer Dep. (01/10/17) pp. 118:18-25, 132:22-24, (01/31/17) p. 261:1-20.

12. Third-party defendant JFK BLVD Acquisition GP, LLC ("JFK") is a Delaware limited liability company, formed on or about March 30, 2006 by Cozen, on its client's instruction, to take title to certain real estate in Philadelphia, Pennsylvania.  Ex. 11, Naselsky Dep. (07/27/16) pp. 62:16-23, 63:11-16, 64:1-65:3; Ex. 17, Teitelman Dep. (08/15/16) pp. 48:19-

3

49:15.

## II. THE PHILADELPHIA REAL ESTATE OPPORTUNITIES

13. Through this civil action, plaintiffs seek to recoup monies that they advanced to non-party Eliyahu Weinstein with the expectation that they would acquire an ownership interest in five parcels of land located in Philadelphia, at 2001 - 2045 John F. Kennedy Boulevard (Parcel A), 2101 - 2145 John F. Kennedy Boulevard (Parcel B), 2201 - 2245 John F. Kennedy Boulevard (Parcel C), 2301 - 2345 John F. Kennedy Boulevard (Parcel D), and 60 North 23rd Street (Parcel E), collectively referred to as "River City." Compl. ¶¶ 1, 21.[2]

14. Although not the subject of plaintiffs' claims in this litigation (Compl. ¶¶ 1, 166, 173, 176), plaintiffs simultaneously intended to invest in a separate property known as "2040 Market," located at 2026 - 2058 Market Street in Philadelphia. Ex. 1, Berger Dep. (05/17/16) pp. 44:18-23, 147:6-10. (Defendants refer to the River City and 2040 Market deals collectively as the "Philadelphia Real Estate Opportunities.")

## III. PRIOR BERGER SUITS

15. This is not plaintiffs' first lawsuit relating to the Philadelphia Real Estate Opportunities. Berger, individually, filed his first action *Berger v. Weinstein et al.*, Civ. A. No. 07-0994, in the Eastern District of Pennsylvania on March 12, 2007 (referred to as "*Berger I*"). When the first action was dismissed for lack of standing, Berger along with the entity plaintiffs commenced a second action, *Berger et al. v. Weinstein et al.*, Civ. A. No. 08-4059, on August 20, 2008 (referred to as "*Berger II*"). On December 18, 2008, plaintiffs commenced a third

---

[2] All references to the "Compl." are to the Amended Complaint filed on the date of February 25, 2013 while this case was still in the Southern District of New York.

action against multiple other defendants, which this Court docketed at *Berger et al. v. Zeghibe et al.*, Civ. A. No. 08-5861 (referred to as "*Berger III*"). On October 28, 2009, *Berger II* and *Berger III* were consolidated; and the consolidated case was tried before a jury from July 16, 2010 to July 29, 2010. The jury reached a verdict on July 30, 2010.

16. In an effort to address the deficiency with respect to Berger's standing in *Berger I*, and specifically to ratify Berger's status as the claimant with respect to whatever claims the plaintiff entities may have "against the defendants [in that action] arising from the facts and circumstances set forth in [Berger's] Second Amended Complaint", Berger received assignments from each of the entity plaintiffs on or about June 30, 2008. Ex. 16, Kilbride Dep. (05/18/16) p. 52:17-20; Ex. 18, Berger Decl. (07/08/08) ¶ 25; Ex. 27, D-41—Assignment Agreement of Kilbride; Ex. 29, D-48—Assignment Agreement of Ardenlink, Busystore and Towerstates; Ex. 30, D-64—Assignment Agreement of Bergfeld. Each assignment assigns "to Berger the entirety of whatever claims and causes of action [it] may have against any and all of the defendants in the Litigation arising from the facts and circumstances alleged in the Second Amended Complaint served by Berger in [*Berger I*] on May 16, 2008". Ex. 27, D-41—Assignment Agreement of Kilbride ¶1; Ex. 29, D-48—Assignment Agreement of Ardenlink, Busystore, and Towerstates ¶1; Ex. 30, D-64—Assignment Agreement of Bergfeld ¶1.

