**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BERISH BERGER, KILBRIDE INVESTMENTS LIMITED, BUSYSTORE LIMITED IN LIQUIDATION, TOWERSTATES LIMITED, BERGFELD CO. LIMITED and ARDENLINK LIMITED, <br><br>                   Plaintiffs, <br><br>       v. <br><br> CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., BLANK ROME LLP and COZEN O'CONNOR, P.C., <br><br>                   Defendants. | No.   13-CV-5195(JD) |
| CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., <br><br>                 Third-Party Plaintiff, <br><br>       v. <br><br> JFK BLVD. ACQUISITION, L.P., CHAIM ZEV LEIFER and HESKEL KISH, <br><br>                Third-Party <br>                Defendants. | |

**DEFENDANT COZEN O'CONNOR, P.C.'S STATEMENT OF UNDISPUTED**
**MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Cozen O'Connor, P.C. ("Cozen") hereby submits the below statement of undisputed material facts, pursuant to Federal Rule of Civil Procedure 56 and the Pretrial and Trial Procedures of the Hon. Jan E. DuBois.

1.      Cozen is a law firm with its principal office located in Philadelphia, Pennsylvania. Amended Complaint in *Berish Berger v. Cushman & Wakefield, et al,*, filed February 25, 2013, attached hereto as Exhibit 1 ("Amend. Compl.") ¶¶ 18, 24.

2.      During the years 2006 and 2007, Charles M. Naselsky ("Naselsky") worked as a real estate attorney in the city of Philadelphia, advising clients on real estate transactions.

Amend. Compl. ¶ 24.

3.　　Beginning on July 1, 2002, Naselsky was a senior member of Cozen.  Deposition Transcript of Jeffrey Leonard taken August 4, 2016[1] ("Leonard Dep. Tr.") 10:13-19, 12:14-13:1; Letter from Elaine Rinaldi to Charles Naselsky, dated June 26, 2002, bearing Bates number COZEN002669, attached hereto as Exhibit 3.

4.　　Naselsky ceased his employment with Cozen on July 28, 2006.  Amend Compl. ¶ 113; Deposition Transcript of Berish Berger, taken May 17, 2016[2] ("Berger Dep. Tr.") 238:6-11; Deposition Transcript of Charles Naselsky, taken July 27, 2016[3] ("Naselsky Dep. Tr.") 252:16-254:11; Leonard Dep. Tr. 16:24-17:2, 20:6-11.

5.　　Naselsky joined defendant Blank Rome LLP ("Blank Rome") on July 31, 2006. Naselsky Dep. Tr. 254:12-18; Deposition Transcript of Patrick Cavanaugh, taken August 4, 2016[4] ("Cavanaugh Dep. Tr.") 16:7-19, 17:23-18:2.

**Naselsky's Work On The River City Property:**

6.　　Naselsky, as a senior member of Cozen, was retained by World Acquisition Partners Corporation ("WAP") and Patriot Properties, Inc. ("Patriot") on or about March 14, 2006 to represent those parties in connection with the purchase of five contiguous parcels of land located in Philadelphia.  Naselsky Dep. Tr. 48:9-19, 49:4-10; Leonard Dep. Tr. 18:10-20:5.

7.　　In or around March 2006 through January 2007, Ravinder Chawla ("Chawla") was a principal of WAP.  Naselsky Dep. Tr. 24:15-21.  During the same time period, Richard Zeghibe ("Zeghibe") was a principal of Patriot.  Naselsky Dep. Tr. 24:16-21.

8.　　The land that WAP and Patriot intended to purchase consists of approximately 8.2

---

[1] A true and correct copy of excerpts of the deposition of Jeffrey Leonard is attached hereto as Exhibit 2.
[2] A true and correct copy of excerpts of the deposition of Berish Berger is attached hereto as Exhibit 4.
[3] A true and correct copy of excerpts of the deposition of Charles Naselsky is attached hereto as Exhibit 5.
[4] A true and correct copy of excerpts of the deposition of Patrick Cavanaugh is attached hereto as Exhibit 6.

acres, divided into five parcels located at 2001-2045 John F. Kennedy Boulevard, 2101-2145 John F. Kennedy Boulevard, 2201-2245 John F. Kennedy Boulevard, 2301-2345 John F. Kennedy Boulevard, and 60 North 23rd Street, all in the city of Philadelphia, Pennsylvania (collectively, the "River City Property").  Amend. Compl. ¶ 21.  At the time, the River City Property was owned by an entity named R&F Penn Center Associates, L.P. ("R&F Penn"). Agreement of Sale between R&F Penn Center Associates and JFK Blvd Acquisition GP LLC, dated May 12, 2006, bearing Bates numbers BERGER3000429-549, attached hereto as Exhibit 7.

9.      Naselsky formed an entity, JFK BLVD Acquisition GP, LLC ("JFK Blvd"), to serve as the purchaser of the River City Property.  Naselsky Dep. Tr. 62:16-24, 63:11-14, 64:1-5; Deposition Transcript of Andrew Teitelman, Esquire, taken August 15, 2016[5] ("Teitelman Dep. Tr.") 48:2-49:15; Email from Jenna Lampe to James Kennedy, dated March 30, 2006, bearing Bates number COZEN001262, attached hereto as Exhibit 9.

10.     Naselsky helped to draft an agreement of sale by which JFK Blvd intended to acquire ownership of the River City Property from R&F Penn for $32.5 million.  Naselsky Dep. Tr. 55:19-22, 57:14-62:10, 72:20-24, 73:18-74:11; Teitelman Dep. Tr. 18:5-10; Plaintiffs' Objections and Responses to Defendant Cozen O'Connor, P.C.'s First Set of Interrogatories, dated March 30, 2015 ("Plaintiff Interrogatories") ¶¶ 1(B), 2, attached hereto as Exhibit 10; Ex. 7.  The agreement was executed by the parties on May 12, 2006.  Ex. 7 at BERGER3000429.

11.     In or around May 2006, Naselsky was directed by an agent of his client, Craig Snider, to engage Cushman and Wakefield of Pennsylvania, Inc. ("C&W") to perform an appraisal of the River City Property on behalf of JFK Blvd.  Letter from Gerald McNamara to

_____

[5] A true and correct copy of excerpts from the deposition of Andrew Teitelman, Esquire is attached hereto as Exhibit 8.

Charles Naselsky, dated May 18, 2006, bearing Bates number BERGER-CW-00000060-62, attached hereto as Exhibit 11; Naselsky Dep. Tr. 88:4-19, 112:16-113:8; Deposition of Gerald B. McNamara, taken on June 24, 2016[6] ("McNamara Dep. Tr.") 127:13-129:15; Teitelman Dep. Tr. 102:15-103:22; Plaintiff Interrogatories ¶ 1(C).

12.     Naselsky did not select C&W to perform the appraisal.  Naselsky Dep. Tr. 89:12-19; McNamara Dep. Tr. 127:13-128:18.  Prior to the engagement for the River City Property, Naselsky had not previously worked with C&W's appraisal business.  Naselsky Dep. Tr. 89:24-90:6; McNamara Dep. Tr. 119:10-14; Deposition of Daniel J. McNeil, taken on June 27, 2016[7] ("McNeil Dep. Tr.") 327:7-15.

13.     When Naselsky left the employment of Cozen on July 28, 2006, Cozen ceased representing WAP and Patriot.  Naselsky Dep. Tr. 43:20-23; Leonard Dep. Tr. 20:6-11, 22:3-12; Cavanaugh Dep. Tr. 27:6-17.

14.     Cozen ceased all work on the acquisition of the River City Property on or before July 28, 2006.  Leonard Dep. Tr. 20:6-11, 22:3-12; Cavanaugh Dep. Tr. 27:6-13.

15.     Cozen was not retained to represent any client in the efforts of JFK Blvd, WAP, Patriot, Zeghibe, or Chawla to sell the River City Property.  Cozen O'Connor New Matter Intake form, dated March 15, 2006, bearing Bates numbers COZEN001267-70, attached hereto as Exhibit 14; Naselsky Dep. Tr. 333:19-334:22, 370:15-371:12, 382:18-383:12, 392:1-15, 445:3-447:2.

16.     Naselsky did not draft any agreement for the sale of the River City Property by JFK Blvd.  Naselsky Dep. Tr. 174:23-176:4.

17.     At the time he left Cozen on July 28, 2006, neither Naselsky nor anyone else at

---

[6] A true and correct copy of excerpts from the deposition of Gerald McNamara is attached hereto as Exhibit 12.
[7] A true and correct copy of excerpts from the deposition of Daniel McNeil is attached hereto as Exhibit 13.