17. The June 30, 2008 Assignments relate to the claims Berger raised in *Berger I*. Berger received no later or additional assignment from the plaintiff entities for the claims raised in the present litigation. Ex. 13, Bergfeld Dep. (05/19/16) pp. 55:7-56:6; Ex. 15, Busystore Dep. (05/18/16) pp. 90:1-92:16; Ex. 16, Kilbride Dep. (05/18/16) pp. 52:2-16, 74:14-22.

5

## IV.    BERGER PARTNERS WITH ELIYAHU WEINSTEIN PURPORTEDLY TO ACQUIRE RIVER CITY

18.    In November of 2006, Rabbi Leifer arranged for Berger to meet non-party Eliyahu Weinstein at Berger's home in London to discuss the possibility of forming a partnership to acquire U.S. real estate.  Ex. 1, Berger Dep. (05/17/16) pp. 88:17-89:8; Ex. 4, Berger Direct (07/22/10) p. 9:14-17; Ex. 18, Berger Decl. (07/08/08) ¶¶ 3, 16; Ex. 19, Berger Decl. (07/20/07) ¶ 7.

19.    Weinstein ultimately became Berger's local partner for the Philadelphia Real Estate Opportunities, both River City and 2040 Market.  Ex. 1, Berger Dep. (05/17/16) pp. 323:13-324:21; Ex. 13, Bergfeld Dep. (05/19/16) p. 41:3-11; Ex. 16, Kilbride Dep. (05/18/16) p. 25:4-10.

## V.    UNBEKNOWNST TO BERGER, WEINSTEIN HAD ENTERED INTO SEPARATE AGREEMENTS REGARDING RIVER CITY

20.    Months before Berger had ever heard of Weinstein (Ex. 7, Berger Cross (09/11/07) p. 31:7-12; Ex. 21, Berger Resp. to Cozen RFA at Resp. 8), Weinstein reached an agreement regarding the purchase of River City with World Acquisition Partners Corporation ("WAPC"), a Pennsylvania corporation controlled by non-party Ravinder Chawla, a Pennsylvania businessman active in Philadelphia real estate.  Ex. 17, Teitelman Dep. (08/15/16) p. 64:11-13.  On or about September 26, 2006, Weinstein, as owner, and WAPC, as nominee, entered into a Nominee Agreement and Contingent Promissory Note and Security Agreement regarding River City.  Ex. 23, D-2—09/26/06 Nominee Agreement; Ex. 24, D-3—09/26/06 Contingent Promissory Note.  The September 26, 2006 Nominee Agreement provided that third-party defendant, JFK, first would purchase River City from the record owner, R&F Penn Center

6

Associates, L.P. ("R&F Penn"), for $32.5 million pursuant to a certain Agreement of Sale dated May 12, 2006 (Ex. 23, D-2—09/26/06 Nominee Agreement at BERGER3008715), and then WAPC, through an assignment from JFK, would transfer the property to Weinstein upon payment of nominee consideration of up to $70 million and fulfillment of other terms. Ex. 17, Teitelman Dep. (08/15/16) pp. 228:14-231:4; Ex. 23, D-2—09/26/06 Nominee Agreement.

21.     Berger had no knowledge of any of the agreements Weinstein made when he decided to partner with Weinstein to acquire River City. Ex. 19, Berger Decl. (07/20/07) ¶ 9. When Weinstein spoke to Berger about the possibility of forming a partnership to acquire Philadelphia real estate at Berger's London home in November of 2006, Weinstein concealed the September 26, 2006 Nominee Agreement that he had entered into with WAPC from Berger. Ex. 1, Berger Dep. (05/17/16) pp. 326:4-327:3; Ex. 19, Berger Decl. (07/20/07) ¶ 9. Berger had no knowledge of the September 26, 2006 Nominee Agreement or Contingent Promissory Note until February 2, 2007, at the earliest, when he received copies of various documents from Weinstein's attorney, Anthony Argiropoulos of Fox Rothschild LLP. Ex. 19, Berger Decl. (07/20/07) ¶¶ 17, 19; Ex. 20, Berger Resp. to Blank Rome RFA Resp. 54, 55, 56, 57.