Cozen had ever heard of, met, corresponded with, or had any dealings of any type with any of Plaintiffs.  Berger Dep. Tr. 223:16-225:14, 254:15-23, 261:7-13.

**WAP and Patriot Work on the River City Property:**

18.     WAP and Patriot engaged an architect named James Rappoport ("Rappoport") to develop designs for a proposed complex of buildings on the River City Property (the "River City Development").   Amend. Compl. ¶ 26; Naselsky Dep. Tr. 82:4-9; Teitelman Dep. Tr. 33:20-34:11; Plaintiff Interrogatories ¶ 6.

19.     Rappoport created numerous architectural drawings, an animated "fly-through" presentation of his proposed designs, and other promotional material concerning the River City Development.  Amend. Compl. ¶ 26; Naselsky Dep. Tr. 82:4-84:7.

20.     The Rappoport-generated designs involved ten high towers and various other structures on the River City Property, which Rappoport suggested could be used for residential, office, retail, and hotel purposes.  Amend. Compl. ¶ 1; Philadelphia River City Presentation by Daroff Design, dated August 29, 2006, bearing Bates numbers BERGER3000318-49, attached hereto as Exhibit 15.

21.     Using Rappoport's promotional material, Chawla, together with Zeghibe and Rappoport, sought investors for the River City Development and/or purchasers for the River City Property.  Teitelman Dep. Tr.  33:8-19, 44:14-45:3, 167:6-170:1, 179:5-181:11, 183:12-185:2.

22.     As part of their preparation for the various options for developing or selling the River City Property, on or about June 28, 2006 WAP and JFK Blvd prepared an agreement of sale by which JFK Blvd would sell the River City Property to WAP for $50 million.  Teitelman Dep. Tr. 41:17-43:22, 67:1-21; Agreement of Sale between JFK Blvd Acquisition GP LLC and World   Acquisition   Partners,   Inc.,   dated   June   28,   2006,   bearing   Bates   numbers

BERGER3001078-107, attached hereto as Exhibit 16.

23.     On or about June 30, 2006, WAP and JFK Blvd entered into another agreement, entitled a "Nominee Agreement," (the "June Nominee Agreement") drafted by in-house counsel for WAP, that provided for WAP ultimately to acquire ownership of the entity holding title to the River City Property for a total amount of $55 million.  Teitelman Dep. Tr. 165:1-24; Nominee Agreement between JFK Blvd Acquisition GP LLC and World Acquisition Partners, Inc., dated June 30, 2006, bearing Bates numbers BERGER3002710-20, attached hereto as Exhibit 17. WAP and JFK Blvd prepared the June Nominee Agreement to correct an error in tax treatment that would have resulted from the agreement that WAP and JFK Blvd entered into on or about June 28, 2006.  Teitelman Dep. Tr. 167:6-170:1, 312:19-313:18.

24.     Ultimately, on or around July 31, 2006 – after Naselsky left Cozen – WAP and JFK Blvd decided to enter into a joint venture with respect to the acquisition of the River City Property, rather than transfer the real estate between them.  Teitelman Dep. Tr. 161:17-164:11; Letter from Andrew Teitelman to Richard Zeghibe, dated July 31, 2006, bearing Bates number BERGER3003548, attached hereto as Exhibit 18.  Andrew Teitelman, Esq. ("Teitelman"), as in-house counsel for WAP, documented that decision through a letter dated July 31, 2006, which was countersigned by Zeghibe as the principal of JFK Blvd.  Teitelman Dep. Tr. 161:17-164:11; Ex.18 at BERGER3003548.

**C&W Appraisal of the River City Property:**

25.     C&W commenced work on appraising the River City Property in or around May 2006.  Amend. Compl. ¶ 40.

26.     C&W's work culminated in the issuance of a Complete Appraisal Report of the River City Property (the "2006 C&W Appraisal").  Amend. Compl. ¶ 46; Cushman & Wakefield

Appraisal, dated June 23, 2006, bearing Bates numbers BR000866-1012, attached hereto as Exhibit 19.

27.     The authors of the 2006 C&W Appraisal are Gerald B. McNamara ("McNamara") and Daniel J. McNeil ("McNeil").  Ex. 19 at BR000869; McNamara Dep. Tr. 266:15-18; McNeil Dep. Tr. 37:1-12, 135:2-136:2.

28.     McNamara and McNeil are MAI designated appraisers licensed in the Commonwealth of Pennsylvania.  Ex. 19 at BR000995; McNamara Dep. Tr. 12:3-5, 14:19-15:7; McNeil Dep. Tr. 10:13-11:5.

29.     Prior to commencing their work, the C&W appraisers met with Rappoport, who provided them with information concerning the project.  McNamara Dep. Tr. 122:19-125:14, 129:22-132:16; McNeil Dep. Tr. 26:10-28:8, 29:6-30:16, 328:12-18, 377:15-378:19; Email from James Rappoport to Daniel McNeil and Gerald McNamara, dated May 18, 2006, bearing Bates numbers BERGER4000802-10, attached hereto as Exhibit 20.  No one from C&W spoke to Naselsky at that time, and Naselsky did not provide C&W with materials concerning the River City Property when it commenced its work in May and June.  McNamara Dep. Tr. 122:19-123:21; McNeil Dep. Tr. 28:9-29:2, 367:2-18.

30.     C&W issued an initial draft of the 2006 C&W Appraisal on or about June 23, 2006, which appraised the property at $57 million.  Amend. Compl. ¶ 46; Naselsky Dep. Tr. 118:10-121:2; McNamara Dep. Tr. 145:1-23; McNeil Dep. Tr. 33:6-35:22; Email from Gerald McNamara to Olivia Baer, dated June 23, 2006, bearing Bates numbers BERGER-CW-00000093-234, attached hereto as Exhibit 21.

31.     The initial draft of the appraisal noted that the River City Property "is currently reported to be under a contract of sale, dated January, 2006, for a reported consideration of

$50,000,000." Teitelman Dep. Tr. 387:9-390:10; Ex. 21 at BERGER-CW-00000111.

32.     C&W received the information concerning the current agreement of sale for the River City Property from Rappoport. McNeil Dep. Tr. 307:2-19.

33.     Zeghibe and Chawla provided feedback on the June draft of the 2006 C&W Appraisal to Naselsky, and requested that Naselsky share that feedback with C&W. Naselsky Dep. Tr. 120:1-125:3, 120:21-131:14; Teitelman Dep. Tr. 391:23-392:20; Email from Ravinder Chawla to Richard Zeghibe and Charles Naselsky, dated June 24, 2006, bearing Bates numbers BERGER3003429-30, attached hereto as Exhibit 22; Email from Richard Zeghibe to Ravinder Chawla and Charles Naselsky, dated June 23, 2006, bearing Bates numbers BERGER4204305-06, attached hereto as Exhibit 23.

34.     Naselsky met with McNeil on July 10, 2006 and discussed with him certain aspects of the appraisal. Naselsky Dep. Tr. 178:10-179:15, 180:20-182:5; McNeil Dep. Tr. 50:10-51:21, 314:23-316:10; Email from Gerald McNamara to Daniel McNeil, dated July 5, 2006, bearing Bates numbers BERGER-CW-00000071-72, attached hereto as Exhibit 24; Ex. 22 at BERGER3003429-30; Ex. 23 at BERGER4204305-06. At the meeting, Naselsky discussed with McNeil the points that his clients wished him to convey to C&W. Naselsky Dep. Tr. 156:16-157:22; McNeil Dep. Tr. 50:10-51:21, 314:23-316:10. Naselsky was unaware of the Proposed Zoning Ordinance (discussed below) at that time or its alleged potential impact on the River City Development. Naselsky Dep. Tr. 265:11-266:4, 267:7-24. Likewise, McNeil was unaware of the Proposed Zoning Ordinance. McNeil Dep. Tr. 252:20-253:14. McNeil testified that, throughout the drafting of the 2006 C&W Appraisal, Naselsky provided any documents that McNeil requested from him. McNeil Dep. Tr. 329:20-331:22.

35.     C&W issued a revised draft appraisal report on July 20, 2006, appraising the

property at $77 million.   Naselsky Dep. Tr. 192:16-193:22; Email from Daniel McNeil to Charles Naselsky, dated July 20, 2006, bearing Bates numbers BERGER-CW00000235-356, attached hereto as Exhibit 25.