22.     On or about December 19, 2006, Weinstein, as owner, entered into a revised Nominee Agreement with JFK BLVD Acquisition Partners LP ("JFK LP"), as nominee. Ex. 17, Teitelman Dep. (08/15/16) pp. 267:17-268:2; Ex. 25, D-6—12/19/06 Nominee Agreement. The terms of the December 19, 2006 Nominee Agreement remained largely the same as the September 26, 2006 version, except for replacing WAPC with JFK LP as nominee and modifying the amount and due date of the required deposit. Ex. 25, D-6—12/19/06 Nominee Agreement at BERGER3008737-38.

23.     Under the December 19, 2006 Nominee Agreement, JFK LP, an entity affiliated with JFK, would obtain title to River City pursuant to an assignment of the May 12, 2006 Agreement of Sale between R&F Penn and JFK (Ex. 25, D-6—12/19/06 Nominee Agreement at BERGER3008737), and JFK LP would subsequently transfer the property to Weinstein upon payment of the balance of the nominee consideration of up to $70 million and fulfillment of other terms.  Ex. 17, Teitelman Dep. (08/15/16) pp. 228:14-231:4; Ex. 25, D-6—12/19/06 Nominee Agreement.

24.     Although the December 19, 2006 Nominee Agreement was negotiated and signed after (or at least simultaneous to when) Berger partnered with Weinstein and they purportedly entered into an agreement to purchase River City, Weinstein did not identify Berger to anyone as an interested party to the December 19, 2006 Nominee Agreement.  In fact, it was not until near the end of January 2007 that Andrew Teitelman, counsel for the nominee—initially WAPC and later JFK LP, first learned of Berger's existence.  Ex. 17, Teitelman Dep. (08/15/16) pp. 279:19-280:13.

25.     Weinstein also concealed the December 19, 2006 Nominee Agreement between JFK LP and Weinstein from Berger. Ex. 19, Berger Decl. (07/20/07) ¶ 20; Ex. 20, Berger Resp. to Blank Rome RFA Resp. 58.  In fact, Berger did not see the December 19, 2006 Nominee Agreement until after he commenced his first litigation.  Ex. 20, Berger Resp. to Blank Rome RFA Resp. 58.

26.     On December 20, 2006, JFK closed on its purchase of River City from R&F Penn for $32.5 million, pursuant to the May 12, 2006 Agreement of Sale.  Ex. 11, Naselsky Dep. (07/27/16) p. 71:21-24; Ex. 17, Teitelman Dep. (08/15/16) p. 53:4-13.

27. Although the May 12, 2006 Agreement of Sale between JFK and R&F Penn was disclosed in the Preamble on Page 1 of both the September 26, 2006 and December 19, 2006 Nominee Agreements (Ex. 24, D-3—09/26/06 Nominee Agreement at BERGER3002557; Ex. 25, D-6—12/19/06 Nominee Agreement at BERGER3008737), Berger had no knowledge of JFK's agreement to purchase River City for $32.5 million (Ex. 1, Berger Dep. (05/17/16) p. 356:12-17), much less the December 20, 2006 closing of that agreement. Ex. 19, Berger Decl. (07/20/07) ¶ 16; Ex. 20, Berger Resp. to Blank Rome RFA Resp. 40-43. This is because Weinstein concealed the existence of the May 12, 2006 Agreement from Berger. Ex. 19, Berger Decl. (07/20/07) ¶¶ 9, 16, 20.

## VI.  BERGER CAUSES MONEY TO BE ADVANCED TO WEINSTEIN'S CONTROL PURPORTEDLY FOR THE BERGER-WEINSTEIN PARTNERSHIP'S PURCHASE OF RIVER CITY

28. With no knowledge of these other agreements regarding the disposition of River City, including the Nominee Agreements involving Weinstein, Berger partnered with Weinstein and they entered into an agreement to purchase River City for $62.5 million, potentially more. Ex. 1, Berger Dep. (05/17/16) pp. 275:4-276:2, 323:13-324:21; Ex. 2, Berger Cross (07/23/10) pp. 47:20-48:3; Ex. 16, Kilbride Dep. (05/18/16) p. 25:4-10; Ex. 18, Berger Decl. (07/08/08) ¶ 11; Ex. 19, Berger Decl. (07/20/07) ¶ 9. Unbeknownst to Berger, the acquisition price Weinstein told Berger they had to pay for River City was at least $30 million more than the purchase price JFK contracted to pay for the same property. Ex. 19, Berger Decl. (07/20/07) ¶¶ 8, 9.