36.     The final version of the 2006 C&W Appraisal was issued on or about November 16, 2006, and the appraisal valued the property at $77 million.  Email from Charles Naselsky to Olivia Baer, dated November 17, 2006, bearing Bates numbers BR007938-41, attached hereto as Exhibit 26; Email from Daniel McNeil to Olivia Baer, dated November 16, 2006, bearing Bates numbers BERGER-CW-00000372-518, attached hereto as Exhibit 27; McNeil Dep. Tr. 130:14-136:5;  Naselsky Dep. Tr. 401:23-402:19, 404:6-10;  Plaintiff Interrogatories ¶ 1(c).   C&W initially misaddressed the final version of the appraisal to Cozen, rather than to Naselsky at his new firm, Blank Rome.  Ex. 26 at BR007938-41.  After Naselsky pointed out C&W's mistake, the final 2006 C&W Appraisal was readdressed to Naselsky at Blank Rome.  Ex. 19 at BR000867; Email from Daniel McNeil to Olivia Baer, dated November 16, 2006, bearing Bates numbers BERGER-CW-00000792-94, attached hereto as Exhibit 28.

37.     The final version of the 2006 C&W Appraisal also reflected a January 2006 $50 million reported contract of sale.  Teitelman Dep. Tr. 387:9-390:10; Ex. 19 at BR000884.  The final 2006 C&W Appraisal also contained the statement that the $50 million conveyance "is not occurring consistent with the recognized definition of Market Value."  Ex. 19 at BR000884.

38.     According to the appraisers, the reported $50 million purchase price was therefore "irrelevant" to the final value ascribed to the River City Property.  McNeil Dep. Tr. 308:14-310:14.

39.     The authors of the 2006 C&W Appraisal reached their own conclusions concerning the appraised value.  McNamara Dep. Tr. 319:14-323:24; McNeil Dep. Tr. 317:1-24,

334:9-335:7, 350:24-352:10, 388:18-396:8, 409:8-20, 414:18-21, 424:1-19, 425:14-18.

40.     In February 2007, C&W issued another appraisal valuing the River City Property at $77 million (the "2007 C&W Appraisal").  McNeil Dep. Tr. 290:7-291:18; Email from Daniel McNeil to Olivia Striker, dated February 26, 2007, bearing Bates numbers BERGER-CW-00001120-274, attached hereto as Exhibit 29.

41.     Prior to issuing the 2007 C&W Appraisal, C&W received a copy of the contract between JFK Blvd and R&F Penn for the purchase of the River City Property for $32.5 million. McNeil Dep. Tr. 310:2-14; Teitelman Dep. Tr. 387:9-390:10; Email from Olivia Striker to Gerald McNamara and Daniel McNeil, dated February 21, 2007, bearing Bates numbers BERGER-CW-00001025-76, attached hereto as Exhibit 30.

42.     C&W's receipt of the contract for the purchase of $32.5 million did not alter the determination of value of the River City Property contained in the 2007 C&W Appraisal. McNeil Dep. Tr. 310:2-14; Ex. 29 at  BERGER-CW-00001126.

**The Proposed Zoning Ordinance:**

43.     On April 20, 2006, at approximately the same time that Chawla and Zeghibe were working to acquire the River City Property, Philadelphia Councilman Darrell L. Clarke introduced Bill No. 060292 in the Philadelphia City Council, titled "An ordinance amending Section 14-1611 of the Philadelphia Code, entitled 'Benjamin Franklin Parkway Controls,' by providing for additional height controls in the vicinity of the Benjamin Franklin Parkway, under certain terms and conditions" (the "Proposed Zoning Ordinance").  Amend. Compl. ¶ 74; Council of the City of Philadelphia, April 20, 2006, Transcript of Stated Meeting at 44:25-

45:15.[8]

44.     The Proposed Zoning Ordinance, if enacted, would have imposed a height limitation overlay on an area bounded by Spring Garden Street, North Broad Street, Arch Street, the Ben Franklin Parkway, North 22nd Street, and Pennsylvania Avenue.  Amend. Compl. ¶ 74; Council of the City of Philadelphia, Committee on Rules, May 10, 2006, Transcript of Stated Meeting ("May 10 2006 Tr.") at 23:13-24.[9]

45.     The Proposed Zoning Ordinance, if enacted, would have restricted buildings to a height of 250 feet from grade without a variance from the zoning board.  Amend. Compl. ¶ 74; Ex. 32 at 23:19-24.

46.     As proposed on April 20, 2006, the Proposed Zoning Ordinance did not affect the River City Property.  Amend. Compl. ¶ 74; Ex. 32 at 23:19-24.

47.     On May 10, 2006, the Proposed Zoning Ordinance was amended to reduce the height limitation to 125 feet from grade.  Ex. 32 at 65:6-66:3.  It still did not affect the River City Property.  Ex. 32 at 65:6-66:3.

48.     On May 25, 2006, the Proposed Zoning Ordinance was amended to expand the territory that would be covered by the height overlay if the Proposed Zoning Ordinance were enacted.  Amend. Compl. ¶ 76; Council of the City of Philadelphia, May 25, 2006, Transcript of Stated Meeting at 101:6-102:4.[10]

49.     The additional territory that would be affected by the Proposed Zoning Ordinance as amended on May 25, 2006, if enacted, would have included two of the five parcels of the

---

[8] A true and correct copy of excerpts from the transcript of Council of the City of Philadelphia Meeting of April 20, 2006  is attached hereto as Exhibit 31.
[9] A true and correct copy of excerpts from the transcript of Council of the City of Philadelphia Meeting of May 10, 2006  is attached hereto as Exhibit 32.
[10] A true and correct copy of excerpts from the transcript of Council of the City of Philadelphia Meeting of May 25, 2006  is attached hereto as Exhibit 33.

River City Property.  Amend. Compl. ¶ 76.

50.     Naselsky did no legal work concerning the Proposed Zoning Ordinance while employed at Cozen.  Legal bills from Cozen O'Connor to World Acquisition Partners Corp, dated June 14, 2006, July 28, 2006, and August 30, 2006, bearing Bates numbers COZEN001859-79, attached hereto as Exhibit 34 at COZEN001869 and COZEN001875; Responses and Objections of Plaintiff Berish Berger to Defendant Cozen O'Connor, P.C.'s Requests for Admission, dated August 1, 2006 ("Berger Admissions") ¶ 2, attached hereto as Exhibit 35.

51.     On June 8, 2006, the Philadelphia City Council passed the Proposed Zoning Ordinance, as amended, and it was subsequently sent to the Mayor of Philadelphia for signature. Council of the City of Philadelphia, June 8, 2006, Transcript of Stated Meeting at 69:9-71:20.[11]

52.     No Cozen attorney did legal work concerning the Proposed Zoning Ordinance in connection with the River City Property.  Ex. 34 at COZEN001859; COZEN001869; COZEN001875; Berger Admissions ¶¶ 2, 4.

53.     Naselsky was not aware that the Proposed Zoning Ordinance applied to any portion of the River City Property prior to August 7, 2006.  Amend. Compl. ¶ 111; Legal bills from Blank Rome to World Acquisition Partners Corp, dated October 11, 2006, bearing Bates numbers BR000416-26, attached hereto as Exhibit 37; Berger Dep. Tr. 279:4-11; Naselsky Dep. Tr. 265:11-266:4, 267:7-24.

54.     The Blank Rome invoices for the River City Property matter show no time spent by Naselsky or any other Blank Rome attorney on the River City Property matter prior to August 7, 2006.  Ex. 37 at BR000416-26.

---

[11] A true and correct copy of excerpts from the transcript of Council of the City of Philadelphia Meeting of June 8, 2006  is attached hereto as Exhibit 36.

PHIL1 5635286v.13

55.     On August 7, 2006, Naselsky received an email from Chawla, forwarding an email to him from Zeghibe, stating that the City Council had approved the Proposed Zoning Ordinance and pointing out that it affected the River City Property.  Email from Ravinder Chawla to Charles Naselsky, dated August 7, 2006, bearing Bates numbers BR009968-71, attached hereto as Exhibit 38.  This email was the first notice Naselsky received that the Proposed Zoning Ordinance may have applied to the River City Property.  Ex. 38 at BR009968.

56.     Blank Rome's time records show that, on August 7, 2006, Naselsky engaged in the following activities in connection with the River City Property: "[t]elephone conference with R. Chawla; telephone conference with Chris in Councilman Kelly's office; review of legislation and related history; analysis on potential claims; e-mail with J. Rappoport; office conference with R. Chawla and M. Sahaya."  Ex. 37 at BR000417.