29. While Berger's partnership with Weinstein and their agreement to purchase River City were never memorialized in writing (Ex. 1, Berger Dep. (05/17/16) pp. 309:7-310:14; Ex. 5,

9

Berger Dep. (04/15/10) pp. 139:11-140:2; Ex. 9, Berger Dep. (09/05/07) pp. 93:21-94:10; Ex. 19, Berger Decl. (07/20/07) ¶ 23), Berger understood the River City transaction with Weinstein to be an 80-20 deal. Ex. 1, Berger Dep. (05/17/16) p. 275:4-21; Ex. 4, Berger Direct (07/22/10) p. 36:4-12; Ex. 9, Berger Dep. (09/05/07) p. 93:9-20; Ex. 20, Berger Resp. to Blank Rome RFA Resp. 11. To Berger, this meant that "[Berger] was to provide 80% of the cash needed for the acquisition[] and [he] would receive 80% of the profits from any future sale, while Weinstein would provide the remaining 20% of the cash and would receive 20% of any profits." Ex. 19, Berger Decl. (07/20/07) ¶ 13.

30. Weinstein told Berger that $51.5 million of the purchase price would be funded by a commercial mortgage. Ex. 19, Berger Decl. (07/20/07) ¶ 10; Ex. 20, Berger Resp. to Blank Rome RFA Resp. 44. Berger later came to understand that Weinstein's statement that a commercial bank agreed to loan $51.5 million for the purchase of River City was a complete fiction. Ex. 1, Berger Dep. (05/17/16) pp. 124:2-20, 125:1-3, 160:20-161:5; Ex. 19, Berger Decl. (07/20/07) ¶¶ 16, 24.

31. When Berger decided to fund his partnership with Weinstein, he did not personally send his own funds. Ex. 15, Busystore Dep. (05/18/16) pp. 133:24-134:17; Ex. 16, Kilbride Dep. (05/18/16) pp. 103:6-104:1. Rather Berger reached out to persons connected to him and entities he controlled to request that money be sent to Weinstein on his behalf. Ex. 8, Berger Direct (09/10/07) p. 63:2-13.

32. On or about December 18, 2006, without a formal written agreement with Weinstein, Berger instructed Kilbride—through James Levy, a Gibraltar attorney who oversaw the activities of Kilbride— to wire $12 million to Montgomery Abstract Corporation

10

("Montgomery Abstract"), a title company. Ex. 1, Berger Dep. (05/17/16) p. 148:14-20; Ex. 4, Berger Direct (07/22/10) pp. 38:19-39:4; Ex. 16, Kilbride Dep. (05/18/16) pp. 49:6-8, 103:14-104:8; Ex. 19, Berger Decl. (07/20/07) ¶ 15; Ex. 26, D-40—December 18, 2006 order to debit $12 million from Kilbride's account and wire it to Montgomery Abstract.

33. Kilbride wired $12 million to Montgomery Abstract because Berger told Kilbride to send the funds there. Ex. 16, Kilbride Dep. (05/18/16) p. 39:9-15. Before Kilbride advanced the $12 million to Montgomery Abstract, Kilbride received no information or documentation regarding the River City deal from anyone besides Berger. Ex. 16, Kilbride Dep. (05/18/16) pp. 25:11-13, 32:4-12, 85:18-21. At the time of the wire, Kilbride had no understanding as to Montgomery Abstract's role in the transaction and why it was requested to send funds there. Ex. 16, Kilbride Dep. (05/18/16) p. 49:3-8.

34. Based upon what Weinstein told him, Berger believed that Weinstein would apply the $12 million from Kilbride to the Berger-Weinstein partnership's purchase of River City. Ex. 1, Berger Dep. (05/17/16) pp. 327:16-24, 329:18-330:13; Ex. 7, Berger Cross (09/11/07) p. 69:4-15. After the fact, Berger learned that Weinstein caused Kilbride's $12 million wire to be applied to JFK's acquisition of River City to satisfy his own contractual obligation. Ex. 19, Berger Decl. (07/20/07) ¶ 16; Ex. 21, Berger Resp. to Cozen RFA at Resp. 17.

35. Also on December 18, 2006, Berger directed Busystore to advance $9.5 million to an entity called Pine Projects LLC ("Pine Projects") purportedly for the Berger-Weinstein partnership's acquisition of 2040 Market. Ex. 15, Busystore Dep. (05/18/16) pp. 37:18-38:9; Ex. 19, Berger Decl. (07/20/07) ¶ 14.