57.     On August 9, 2006, Naselsky billed 2.2 hours to the River City Property file for the following tasks: "[t]elephone conference with R. Chawla; e-mail exchange with J. Rappoport; telephone conference with A. Gottlieb, review of city record on legislation; telephone conference with R. Amengual; telephone conference with R. Zeghibe; prepare correspondence; e-mail exchange with R. Amengual."  Ex. 37 at BR000417.

58.     The Blank Rome invoices for the River City Property matter show time entries by Naselsky or other Blank Rome attorneys on every working day for the three weeks following August 7, 2006, including numerous entries concerning zoning questions.  Ex. 37 at BR000416-26.

59.     The Blank Rome invoices for the River City Property matter contain time descriptions evidencing that Naselsky emailed Blank Rome attorney Peter Kelsen on August 10, 2006 and spoke with him on August 11, 2006.  Ex. 37 at BR000417-18.

60.     The Blank Rome invoices contain an initial time entry by attorney William Kerr on August 16, 2006 that state Kerr was working on zoning issues for the River City Property on that date.  Ex. 37 at BR000418.

61.     In 2006, Kerr was a partner at Blank Rome in the real estate department, who focused his practice on zoning and land use development law.  Deposition Transcript of William F. Kerr, Jr., taken April 27, 2016 ("Kerr Dep. Tr.") 13:2-8.[12]

62.     Peter Kelsen is a partner at Blank Rome who focuses his practice on zoning, land use, and municipal law.  Deposition Transcript of Peter F. Kelsen, taken March 4, 2016 ("Kelsen Dep. Tr.") 8:7-9:5.[13]

63.     On September 14, 2006, Councilman Clarke, the sponsor of the Proposed Zoning Ordinance, moved for and received a resolution requesting that the Mayor of Philadelphia return the Proposed Zoning Ordinance to the Philadelphia City Council for further consideration.  The Proposed Zoning Ordinance was returned to the City Council.  Council of the City of Philadelphia, September 14, 2006, Transcript of Stated Meeting at 65:23-69:20.[14]

64.     The Rules Committee of the Philadelphia City Council once again considered and reported favorably on the Proposed Zoning Ordinance on November 28, 2006.  Email from Charles Naselsky to Ravinder Chawla and Richard Zeghibe, dated November 28, 2006, bearing Bates numbers BR011260-62, attached hereto as Exhibit 42; Council of the City of Philadelphia, Committee on Rules, November 28, 2006, Transcript of Stated Meeting at 136:19-138:15.[15]

65.     The Philadelphia City Council again passed the Proposed Zoning Ordinance on

---

[12] A true and correct copy of excerpts from the deposition of William F. Kerr, Jr. is attached hereto as Exhibit 39.
[13] A true and correct copy of excerpts from the deposition of Peter F. Kelsen is attached hereto as Exhibit 40.
[14] A true and correct copy of excerpts from the transcript of Council of the City of Philadelphia Meeting of September 14, 2006  is attached hereto as Exhibit 41.
[15] A true and correct copy of excerpts from the transcript of Council of the City of Philadelphia Meeting Committee on Rules of November 28, 2006  is attached hereto as Exhibit 43.

December 14, 2006.  Amend. Compl. ¶ 139; Council of the City of Philadelphia, December 14, 2006, Transcript of Stated Meeting at 86:25-88:19.[16]

66.     On January 23, 2007, the Mayor of Philadelphia signed the Proposed Zoning Ordinance into law.

**Weinstein Contracts To Purchase The River City Property:**

67.     Eli Weinstein ("Weinstein") is a member of the ultra-Orthodox Jewish community who, in 2006, lived in Lakewood, New Jersey and was purportedly a real estate investor.  Berger Dep. Tr. 60:9-61:21, 81:1-82:17.

68.     Chawla and Zeghibe first met Weinstein on August 29, 2006.  Email from Mark Sahaya to Ravinder Chawla, dated August 29, 2006, bearing Bates numbers BERGER3000923-24, attached hereto as Exhibit 45; Teitelman Dep. Tr. 176:17-178:14, 207:21-209:20.  On that date, Weinstein first expressed interest in purchasing the River City Property from JFK Blvd. Ex. 45.

69.     On or about September 26, 2006, Weinstein signed a document entitled a "Nominee Agreement," by which he agreed to purchase the entity holding title to the River City Property (the "September Nominee Agreement") for $70 million.   Amend. Compl. ¶ 27; Teitelman Dep. Tr. 33:8-13; Deposition Transcript of Anthony Argiropoulos, Esquire, taken December 9, 2015 ("Argiropoulos Dep. Tr.") 20:5-21:8, 24:4-25:21[17]; Nominee Agreement between World Acquisition Partners Corp. and Eli Weinstein, dated September 26, 2006, bearing Bates numbers BERGER4188683-700, attached hereto as Exhibit 47.

70.     Together with the September Nominee Agreement, Weinstein also executed a Contingent Promissory Note and Security Agreement, dated September 26, 2006 (the

---

[16] A true and correct copy of excerpts from the transcript of the Council of the City of Philadelphia Meeting of December 14, 2006 is attached hereto as Exhibit 44.

[17] A true and correct copy of excerpts from the deposition of Anthony Argiropoulos is attached hereto as Exhibit 46.

PHIL1 5635286v.13

"Promissory Note"), which, among other things, provided that the amount paid under the September Nominee Agreement would be adjusted based upon the amount of square feet of development available on the River City Property.  Contingent Promissory Note between Eli Weinstein and World Acquisition Partners Corp., dated September 26, 2006, bearing Bates numbers BERGER3002557-60, attached hereto as Exhibit 48.  Specifically, the Promissory Note provided that Weinstein could acquire the River City Property for $62.5 million if WAP and JFK Blvd were not able to provide the maximum amount of development expected for the River City Development.  Teitelman Dep. Tr. 247:4-251:1; Ex.48 at BERGER3002557-60.

71.    In the September Nominee Agreement, Weinstein agreed that WAP would take title to the River City Property, through JFK Blvd, as an agent for Weinstein.  Ex. 47 at BERGER4188683-700.  The September Nominee Agreement further provided that Weinstein would make an initial deposit of $2 million, followed by a deposit of $1 million, to secure the right ultimately to acquire ownership of JFK Blvd upon the payment of a total purchase price of $70 million within the next two years after JFK Blvd closed on the River City Property. Teitelman Dep. Tr. 230:8-234:19, 247:4-248:21; Ex. 47 at BERGER4188683-700.  Weinstein agreed in the September Nominee Agreement that, in the event he failed to pay the full purchase price required by that contract, then WAP would retain any monies paid by Weinstein to WAP up to that point, and that WAP or an entity that it designated would then "become the absolute legal and equitable owner" of JFK Blvd.   Teitelman Dep. Tr. 230:8-234:19; Ex. 47 at BERGER4188687.  Zeghibe approved the September Nominee Agreement on behalf of JFK Blvd.  Ex. 47 at BERGER4188696.

72.    Weinstein was represented by the Philadelphia law firm of Fox Rothschild LLP ("Fox Rothschild") in connection with his acquisition of the River City Property.  Argiropoulos

Dep. Tr. 15:21-17:13; Teitelman Dep. Tr. 210:19-211:14, 214:10-216:5, 228:14-230:6.  Anthony Argiropoulos ("Argiropoulos") headed up that representation.  Argiropoulos Dep. Tr. 13:14-16, 15:21-17:13.

73.     Weinstein engaged Fox Rothschild and Argiropoulos to represent him in connection with the River City Property in or around September 2006.  Argiropoulos Dep. Tr. 15:21-25; Responses and Objection of Plaintiff Berish Berger to Defendant Blank Rome LLP's Requests for Admission, dated August 8, 2016 (the "Berger Blank Rome Admissions") ¶ 13, attached hereto as Ex. 49.

74.     Argiropoulos and his partner at Fox Rothschild, William Martin, participated in the drafting of the September Nominee Agreement on behalf of Weinstein.  Argiropoulos Dep. Tr. 20:5-25:21, 31:19-32:16.

75.     Naselsky did not draft the September Nominee Agreement or the Promissory Note, and did not negotiate them on behalf of JFK Blvd or otherwise participate in that transaction.  Naselsky Dep. Tr. 334:23-339:19; Argiropoulos Dep. Tr. 20:5-24:3; Teitelman Dep. Tr. 210:19-211:14, 214:10-216:5, 228:14-230:6, 247:4-11.  Those agreements were prepared by WAP's in-house counsel, Teitelman.  Naselsky Dep. Tr. 334:23-339:19; Argiropoulos Dep. Tr. 20:5-24:3; Teitelman Dep. Tr. 210:19-211:14, 214:10-216:5, 228:14-230:6, 247:4-11.