36. When Busystore wired the $9.5 million to Pine Projects, Busystore, through

Berger (its only information source), had no specific understanding as to who owned and/or operated Pine Projects. Busystore wired $9.5 million to Pine Projects because Weinstein had instructed Berger to send the funds there. Ex. 1, Berger Dep. (05/17/16) pp. 155:7-23, 276:3-277:11; Ex. 15, Busystore Dep. (05/18/16) p. 36:2-6.

37. Once Berger caused the wires to be sent to Montgomery Abstract and Pine Projects, totaling $21.5 million, he believed that he had fulfilled his 80% financial responsibility for both the River City and 2040 Market deals that he reached with Weinstein and he would own an 80% interest in both properties. Ex. 6, Berger Dep. (05/14/08) p. 71:4-16; Ex. 7, Berger Cross (09/11/07) pp. 31:3-6, 67:8-13; Ex. 8, Berger Redirect (09/10/07) p. 146:13-24; Ex. 19, Berger Decl. (07/20/07) ¶¶ 14, 15.

38. Although Weinstein told Berger that the $21.5 million would be put toward the Berger-Weinstein partnership's purchase of River City and 2040 Market (Ex. 7, Berger Cross (09/11/07) p. 69:4-15), Weinstein applied the $21.5 million for other purposes, and bought plaintiffs nothing. Ex. 19, Berger Decl. (07/20/07) ¶¶ 3, 14, 16.

39. Plaintiffs never obtained title to River City (Ex. 19, Berger Decl. (07/20/07) ¶¶ 31, 32; Ex. 21, Berger Resp. to Cozen RFA at Resp. 17); and a closing on 2040 Market never occurred, Pine Projects having dissipated the funds for its own purposes. Ex. 5, Berger Dep. (04/15/10) p. 10:6-19; Ex. 19, Berger Decl. (07/20/07) ¶¶ 14, 26.

### VII. WEINSTEIN DEMANDS MORE MONEY FROM BERGER

40. Despite the fact that Weinstein did not use plaintiffs' $21.5 million to close on either River City or 2040 Market on behalf of any Berger-Weinstein venture, Weinstein continued to pursue Berger for more money for all sorts of fictitious reasons, fabricating that he

closed on the Berger-Weinstein venture's purchase of River City from the record owner but had to pay additional, unexpected interest and closing costs for River City, concealing that he had not made his 20% contribution to the deals, and demanding that Berger immediately remit his 80% share of the "mushrooming" differential.  Ex. 1, Berger Dep. (05/17/16) pp. 160:11-162:15, 327:16-24, 330:1-13; Ex. 15, Busystore Dep. (05/18/16) pp. 41:2-43:22; Ex. 18, Berger Decl. (07/08/08) ¶ 19; Ex. 19, Berger Decl. (07/20/07) ¶¶ 14, 24, 26.

## VIII.  BERGER CAUSES ADDITIONAL FUNDS TO BE SENT TO WEINSTEIN'S CONTROL

41. By January 19, 2007, still without any documents from Weinstein memorializing a Berger-Weinstein venture, Berger caused three family-related entities, Ardenlink, Towerstates, and Bergfeld, to remit an additional $15 million to Weinstein's company, Pine Projects.  Ex. 9, Berger Dep. (09/05/07) pp. 93:21-94:10; Ex. 19, Berger Decl. (07/20/07) ¶¶ 27, 29.

42. Specifically, on January 8, 2007, Berger caused Ardenlink to wire $6 million to Pine Projects, and Towerstates to send $4 million to Pine Projects.  Ex. 1, Berger Dep. (05/17/16) pp. 163:14-164:1; Ex. 12, Ardenlink Dep. (05/19/16) pp. 17:18-20, 33:9-12; Ex. 14, Towerstates Dep. (05/19/16) p. 16:8-21; Ex. 19, Berger Decl. (07/20/07) ¶¶ 24, 27.

43. When Berger instructed Ardenlink to wire $6 million to Pine Projects on January 8, 2006, he did so because Weinstein requested that the funds be sent there; Berger had no understanding as to what Pine Projects was or its role in the transaction.  Ex. 1, Berger Dep. (05/17/16) pp. 276:3-277:11; Ex. 12, Ardenlink Dep. (05/19/16) pp. 26:20-23, 30:3-11.