76.     Naselsky was not even aware of Weinstein's existence until the fall of 2006. Naselsky Dep. Tr. 343:5-11.

77.     Naselsky never met Weinstein, and Naselsky was only present in the same location as Weinstein on one occasion, when a third party pointed out Weinstein at a political fundraiser.  Naselsky Dep. Tr. 343:5-20; Teitelman Dep. Tr. 320:16-321:3, 322:17-323:4.

78.     As of at least December 14, 2006, prior to the closing on the agreement between

R&F Penn and JFK Blvd, Weinstein was aware of the Proposed Zoning Ordinance. Argiropoulos Dep. Tr. 63:2-64:19; Email from William Martin to Eli Weinstein, dated December 14, 2006, bearing Bates numbers BERGER4213161-64, attached hereto as Exhibit 50.

79.     Weinstein's attorneys, Argiropoulos and Martin, also knew of the Proposed Zoning Ordinance as of at least December 14, 2006, prior to the closing on the real estate. Argiropoulos Dep. Tr. 63:2-64:19; Ex. 50 at BERGER4213161-64.

80.     Weinstein, Argiropoulos, and Martin met with Chawla and others at the Fox Rothschild offices in Philadelphia to discuss the Proposed Zoning Ordinance prior to December 20, 2006.  Argiropoulos Dep. Tr.  64:21-67:9.

81.     Argiropoulos testified that Weinstein was "unphased by" the Proposed Zoning Ordinance, and was "satisfied and prepared to proceed."  Argiropoulos Dep. Tr.  64:21-66:9.

**Background On Plaintiffs:**

82.     Berger is an experienced real estate investor who lives in London.  Amend. Compl. ¶ 10; Berger Dep. Tr. 15:5-24.

83.     Berger is a member of a highly conservative, ultra-Orthodox Jewish religious community.  Berger Dep. Tr. 60:9-61:21.  Berger has never conducted a business deal for the purchase of real estate outside of his home city of London in which a member of his ultra-Orthodox Jewish community was not involved.  Berger Dep. Tr. 22:11-23:1.  Berger admits that he relies upon members of his religious community vouching for the reputation and character of potential business partners when considering whether to enter into a partnership to purchase real estate outside of London.  Berger Dep. Tr. 38:23-39:16.

84.     Plaintiff Kilbride Investments Limited ("Kilbride") is a trust incorporated in Gibraltar.   Amend. Compl. ¶ 11; Deposition Transcript of Berish Berger as Corporate

Representative of Kilbride Investments Ltd., taken May 18, 2016 ("Kilbride Dep. Tr.") 12:12-18.[18]

85.     The ultimate owner of Kilbride is a discretionary trust established by Berish Berger's father for the benefit of his children.  Amend. Compl. ¶ 11; Kilbride Dep. Tr. 12:12-18, 14:17-24.

86.     Plaintiff Busystore Limited In Liquidation ("Busystore") is a United Kingdom private limited company in liquidation.  Amend. Compl. ¶ 12; Deposition Transcript of Berish Berger as Corporate Representative of Busystore Limited In Liquidation, taken May 18, 2016 ("Busystore Dep. Tr.") 12:4-10.[19]

87.     The directors of Busystore are Berish Berger, his wife, and his son.  Amend. Compl. ¶ 12; Busystore Dep. Tr. 12:13-13:3.

88.     Busystore was formed for the purpose of engaging in real estate transactions. Busystore Dep. Tr. 12:4-10.

89.     Plaintiff Towerstates Limited ("Towerstates") is a United Kingdom private limited company.  Amend. Compl. ¶ 13; Deposition Transcript of Berish Berger as Corporate Representative of Towerstates, taken May 19, 2016 ("Towerstates Dep. Tr.") 10:23-11:3.[20]

90.     The directors of Towerstates are Berish Berger, his wife, and his son.  Amend. Compl. ¶ 13; Towerstates Dep. Tr. 11:19-13:6.

91.     Towerstates operates in the real estate business.  Towerstates Dep. Tr. 11:10-12.

92.     Plaintiff Ardenlink Limited ("Ardenlink") is a United Kingdom private company.

---

[18] A true and correct copy of excerpts from the deposition of Berish Berger as Corporate Representative of Kilbride Investments Ltd. is attached hereto as Exhibit 51.

[19] A true and correct copy of excerpts from the deposition of Berish Berger as Corporate Representative of Busystore Limited in Liquidation is attached hereto as Exhibit 52.

[20] A true and correct copy of excerpts from the deposition of Berish Berger as Corporate Representative of Towerstates is attached hereto as Exhibit 53.

Amend. Compl. ¶ 15; Deposition Transcript of Berish Berger as Corporate Representative of Ardenlink, taken May 19, 2016 ("Ardenlink Dep. Tr.") 11:23-12:7.[21]

93.     The directors of Ardenlink are Berish Berger, Pessie Berger, and Getzel Berger. Ardenlink Dep. Tr. 12:17-24, 13:12-22.

94.     Plaintiff Bergfeld Co. Limited ("Bergfeld") is a United Kingdom private limited company.     Amend. Compl. ¶ 14; Deposition Transcript of Berish Berger as Corporate Representative of Bergfeld, taken May 19, 2006 ("Bergfeld Dep. Tr.") 10:11-16.[22]

95.     The officers and directors of Bergfeld are Berger's siblings.  Bergfeld Dep. Tr. 11:1-13:20.

96.     Bergfeld is engaged in the real estate business.  Bergfeld Dep. Tr. 10:11-21.

97.     Each of the entity Plaintiffs is therefore, directly or indirectly, owned and/or controlled by Berger, or by members of his family.

**Plaintiffs' Relationship To Cozen & Naselsky:**

98.     Berger was never a client of Cozen.  Berger Dep. Tr. 223:17-224:1.

99.     None of the entity Plaintiffs were ever clients of Cozen.  Berger Dep. Tr. 223:17-224:1.

100.     In fact, Berger testified that, as of December 2006, he had never even heard of Cozen or Naselsky.  Berger Dep. Tr. 254:15-23, 261:7-20.

101.     Berger was never a client of Blank Rome.  Berger Blank Rome Admissions ¶ 27.

102.     Berger never met or spoke to Naselsky in 2006 or 2007.  Berger Dep. Tr. 261:7-20; Berger Admissions ¶¶ 9, 10; Berger Blank Rome Admissions ¶¶ 31, 32.

---

[21] A true and correct copy of excerpts from the deposition of Berish Berger as Corporate Representative of Ardenlink is attached hereto as Exhibit 54.
[22] A true and correct copy of excerpts from the deposition of Berish Berger as Corporate Representative of Bergfeld is attached hereto as Exhibit 55.

PHIL1 5635286v.13

103.    Nor did Berger ever speak to anyone who worked for Cozen in 2006 or 2007.
Berger Dep. Tr. 224:11-225:14.

104.    No representative of any of the entity Plaintiffs spoke to anyone who worked for
Cozen in 2006 or 2007.  Kilbride Dep. Tr. 63:4-20.  Berger Dep. Tr. 224:11-225:14; Towerstates
Dep. Tr. 43:13-19; Ardenlink Dep. Tr. 40:15-41:6; Bergfeld Dep. Tr. 87:3-22; Berger
Admissions ¶ 10.

**Plaintiffs' Involvement with Weinstein and River City:**

105.    Berger met Weinstein for the first time in November 2006.  Amend. Compl.
¶ 131; Berger Dep. Tr. 86:3-14, 90:17-24, 92:2-93:19; Berger Admissions ¶ 8; Berger Blank
Rome Admissions ¶ 1.

106.    An individual named Chaim Leifer ("Leifer") introduced Berger to Weinstein.
Berger Dep. Tr. 61:23-62:11; Deposition Transcript of Chaim Zev Leifer, taken January 10,
2017 ("Leifer Dep. Tr.") 92:19-98:6.[23]

107.    Leifer is a member of Berger's ultra-Orthodox Jewish religious community.
Berger Dep. Tr. 61:23-63:5; Leifer Dep. Tr. 94:2-19; Berger Blank Rome Admissions ¶ 1.

108.    Weinstein visited Berger's home in London on November 16, 2006, and
discussed Berger's possible participation with Weinstein in real estate deals in Philadelphia.
Berger Dep. Tr. 85:20-86:14, 92:12-94:12.