44. Berger instructed Towerstates to wire $4 million to Pine Projects because Weinstein told Berger to send the money there.  At the time Towerstates wired the funds, Berger had no knowledge that Pine Projects was Weinstein's company.  Ex. 14, Towerstates Dep.

13

(05/19/16) pp. 26:13-19, 49:12-50:10.

45. On January 19, 2007, following a statement by Weinstein to Berger that the Berger-Weinstein partnership closed on its purchase of 2040 Market on January 4, 2007 and Weinstein immediately had to pay down a $23 million mortgage on 2040 Market, because of the imminent sale of the air rights (Ex. 6, Berger Dep. (05/14/08) p. 49:5-16; Ex. 19, Berger Decl. (07/20/07) ¶¶ 26, 27), Berger caused Bergfeld to wire $5 million to Pine Projects. Ex. 13, Bergfeld Dep. (05/19/16) pp. 22:8-24:15; 32:13-19, 33:3-7; Ex. 4, Berger Direct (07/22/10) p. 66:4-13.

46. Bergfeld had no independent knowledge about the Philadelphia Real Estate Opportunities beyond the information that Berger conveyed. Ex. 13, Bergfeld Dep. (05/19/16) pp. 100:16-101:6. At the time Berger requested that Bergfeld wire $5 million to Pine Projects, Berger had no knowledge or understanding as to Pine Projects' role in the transaction. Ex. 13, Bergfeld Dep. (05/19/16) p. 26:10-15.

47. In total, between December 18, 2006 and January 19, 2007, Berger caused $36.5 million to be wired to Weinstein's control for the purchase of 2040 Market and River City. Ex. 3, Berger Cross (07/22/10) p. 11:10-16; Ex. 4, Berger Direct (07/22/10) p. 66:14-18; Ex. 19, Berger Decl. (07/20/07) ¶¶ 3, 28.

### IX. OWNERSHIP OF THE FUNDS KILBRIDE, ARDENLINK, AND TOWERSTATES ADVANCED TO WEINSTEIN'S CONTROL

48. With respect to the wire of $12 million that Kilbride advanced to Montgomery Abstract and the $15 million collectively sent by Ardenlink, Towerstates, and Bergfeld to Pine Projects, Berger acknowledges that none of the money originated from his personal bank accounts. Ex. 15, Busystore Dep. (05/18/16) pp. 133:24-134:17; Ex. 16, Kilbride Dep.

14

(05/18/16) pp. 103:6-104:1.

49.     Rather Berger claims that the entire $12 million that Kilbride wired to Montgomery Abstract was a loan to him. Ex. 16, Kilbride Dep. (05/18/16) pp. 35:22-36:24, 42:15-43:1; Ex. 20, Berger Resp. to Blank Rome RFA at Resp. 38. Berger makes no claim that any of the $15 million that Ardenlink, Towerstates, and Bergfeld wired to Pine Projects belonged to him.

50.     The only evidence of record that the wire from Kilbride to Montgomery Abstract was a loan to Berger is Berger's own self-serving statements. Ex. 15, Busystore Dep. (05/18/16) p. 64:2-4; Ex. 16, Kilbride Dep. (05/18/16) pp. 35:22-36:24, 42:15-43:1; Ex. 20, Berger Resp. to Blank Rome RFA at Resp. 38. Kilbride has no documentation regarding any request for any loan, distribution, or other transfer of funds related to River City (or, for that matter, 2040 Market). Ex. 22, Kilbride Resp. to Cozen RPD at Resp. 8.

51.     Kilbride designated Berger to speak on its behalf regarding this alleged loan. Ex. 16, Kilbride Dep. (05/18/16) pp. 60:24-61:4, 65:6-66:3, 78:3-19. Berger, in his capacity as the corporate designee of Kilbride, could provide no details about the purported loan—including any associated costs, interest rate, or payback terms. Ex. 16, Kilbride Dep. (05/18/16) pp. 36:2-24, 61:18-24. Berger confirmed that Kilbride has not received any payment from him in the nearly 10 years since it wired the $12 million to Montgomery Abstract (Ex. 16, Kilbride Dep. (05/18/16) p. 54:1-10), and Kilbride has taken no active steps to collect payment from Berger, beyond informally asking him about the status of his litigation efforts. Ex. 16, Kilbride Dep. (05/18/16) pp. 54:24-55:9.