109.    In late November or early December 2006, Leifer followed up with Berger to
invite him to a meeting in Philadelphia concerning opportunities to partner with Weinstein in
Philadelphia real estate investments.  Amend. Compl. ¶ 131; Berger Dep. Tr. 98:16-101:5; Leifer
Dep. Tr. 116:25-117:8.

---

[23] A true and correct copy of excerpts from the deposition of Chaim Leifer is attached hereto as Exhibit 56.

110.    Berger attended a meeting at Rappoport's office in Philadelphia on December 6, 2006 (the "December 6 Meeting").  Amend. Compl. ¶ 132; Berger Dep. Tr. 101:9-18.

111.    Along with Berger, Weinstein, Leifer, and Chawla attended the December 6 Meeting.  Amend. Compl. ¶ 132; Berger Dep. Tr. 101:9-18.

112.    The December 6 Meeting was the first time that Berger or any of the Plaintiffs had heard of the River City Property or the River City Development.  Berger Dep. Tr. 105:16-19.

113.    At the December 6 Meeting, Rappoport gave a presentation concerning the River City Development.   Amend. Compl. ¶ 132; Berger Dep. Tr. 102:21-103:15; Leifer Dep. Tr. 116:17-24.

114.    Rappoport was the only person who gave any presentation during the December 6 Meeting.  Berger Dep. Tr. 123:3-6.

115.    Neither Naselsky, nor any representative of Cozen or Blank Rome, attended the December 6 Meeting.  Berger Admissions ¶¶ 11, 12; Naselsky Dep. Tr. 440:12-441:5; Berger Dep. Tr. 272:5-14.

116.    Weinstein sent a fax to Berger following the December 6 Meeting.  Berger Dep. Tr. 117:9-119:18; Handwritten Notes from Eli Weinstein, undated, bearing Bates numbers BERGER3008217-19, attached hereto as Exhibit 57.  This document is the only writing related to Berger's relationship with Weinstein.  Besides the fax cover page, the document is a two-page handwritten document.  Ex. 57.  One page is devoted to a different Philadelphia property, 2040 Market Street.  Ex. 57 at BERGER3008218.  The single page devoted to the River City Property states that the project is ten acres of land, with a proposal for eight to fourteen million square feet of mixed use development for residential, hotel, and commercial use.   Ex. 57 at BERGER3008219.  Apparently related to the zoning, it states "AS OF RIGHT".  Ex. 57 at

BERGER3008219.  The fax goes on to state that the purchase price is $62.5 million based on 8 million square feet of development, with increases if there is additional development.  Ex. 57 at BERGER3008219.  The fax further contains the statement that the purchase price plus closing costs will be financed by $11 million of "equity" plus a non-recourse loan for $51.5 million.  Ex. 57 at BERGER3008219.  The fax also mentions that closing costs could be up to $3 million, and that closing was scheduled for December 18, 2006 and could not be extended.  Ex. 57 at BERGER3008219.  The fax was silent on how much money Berger was to put up or what his interest would be in the River City Property following closing.  *See generally* Ex. 57.

117.   Following the December 6 Meeting, Berger also received a copy of the C&W 2006 Appraisal from Leifer, who received it by fax from Weinstein.  Amend. Compl. ¶ 138; Berger Dep. Tr. 127:8-128:11; Leifer Dep. Tr. 137:5-138:4.  The copy of the C&W appraisal that Berger received was the final appraisal issued in November 2006 that had been misaddressed to Naselsky at Cozen, although Naselsky had already left Cozen to join Blank Rome.  Berger Dep. Tr. 191:13-17, 207:23-208:14; Ex. 28.

118.   When Berger appeared hesitant to invest in the River City Property, Leifer and Weinstein arranged for at least one individual from their religious community, Rabbi Kleinman of Lakewood, New Jersey, to contact Berger to vouch for Weinstein and encourage Berger to commit to the River City Property deal.  Berger Blank Rome Admissions ¶ 12; Leifer Dep. Tr. 143:1-145:17.

119.   Berger did not retain an attorney to represent him or the Plaintiff entities in connection with the River City Property until January 19, 2007.  Berger Blank Rome Admissions ¶ 14.

120.   Based solely on the information imparted to him in Rappoport's office, the one-

page fax to him from Weinstein, a review of the 2006 C&W Appraisal, and his meetings with Weinstein fortified by the recommendation as to Weinstein by others of his ultra-Orthodox faith, Berger decided to go ahead with the transaction.  Berger Dep. Tr. 340:21-343:7.

**Closing On The Property And Initial Wire Transfer:**

121.    On or about December 18, 2006, at Berger's direction, Kilbride wired $12,000,000 (twelve million dollars) to Montgomery Abstract Company.  Amend. Compl. ¶ 140. Berger understood that Montgomery Abstract was closing the title to a transaction in which he and Weinstein would acquire control over the River City Property.  Berger Dep. Tr. 274:21-275:21.

122.    On or about December 19, 2006, Weinstein signed a new Nominee Agreement with JFK Blvd, which corrected certain items in the September Nominee Agreement, but left in place the same financial structure pursuant to which Weinstein would take title to the entity owning the River City Property (the "Nominee Agreement").  Teitelman Dep. Tr. 265:1-274:1; Nominee Agreement between Eli Weinstein and JFK Blvd Acquisition Partners, L.P. dated December 19, 2006, bearing Bates numbers BERGER3008737-50, attached hereto as Exhibit 58. JFK Blvd was substituted in for WAP by WAP's in-house counsel for liability reasons related to the holding of the River City Property, but the purchase price remained at $70 million. Teitelman Dep. Tr. 267:17-270:6; Ex. 58 at BERGER3008737-50.  Weinstein did not sign a revised version of the Promissory Note.  Teitelman Dep. Tr. 272:18-274:1.  Weinstein still did not disclose the Nominee Agreement to Berger.  Berger Dep. Tr. 325:20-326:13.

123.    Berger understood from Weinstein that, through the December 18, 2006 wire, they were funding a transaction that would result, at closing, in the transfer of ownership of the corporation that held title to the River City Property, JFK Blvd, to Weinstein and Berger directly

from R&F Penn.   Berger Dep. Tr. 274:21-276:2, 323:13-324:3, 326:14-327:3.   Berger understood that he would own an 80% interest in that entity, and that Weinstein would own 20%. Berger Dep. Tr. 274:21-276:2.   Berger believed that the purchase price for the River City Property was $62.5 million, and that Weinstein had advanced approximately $2 million of his own funds.   Berger Dep. Tr. 326:14-327:3; Ex.57 at BERGER3008219.

124.   In fact, closing on the sale of the River City Property from R&F Penn to JFK Blvd occurred on December 20, 2006, two days after the originally scheduled closing on December 18, 2006.   Ex. 57; HUD Settlement Statement, dated December 21, 2006, bearing Bates number BR017215-16, attached hereto as Exhibit 59.   Montgomery Abstract served as the title insurance company handling the transaction.   Ex. 59.

125.   At the closing, JFK Blvd took title to the River City Property.   Ex. 59.   The seller, R&F Penn, received $23,289,734.07 of additional cash at closing, based on a contract sale price of $32.5 million.   Ex. 59 at BR017215.   Including settlement charges and taxes, JFK Blvd paid a total of $35,663,471.45 for the River City Property.   Ex. 59 at BR017215.   The $35.6 million paid by JFK Blvd came from the following sources: $2.2 million paid in deposits on behalf of JFK Blvd by WAP and Patriot; $20 million from a loan made by Kennedy Funding, Inc. ("Kennedy Funding"), $1.4 million in cash at closing, paid by JFK Blvd, and $12 million that Weinstein caused to be wired by Berger.   Ex. 59 at BR017215.   Weinstein did not advance any funds of his own.   Ex. 59 at BR017215.

126.   As Weinstein had not paid the full purchase price of $70 million pursuant to the Nominee Agreement, he did not take ownership of JFK Blvd at the December closing, and Berger acquired no interest in that entity.   Teitelman Dep. Tr. 278:3-279:18, 370:14-372:20; Ex. 58 at BERGER3008737-50.

PHIL1 5635286v.13

**Weinstein Requests For Money And Further Wire Transfers:**

127.    On or about January 1, 2007, Weinstein again met with Berger in London, at which time Weinstein told Berger that he needed more money for the River City Property (the "January 1 Meeting").  Berger Dep. Tr. 159:17-160:24; Leifer Dep. Tr. 243:8-24.