52.     Turning to the $6 million that Berger instructed Ardenlink to wire to Pine Projects

15

(Ex. 12, Ardenlink Dep. (05/19/16) pp. 17:13-18:9, 25:6-22, 26:20-23), Ardenlink wired $6 million from its bank account to Pine Projects' bank account on January 8, 2007.  Ex. 1, Berger Dep. (05/17/16) p. 163:14-24; Ex. 12, Ardenlink Dep. (05/19/16) pp. 33:9-12, 36:7-14.  While the funds originated from Ardenlink's bank account, none of the $6 million that Ardenlink sent to Pine Projects was owned by Ardenlink.  Ex. 12, Ardenlink Dep. (05/19/16) p. 34:10-15.  Instead, the entire $6 million that Ardenlink wired to Pine Projects belonged to Busystore.  Ex. 12, Ardenlink Dep. (05/19/16) pp. 18:20-20:3, 34:10-15, 36:2-14; Ex. 15, Busystore Dep. (05/18/16) pp. 61:7-62:10, 71:11-72:5, 78:16-79:20, 88:3-13.  The account records of Busystore confirm that on January 8, 2007, Ardenlink transferred $6 million (£3,115,750.12) to Pine Projects on behalf of Busystore.  Ex. 28, D-46—Busystore Account Record re: advances to Pine Projects.

53.     In connection with the $4 million that Towerstates wired at Berger's request to Pine Projects (Ex. 1, Berger Dep. (05/17/16) p. 163:14-21; Ex. 14, Towerstates Dep. (05/19/16) pp. 16:8-24, 22:13-20, 27:22-28:2), the entire $4 million wired on January 8, 2007 from Towerstates' account to Pine Projects' account were the proceeds of a loan to Busystore.  Ex. 15, Busystore Dep. (05/18/16) pp. 61:7-62:10, 64:6-12, 77:20-78:15, 87:12-88:2; Ex. 14, Towerstates Dep. (05/19/16) pp. 19:20-20:2, 32:18-33:2.  Busystore accounted for the $4 million (£2,077,166.74) that Towerstates advanced to Pine Projects on January 8, 2007 as having been made on Busystore's behalf.  Ex. 28, D-46—Busystore Account Record re: advances to Pine Projects.

## X. WEINSTEIN STEALS PLAINTIFFS' MONEY

54. Based upon Weinstein's promises, Berger caused Kilbride, Busystore, and Bergfeld to send $36.5 million to Weinstein's control to be applied to two distinct real estate deals that Berger reached with Weinstein: River City and 2040 Market. Ex. 1, Berger Dep. (05/17/16) pp. 44:18-23, 147:6-10; Ex. 13, Bergfeld Dep. (05/19/16) pp. 22:24-24:15, 29:19-31:19, 39:18-41:2; Ex. 15, Busystore Dep. (05/18/16) pp. 41:2-43:16; Ex. 19, Berger Decl. (07/20/07) ¶¶ 3, 28.

55. Instead, the monies went into the "black hole" of Weinstein's fraud. Ex. 12, Ardenlink Dep. (05/19/16) p. 75:12-24; Ex. 15, Busystore Dep. (05/18/16) pp. 67:2-10, 81:7-16. Weinstein failed to acquire title to River City (or, for that matter, 2040 Market) on behalf of the Berger-Weinstein venture. Rather Weinstein stole some or all of the funds that he received from plaintiffs. Ex. 1, Berger Dep. (05/17/16) pp. 277:22-279:3; Ex. 12, Ardenlink Dep. (05/19/16) p. 75:12-24; Ex. 19, Berger Decl. (07/20/07) ¶ 32; Ex. 20, Berger Resp. to Blank Rome RFA Resp. 24.