128.    Chawla and Zeghibe did not attend the January 1 Meeting.  Berger Dep. Tr. 160:5-10.

129.    Neither Naselsky, nor any representative of Cozen or Blank Rome, attended the January 1 Meeting.  Berger Dep. Tr. 160:5-10.

130.    At the January 1 Meeting, Weinstein represented to Berger that a closing had occurred on the River City Property, but that more money was needed because "the bank didn't come up with the entirety of the money envisioned.  There was two years of interest rates that they had held back."  Berger Dep. Tr. 160:14-19.

131.    Weinstein also represented to Berger, at the January 1 Meeting, that additional money was needed for the River City Property, because there were "additional closing costs of $3.9 million."  Berger Dep. Tr. 160:14-19.

132.    At the January 1 Meeting, Weinstein requested that Berger wire additional funds for the River City Property to cover the additional expenses he claimed occurred in connection with the purported closing.  Berger Dep. Tr. 159:17-160:19.

133.    Following the January 1 Meeting and prior to wiring money in connection with Weinstein's requests, Berger did not request any documentation from anyone concerning Weinstein's representations that a bank lending money for the purchase of the River City Properties had held back two years of interest, or that an additional $3.9 million in closing costs had been incurred.  Berger Admissions ¶¶ 20, 22, 23, 28, 30, 31.

134.    Nor did Berger, an experienced real estate investor, request a copy of the closing statement to see how the alleged shortage in funds was covered in order to complete the closing. *See* Berger Admissions ¶¶ 20, 22, 23, 28, 30, 31.

135.    On January 8, 2007, Towerstates wired $4,000,00 to Pine Projects, LLC ("Pine Projects").  Amend. Compl. ¶ 143; Towerstates Dep. Tr. 16:16-21, 17:14-18:9.  In January 2007, Weinstein was the principal of Pine Projects.  Berger Dep. Tr. 66:8-14.

136.    On January 8, 2007, Ardenlink wired $6,000,000 to Pine Projects.  Amend. Compl. ¶ 143; Ardenlink Dep. Tr. 23:4-21.

137.    On January 19, 2007, Bergfeld wired $5,000,000 to Pine Projects.  Amend Compl. ¶ 144; Bergfeld Dep. Tr. 24:19-25:13, 26:1-9.

138.    All of the money that was wired in January 2007 by Plaintiffs was wired directly to Weinstein's custody and control.  Amend Compl. ¶¶ 143, 144; Berger Blank Rome Admissions ¶ 24.

139.    None of the money that was wired in January 2007 by Plaintiffs to Pine Projects was ever used for the River City Property or the River City Development.  Berger Dep. Tr. 277:22-278:9; Berger Blank Rome Admissions ¶ 24; Teitelman Dep. Tr. 282:14-284:1.

140.    All of the money that was wired in January 2007 by Plaintiffs to Pine Projects was misappropriated by Weinstein and used for other things not related to the River City Property or the River City Development.  Berger Blank Rome Admissions ¶ 24; Teitelman Dep. Tr. 282:14-284:1.

141.    Plaintiffs never received an 80% partnership interest in the entity owning the River City Property, as Weinstein led Berger to believe that they would.  Berger Dep. Tr. 274:21-275:9; Berger Admissions ¶ 17.

**Weinstein Criminal Proceedings:**

142.     Berger has referred to Weinstein, in sworn testimony, as a "thief" and stated that the conflict between him and Weinstein "was a simple police situation."   Berger Dep. Tr. 178:17-179:2, 250:15-252:7.

143.     Berger met with the Federal Bureau of Investigation at some point in early 2007 to discuss Weinstein's activities.  Berger Dep. Tr. 179:19-180:23.

144.     On October 27, 2011, an indictment was filed in the United States District Court for the District of New Jersey, charging that Weinstein committed conspiracy to commit wire fraud, wire fraud, bank fraud, and transacted in criminal proceeds.  Indictment in *United States v. Weinstein*, No. 11-CR-00701 (D.N.J.) (the "Weinstein Indictment"), attached hereto as Exhibit 60.

145.     The Weinstein Indictment charged that Weinstein and others "orchestrated and executed a real estate investment fraud scheme, pursuant to which they raised funds from victims for specific real estate transactions and used material portions of the raised funds for other purposes without disclosing those diversions of funds to victims."  Ex. 60 at ¶ 2.

146.     Berger was listed in the Weinstein Indictment, among many others, as a victim of Weinstein's crimes.  Ex. 60 at ¶ 43-48.

147.     The Weinstein Indictment states that all but $12 million of Berger's funds were misappropriated by Weinstein for "other uses."  Ex. 60 at ¶ 45.

148.     On or about January 3, 2013, Weinstein accepted a plea agreement in which he pleaded guilty to certain of the crimes charged in the Weinstein Indictment.  Second Amended Judgment in *United States v. Weinstein*, No. 11-CR-00701 (D.N.J.), attached hereto as Exhibit 61.

PHIL1 5635286v.13

149.    Weinstein was sentenced to 264 months incarceration for the crimes in the Weinstein Indictment to which he pleaded guilty.  Ex. 61.

150.    In September 2014, Weinstein pleaded guilty to an additional fraud in which he offered investors the opportunity to purchase large blocks of Facebook shares in advance of the company's May 2012 initial public offering.  Indictment, *United States v. Weinstein*, No. 14-CR-00219 (D.N.J.) ¶¶ 1, 11-13, attached hereto as Exhibit 62; Plea Agreement, *United States v. Weinstein*, No. 14-CR-00219 (D.N.J.), attached hereto as Exhibit 63.  In that scheme, Weinstein again did not use his investors' money to purchase Facebook stock, but rather misappropriated it to pay for lawyers and experts representing him in his then-pending civil and criminal matters. Ex. 62 at ¶ 15.

151.    On December 16, 2014, Weinstein was sentenced to an additional 24 months incarceration in connection with the Facebook fraud committed in 2012.  Amended Judgment at 3, *United States v. Weinstein*, No. 14-CR-00219 (D.N.J.), attached hereto as Exhibit 64.

**Prior Litigation:**

152.    Berger, as the sole plaintiff, filed a lawsuit against Weinstein and Chawla in the United States District Court for the Eastern District of Pennsylvania on or about March 13, 2007 ("Berger I").  Complaint, *Berger v. Weinstein, et al.*, No. 07-CV-0994 (E.D. Pa.), attached hereto as Exhibit 65.

153.    On or about May 21, 2007, Berger filed an amended complaint in Berger I, adding Anthony Argiropoulos, 2040 Market Associates, LP, JFK Blvd Acquisition Partners, L.P., UBS Real Estate Securities, Inc., Mark Sahaya, Pine Projects, LLC, and Montgomery Abstract as defendants.  Amended Complaint in *Berger v. Weinstein, et al.*, No. 07-CV-0994 (E.D. Pa.), attached hereto as Exhibit 66.

154.    The Court dismissed Berger I on the grounds that Berger lacked standing to pursue the claims individually.

155.    On or about August 20, 2008, the Plaintiffs herein then filed a lawsuit against Weinstein, Chawla, Mark Sahaya, 2040 Market Associates, L.P., Pine Projects LLC, and World Acquisition Partners ("Berger II") in the Eastern District of Pennsylvania.  Complaint, *Berger, et al. v. Weinstein, et al.*, No. 08-CV-04059 (E.D. Pa.), attached hereto as Exhibit 67.

156.    Plaintiffs filed an additional complaint on or about December 18, 2008 against Richard Zeghibe, Patriot Parking, Inc., James Rappoport, DDI Architects, P.C., Daroff Design, Inc., Daroff Design Inc + DDI Architects, P.C., and Jatinder Chawla ("Berger III").  Complaint in *Berger, et al. v. Zeghibe, et al.*, No. 08-5861 (E.D. Pa.), attached hereto as Exhibit 68.

157.    The Berger II litigation was consolidated for trial with the Berger III litigation (the "Prior Litigation").  Ex. 68.

158.    Neither Naselsky, nor Cozen or Blank Rome, were defendants in the Prior Litigation.  Ex. 68.

159.    C&W was also not a defendant in the Prior Litigation.  Ex. 68.

160.    The Prior Litigation involved Berger's claims that he was defrauded not only in connection with the River City Property, but also with respect to another property in Philadelphia, 2040 Market Street.  Ex. 68.

161.    Rappoport and Daroff Designs settled prior to the jury's verdict in the Prior Litigation.  Berger Dep. Tr. 271:21-272:2.