56. Berger repeatedly has demanded that Weinstein immediately return the entity plaintiffs' funds to him, *i.e.*, the $36.5 million that Berger caused the entity plaintiffs to wire to Weinstein's control. Ex. 19, Berger Decl. (07/20/07) ¶ 40. Initially, Weinstein indicated that he would return the full $36.5 million to Berger, upon receipt of Berger's wiring information. Ex. 4, Berger Direct (07/22/10) p. 85:9-17. True to form, Weinstein—to date—has not returned any

17

of plaintiffs' funds.  Ex. 1, Berger Dep. (05/17/16) pp. 172:5-20, 347:3-19; Ex. 4, Berger Direct (07/22/10) p. 85:18-21; Ex. 19, Berger Decl. (07/20/07) ¶ 40.

                                                Respectfully submitted,

                                                /s/John G. Harkins, Jr.

| | |
|---|---|
| William A. Harvey | John G. Harkins, Jr. (Id. No. 04441) |
| *wharvey@klehr.com* | *jharkins@harkinscunningham.com* |
| Matthew J. Borger | Dawn M. Sigyarto (Id. No. 91580) |
| *mborger@klehr.com* | *dsigyarto@harkinscunningham.com* |
| Paige M. Willan | Harkins Cunningham LLP |
| *pwillan@klehr.com* | 4000 Two Commerce Square |
| Klehr Harrison Harvey Branzburg LLP | 2001 Market Street |
| 1835 Market Street, Suite 1400 | Philadelphia PA 19103-7044 |
| Philadelphia, PA  19103 | Tel: (215) 851-6700 |
| Tel: (215) 569-2700 | Fax: (215) 851-6710 |
| Fax: (215) 568-6603 | |
| | *Attorneys for Defendant, Blank Rome LLP* |
| *Attorneys for Defendant, Cozen O'Connor, P.C.* | |

                                                and

                                                Jayne A. Risk
*jayne.risk@dlapiper.com*
Nathan P. Heller
*nathan.heller@dlapiper.com*
Justin E. Kerner
*justin.kerner@dlapiper.com*
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
Tel: (215) 656-3300
Fax: (215) 656-3301

*Attorneys for Defendant, Cushman & Wakefield of Pennsylvania, Inc.*

Dated:  April 13, 2017

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BERISH BERGER, KILBRIDE INVESTMENTS LIMITED, BUSYSTORE LIMITED IN LIQUIDATION, TOWERSTATES LIMITED, BERGFELD CO. LIMITED and ARDENLINK LIMITED,<br>　　　　　Plaintiffs,<br><br>　　v.<br><br>CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., BLANK ROME LLP and COZEN O'CONNOR, P.C.,<br>　　　　　Defendants, | Civil Action No.   2:13-CV-05195-JD |
| CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC.,<br>　　　　　Third-Party Plaintiff,<br><br>　　v.<br><br>CHAIM ZEV LEIFER,<br>CHESKY HESKEL KISH and<br>JFK BLVD ACQUISITION GP, LLC,<br>　　　　　Third-Party Defendants. | |

## **CERTIFICATE OF SERVICE**

　　　　I, Dawn M. Sigyarto, hereby certify that on this 13th day of April, 2017, I caused a true and correct copy of Defendants' Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment as to the Claims of Berish Berger, Ardenlink Limited, and Towerstates Limited for Lack of Subject-Matter Jurisdiction Based Upon Want of Standing to be served upon the following parties via ECF and electronic mail addressed to:

Mary Kay Brown, Esquire
*mkbrown@bmnlawyers.com*
Raymond McGarry, Esquire
*rmcgarry@bmnlawyers.com*
Jami B. Nimeroff, Esquire
*jnimeroff@bmnlawyers.com*
Brown McGarry Nimeroff LLC
2001 Market Street, Suite 3420
Philadelphia, PA  19103

Danielle C. Lesser, Esquire
*dlesser@morrisoncohen.com*
Brett D. Dockwell, Esquire
*bdockwell@morrisoncohen.com*
Morrison Cohen LLP
909 Third Avenue
New York, NY  10022

Andrew Teitelman
*ateitelman@teitelaw.com*
Law Offices of Andrew Teitelman P.C.
380 Red Lion Road, Suite 103
Huntington Valley, PA  19006

I also certify that a copy of the foregoing was served on the following unrepresented parties via first class mail:

Chaim Zev Leifer
16 Portland Avenue
London N16 6ET
UK

Heskel Kish
106 Lealand Road
London N15 6JT
UK

              /s/Dawn M. Sigyarto
              Dawn M. Sigyarto