162.    On July 30, 2010, after a trial, a jury issued a verdict in the Prior Litigation (the "Jury Verdict") in the total amount of $33 million.  *See generally* transcript of Civil Jury Trial, *Berger, et al. v. Zeghibe, et al.*, No. 08-5861 (E.D. Pa.) (July 30, 2010) (the "July 30 Tr."),

PHIL1 5635286v.13

attached hereto as Exhibit 69.

163.    In the Jury Verdict, Chawla and WAP were found not to be liable for fraud against Plaintiffs.  July 30 Tr. at 5:18-22, 6:2-4.

164.    In the Jury Verdict, Weinstein and Pine Projects were found liable for fraud against Plaintiffs.  July 30 Tr. at 5:18-24, 6:5-6.

165.    Weinstein and Pine Projects were also found liable for conspiracy to defraud Plaintiffs.  July 30 Tr. at 5:18-20, 6:5-6.  Chawla and WAP were similarly found liable for conspiracy to defraud Plaintiffs.  July 30 Tr. at 6:7-22.

166.    Zeghibe was found not liable for conspiracy to defraud Plaintiffs.  July 30 Tr. at 6:7-22.

167.    The jury in the Prior Litigation found that Berger entered into a partnership with Weinstein.  July 30 Tr. at 12:24-13:2.

168.    In the Jury Verdict, Weinstein was found to have breached his contract with JFK Blvd, and the jury assessed $900,000 in damages against Weinstein for that claim.  July 30 Tr. at 15:10-13.

169.    The jury in the Prior Litigation assigned the following percentages of liability for Plaintiffs' damages (July 30 Tr. at 9:20-10:24):

- Weinstein: seventy percent (70%);

- Pine Projects: twenty percent (20%);

- Chawla: five percent (5%);

- WAP five percent (5%).

170.    The jury in the Prior Litigation found JFK Blvd, Zeghibe and Patriot Parking, Inc. zero percent (0%) liable for Plaintiffs' damages.  July 30 Tr. at 9:20-10:24.

PHIL1 5635286v.13

171.    The jury also found Rappoport and Daroff Design, Inc. zero percent (0%) liable for Plaintiffs' damages.  July 30 Tr. at 9:20-10:24.

172.    The jury in the Prior Litigation assessed punitive damages in the amount of $1 million against Weinstein and $50,000 against Pine Projects.  July 30 Tr. at 11:1-12:8.

173.    The jury in the Prior Litigation assessed no punitive damages against WAP, Chawla, or Zeghibe. July 30 Tr. at 11:1-12:8.

174.    Plaintiffs recovered $3.7 million a confidential sum from Rappoport in the settlement arising from the Prior Litigation.  Berger Dep. Tr. 271:21-272:2;

175.    Any recovery in the above-captioned litigation must be net of the Rappoport settlement.  Amend. Compl. ¶ 146.

**Naselsky Criminal Conviction:**

176.    Naselsky was indicted by a federal grand jury on September 7, 2010 for nine counts including tax evasion, filing a false tax return, wire fraud, aiding and abetting wire fraud, obstruction of justice, and aiding and abetting obstruction of justice.  Naselsky Dep. Tr. 33:10-34:1; Indictment, *United States v. Naselsky*, No. 10-CR-00577 (E.D. Pa.) (the "Naselsky Indictment"), attached hereto as Exhibit 70.

177.    As set forth in the Naselsky Indictment, Naselsky was charged with instructing clients of Cozen to pay him directly rather than through Cozen, thereby concealing income in the amount of approximately $380,000 from both Cozen and the Internal Revenue Service ("IRS"). Ex. 70 at 1-2.

178.    A company called Sant Properties was among the clients that Naselsky instructed to pay him directly instead of through Cozen.  Naselsky Dep. Tr. 35:7-40:16.

179.    Sant Properties sent Naselsky a check for $150,000 in September 2005, which

Naselsky did not report to Cozen or to the IRS.  Naselsky Dep. Tr. 35:18-40:17; Check to the Order of Charles Naselsky from Sant Properties, dated September 21, 2005, bearing Bates number COZEN011479, attached hereto as Exhibit 71.

180.    Sant Properties sent Naselsky a second check for $40,000 in November 2005, which Naselsky did not report to Cozen or to the IRS.  Naselsky Dep. Tr. 35:18-40:17; Check to the Order of Charles Naselsky from Sant Properties, dated November 18, 2005, bearing Bates number COZEN011477, attached hereto as Exhibit 72.

181.    Hardeep Chawla, Chawla's brother, was a partner in Sant Properties.  Naselsky Dep. Tr. 25:2-16.

182.    The payments made by Sant Properties in September and November 2005 related to two real estate transactions in which Naselsky and Sant Properties participated, involving property located at 1401 Arch Street and 1500 Walnut Street, both in Philadelphia.  Naselsky Dep. Tr. 37:18-38:15.  Neither of the payments related to the River City Property.  Naselsky Dep. Tr. 37:18-38:15.

183.    Naselsky also received a total of $90,000 in payments from Sant Properties and from WAP from August 2006 through January 2007, after he was already a partner at Blank Rome.  Naselsky Dep. Tr. 44:4-45:12.  Those funds were also initially not reported to Blank Rome, although they ultimately were disclosed.  Naselsky Dep. Tr. 45:13-46:8.

184.    After a trial, Naselsky was found guilty on all counts by a jury, and sentenced to seventy months of imprisonment and three years of supervised release.  Judgment at 1-3, *United States v. Naselsky*, No. 10-CR-00577 (E.D. Pa.), attached hereto as Exhibit 73; Naselsky Dep. Tr. 46:9-15.

185.    Naselsky was ordered to pay $290,000 in restitution to Cozen as a result of his

conviction.  Ex. 73 at 5.

Dated: Philadelphia, Pennsylvania          KLEHR HARRISON HARVEY BRANZBURG LLP
        April 17, 2017

                             By:   */s/ William A. Harvey*
                                      William A. Harvey
                                    Matthew J. Borger
                                    Paige M. Willan
                                    1835 Market Street, 14th Floor
                                    Philadelphia, PA 19103
                                    (215) 569-2700
                                    wharvey@klehr.com
                                    mborger@klehr.com
                                    pwillan@klehr.com

                                    *Attorneys for Defendant Cozen O'Connor, P.C.*

PHIL1 5635286v.13

## <u>CERTIFICATE OF SERVICE</u>

I, Paige M. Willan, hereby certify that, on April 17, 2017, I caused a true and correct copy of the foregoing Defendant Cozen O'Connor, P.C.'s Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment to be served on counsel for Plaintiffs, counsel for defendants Cushman & Wakefield of Pennsylvania, Inc. and Blank Rome LLP, and on counsel for third-party defendant JFK Blvd Acquisition, L.P. via this court's electronic filing system, and via first-class mail on third-party defendants Chaim Zev Leifer and Heskel Kish:

> Morrison Cohen LLP
> Attn: Danielle C. Lesser & Brett D. Dockwell
> 909 Third Avenue
> New York, New York, 10022
> dlesser@morrisoncohen.com, bdockwell@morrisoncohen.com

> Brown McGarry Nimeroff LLC
> Attn: Mary Kay Brown, Jami Nimeroff
> Two Commerce Square, 2001 Market Street
> Philadelphia, Pennsylvania 19103
> mkbrown@bmnlawyers.com, jnimeroff@bmnlawyers.com

> *Attorneys for Plaintiffs*

> DLA Piper LLP
> Attn: Jayne Anderson Risk, Nathan Heller
> One Liberty Place
> 1650 Market Street
> Philadelphia, PA  19103
> jayne.risk@dlapiper.com, nathan.heller@dlapiper.com

> *Attorneys for Defendant Cushman & Wakefield of Pennsylvania, Inc.*

> Harkins Cunningham LLP
> Attn: John G. Harkins, Jr., Dawn M. Sigyarto
> 4000 Two Commerce Square
> 2001 Market Street
> Philadelphia, PA  19103-7044
> jharkins@harkinscunningham.com, dsigyarto@harkinscunningham.com

> *Attorneys for Defendant Blank Rome LLP*

> Law Offices of Andrew Teitelman P.C.

Attn: Andrew Teitelman
380 Red Lion Road, Suite 103
Huntington Valley, PA 19006

*Attorneys for Third-Party Defendant JFK Blvd. Acquisition, L.P.*

Chaim Zev Leifer
16 Portland Avenue
London N16 6ET
United Kingdom

Heskel Kish
106 Leland Road
London N15 6JT
United Kingdom

*/s/ Paige M. Willan*
Paige M. Willan

PHIL1 5635286v.13