# EXHIBIT 5

CHARLES  M.  NASELSKY

Page 1

IN  THE  UNITED  STATES  DISTRICT  COURT
EASTERN  DISTRICT  OF  PENNSYLVANIA
-  -  -

BERISH BERGER,          :   CIVIL ACTION NO.
KILBRIDE INVESTMENTS :   2:13-CV-05195-JD
LIMITED, BUSYSTORE    :
LIMITED IN            :
LIQUIDATION,          :
TOWERSTATES LIMITED,  :
BERGFELD CO. LIMITED  :
and ARDENLINK         :
LIMITED               :
                      :
        vs.           :
                      :
CUSHMAN & WAKEFIELD   :
OF PENNSYLVANIA,      :
INC., BLANK ROME LLP  :
and COZEN O'CONNOR,   :
P.C.                  :
                      :
        vs.           :
                      :
CHAIM ZEV LEIFER,     :
CHESKY FIESKEL KISH,  :
and JFK BLVD          :
ACQUISITION GP, LLC   :
                -  -  -

WEDNESDAY, JULY 27, 2016
                -  -  -

VIDEOTAPE DEPOSITION OF
CHARLES M. NASELSKY, taken pursuant to
notice, was held at the law offices of Blank
Rome LLP, The Chrysler Building, 405
Lexington Avenue, New York, NY 10174,
commencing at 9:58 a.m., before Kimberly S.
Gordon, a Registered Professional Reporter,
Certified Court Reporter and Notary Public.

                -  -  -

ELITE LITIGATION SOLUTIONS, LLC
1518 Walnut Street, Suite 300
Philadelphia, Pennsylvania 19102
www.elitelsllc.com ~ (215) 563-3703

CHARLES M. NASELSKY

Page 24

1    interest for myself to be on my own.

2       Q.    Are you familiar with Ravinder

3    Chawla, also known as Ravi Chawla?

4       A.    I am.

5       Q.    How are you familiar with Mr. Chawla?

6       A.    He was a client of the various law

7    firms that you mentioned.

8       Q.    Are you familiar with an entity

9    called World Acquisition Partners

10   Corporation?

11      A.    I am.

12      Q.    How so?

13      A.    They -- it was a client of some of

14   the firms you mentioned.

15      Q.    And is there a connection between

16   Ravi Chawla and World Acquisition Partners

17   Corporation?

18      A.    I believe that he might be an

19   officer, might have equity.  I don't know

20   exactly his relationship.  But he was, he was

21   the spokesman for the company.

22      Q.    You didn't understand him to be the

23   sole owner of World Acquisition Partners

24   Corporation?

CHARLES M. NASELSKY

Page 25

1    A.    I did not, I did not know that.

2    Q.    Are you familiar with Hardeep Chawla?

3    A.    I am.

4    Q.    How so?

5    A.    He's Ravi's brother.

6    Q.    Are you familiar with an entity

7    called Sant Properties?

8    A.    I am.

9    Q.    How so?

10   A.    It was a client of the various firms

11   you mentioned.

12   Q.    Is there a connection between Hardeep

13   Chawla and Sant Properties?

14   A.    I think -- I take, I'm taking a

15   guess, but I believe he's a partner in Sant

16   Properties.

17   Q.    Did you ever represent either Ravi

18   Chawla, Hardeep Chawla, World Acquisition

19   Partners or Sant Properties?

20   A.    Yes.

21   Q.    Can you tell me when the first time

22   was that you represented any of those

23   individuals or entities?

24   A.    It occurred in and around -- I cannot

CHARLES M. NASELSKY

Page 33

1           facility between prison and the real
2           world.  It's -- you live in a
3           restricted environment subject to
4           rules.

5                 It's all common -- there's no
6           common -- it's all common facilities.
7           You have your own room you share with
8           somebody.

9     BY MS. BROWN:
10    Q.    On September 7, 2010, you were
11    indicted by a grand jury in a nine-count
12    indictment, correct?
13    A.    Yes.
14    Q.    And that indictment contained counts
15    for tax evasion, for filing a false tax
16    return, for wire fraud, for aiding and
17    abetting wire fraud, for obstruction of
18    justice, and for aiding and abetting
19    obstruction of justice, correct?
20    A.    I take your word on that.  I'd have
21    to see the indictment to confirm it.
22    Q.    I'm happy to show it to you if you
23    need to --
24    A.    If you say that's what's in the

CHARLES M. NASELSKY

Page 34

1   indictment, I'll accept it.

2      Q.    The government alleged that during

3   the time period 2005 and 2006 you defrauded

4   your employer Cozen O'Connor, correct?

5      A.    That's the allegation, correct.

6      Q.    The government alleged that by doing

7   so you directed firm clients to pay you for

8   legal services knowing that those payments

9   belonged to the law firm, correct?

10     A.    That's the allegation, correct.

11     Q.    The government alleged that some of

12  these payments to you came from World

13  Acquisition Partners Corporation, correct?

14     A.    That's the allegation, correct.

15     Q.    And that other payments came from

16  Sant Properties, correct?

17     A.    That's the allegation, correct.

18     Q.    And the government alleged that you

19  hid those payments from the IRS by knowingly

20  filing false tax returns in order to avoid

21  paying taxes on that income, correct?

22     A.    That's the allegation, correct.

23     Q.    And the government alleged that when

24  you became aware that the IRS was

CHARLES M. NASELSKY

Page 35

1    investigating you for tax offenses you

2    obstructed that investigation by fabricating

3    evidence, correct?

4       A.    That's the allegation.

5       Q.    Your case went to trial?

6       A.    It did.

7       Q.    And at trial, the government

8    introduced into evidence a check made payable

9    to you for $150,000 dated September 21, 2005,

10   correct?

11      A.    I believe so.

12      Q.    All right.  I'm going to show you

13   something.

14      A.    Uh-huh.

15              MS. BROWN:  Bob.

16              MR. WELSH:  Thank you.

17                  -  -  -

18       (P-99 marked for identification.)

19                  -  -  -

20   BY MS. BROWN:

21      Q.    I'm going to ask you to look at what

22   we've marked as P-99.  Let's make sure I get

23   this to you right.

24      A.    Uh-huh.

CHARLES M. NASELSKY

Page 36

1    Q.    P-99 is a copy of a check made

2    payable to you from Sant Properties for

3    $150,000, right?

4    A.    Correct.

5    Q.    The middle of the page there's a

6    signature, Charles Naselsky.  Is that your

7    endorsement on the back of the check?

8    A.    Yes.

9    Q.    And you deposited this check in your

10   personal bank account, correct?

11   A.    Correct.

12   Q.    And at trial, the government

13   introduced into evidence a check made payable

14   to you in the amount of $40,000 dated

15   November 18, 2005, correct?

16   A.    Yes, I -- yes.

17                       -   -   -

18      (P-100 marked for identification.)

19                       -   -   -

20   BY MS. BROWN:

21   Q.    If you turn to the next exhibit, --

22   A.    Oh.

23   Q.    -- P-1, is this a copy of the check?

24   A.    Yes.

CHARLES M. NASELSKY

Page  37

1    Q.    I'm sorry, P-100.  My fault.  Is this

2  a copy of the check made payable to you from

3  Sant Properties for $40,000?

4    A.    Yes.

5    Q.    And that's your endorsement on the

6  back of the check?

7    A.    It is.

8    Q.    And you deposited that check into

9  your personal bank account, correct?

10    A.    I did.

11    Q.    Hardeep Chawla testified at your

12  trial.  Is that right?

13    A.    At --

14    Q.    At your criminal trial.

15    A.    Yes.

16    Q.    You were there, right?

17    A.    Uh-huh.

18    Q.    Okay.  Hardeep maintained that these

19  two checks P-99 and P-100 represented a

20  commission owed to you on a real estate deal,

21  right?

22              MR. HARVEY:  Object to the

23         form.

24  BY MS. BROWN:

CHARLES M. NASELSKY

Page 38

1    Q.    You can answer.

2    A.    Yes.

3    Q.    And he also testified that you told

4    him, Hardeep, that it was okay for you to be

5    paid this money, that it was okay with your

6    law firm, correct?

7    A.    I did.

8    Q.    Hardeep testified these checks relate

9    to a deal involving a property at 1401 Arch

10   Street, right?

11   A.    In part, yes.

12   Q.    How else?

13   A.    It involved another property.

14   Q.    What other property?

15   A.    1500 Walnut Street.

16   Q.    You didn't testify at your criminal

17   trial, right?

18   A.    I did not.

19   Q.    With respect to 1401 Arch, you found

20   that property that the seller was willing to

21   sell for the Chawlas, correct?

22   A.    I was the effective procuring cause

23   of the relationship between the buyer and the

24   seller.

CHARLES M. NASELSKY

Page 39

1      Q.    And you actually represented the
2    seller at the time, right?
3      A.    I did.
4      Q.    And the seller at the time was a
5    special purpose entity owned by David Grasso,
6    correct?
7      A.    Correct.
8      Q.    And David Grasso was also a client of
9    Cozen O'Connor, right?
10     A.    He was.
11     Q.    And you were the billing attorney on
12   the Grasso file?
13     A.    Correct.
14     Q.    And you represented the seller,
15   Mr. Grasso's entity, in selling 1401 Arch to
16   the Chawlas and their special purpose entity,
17   correct?
18     A.    I did.
19     Q.    And Cozen got paid a legal fee for
20   the seller for that work?
21     A.    Yes.
22     Q.    By the seller for that work, I should
23   say.
24     A.    Yes.

CHARLES M. NASELSKY

Page 40

1    Q.    But in addition, you received checks

2    that I just showed you --

3    A.    Uh-huh.

4    Q.    -- directly from the Chawlas for

5    bringing them this opportunity, correct?

6    A.    Correct.

7    Q.    And you did not report this $190,000

8    to Cozen O'Connor?

9    A.    I did not report the money to Cozen

10   O'Connor.

11   Q.    And you did not report the $190,000

12   as income to the IRS, correct?

13   A.    I did not report it as income to the

14   IRS.

15   Q.    And at the time in 2000 -- this took

16   place in 2005, correct?

17   A.    Uh-huh.

18              THE COURT REPORTER:  Yes?

19   BY MS. BROWN:

20   Q.    And at that time, you were earning a

21   salary at Cozen, correct?

22   A.    Yes.

23   Q.    Some $350,000?

24   A.    I take your word on it.

CHARLES M. NASELSKY

Page 43

1    matter.

2       A.    I don't really remember all their

3    names, honestly.

4       Q.    Okay.

5       A.    Yes, that was a much larger client.

6       Q.    Okay.

7       A.    And one of them was -- let's leave it

8    at that.

9       Q.    Top two clients in terms of fee

10   producing for you 2005/2006?

11              MR. HARVEY:  I'm sorry.  Is the

12         question were the Chawlas one of the

13         top two?

14              MS. BROWN:  Chawlas and their

15         entities.

16              MR. HARVEY:  Okay.

17              THE WITNESS:  Might have been.

18         Might have been.  I don't know.

19   BY MS. BROWN:

20      Q.    And after July of 2006, the Chawlas

21   and their affiliated entities became clients

22   of Blank Rome, correct?

23      A.    Yes.

24      Q.    And you were the billing attorney

CHARLES M. NASELSKY

Page 44

1   responsible for their work at Blank Rome,

2   correct?

3      A.    Yes.  Yes.

4      Q.    You also received payments from Sant

5   Properties and World Acquisition Partners

6   Corporation from August of 2006 through

7   January of 2007, correct?

8      A.    Correct.

9      Q.    Starting on August 25, 2006, you

10  received a check from World Acquisition

11  Partners Corporation made payable to you in

12  the amount of $15,000, correct?

13     A.    Yes.

14     Q.    In September of 2006, you received a

15  check from World Acquisition Partners

16  Corporation made payable to you in the amount

17  of $15,000, correct?

18     A.    Correct.

19     Q.    In October of 2006, you received a

20  check from Sant Properties made payable to

21  you in the amount of $15,000, correct?

22     A.    Correct.

23     Q.    In November of 2006, you received a

24  check from World Acquisition Partners

CHARLES M. NASELSKY

Page 45

1    Corporation made payable to you in the amount

2    of $15,000, correct?

3       A.    Correct.

4       Q.    In December of 2006, you received a

5    check from World Acquisition Partners made

6    payable to you in the amount of 15,000?

7       A.    Correct.

8       Q.    And, finally, in July, sorry, January

9    of 2007, you received a check from World

10   Acquisition Partners Corporation made payable

11   to you in the amount of $15,000, correct?

12      A.    Correct.

13      Q.    You failed to report the $90,000 paid

14   to you directly by World Acquisition Partners

15   and Sant Properties to Blank Rome, correct?

16      A.    No, that's not correct.

17      Q.    You told them?

18      A.    I disclosed it at one point.

19      Q.    At what point?

20      A.    I can't remember.

21      Q.    Did you disclose it in August of

22   2006?

23      A.    I don't know.

24      Q.    September?

CHARLES M. NASELSKY

Page 46

1    A.    I can't remember.

2    Q.    October?

3    A.    I don't know.

4    Q.    November?  December?  Can't tell me?

5    A.    I don't remember.

6    Q.    Fair enough.

7    A.    I don't remember, but I did disclose

8    it.

9    Q.    On September 24, 2012, you were

10   convicted of all nine counts over the

11   indictment following a jury trial, correct?

12   A.    Correct.

13   Q.    And you were ultimately sentenced to

14   70 months in a federal prison?

15   A.    Correct.

16   Q.    And that was the sentence recommended

17   by the U.S. Attorney.  Was it not?

18   A.    I don't know.

19   Q.    When are you scheduled to be released

20   from the Brooklyn Center?

21   A.    December 18, 2016.

22   Q.    Is it your intention to relocate back

23   to the Philadelphia area?

24   A.    Not at the moment, no.

CHARLES M. NASELSKY

Page 48

1    A.    -- in December of 2012.

2    Q.    And what is the status of your New

3    Jersey law license?

4    A.    Voluntarily surrendered it in

5    December of 2012.

6    Q.    Were you licensed in any other

7    states?

8    A.    No.

9    Q.    Are you familiar with a piece of

10   property consisting of five contiguous

11   parcels of land located on John F. Kennedy

12   Boulevard in Philadelphia between 20th and

13   23rd Streets?

14   A.    I am.

15   Q.    How are you familiar with that

16   property?

17   A.    It was the subject of transactions

18   that both Cozen and Blank were engaged by

19   clients.

20   Q.    If I refer to that property as the

21   River City Property -- I'm going to refer to

22   it as the River City Property.

23   A.    Okay.

24   Q.    So I just want to make sure that you

CHARLES M. NASELSKY

Page 49

1    and I agree that we're talking about the same

2    property when I say that.

3      A.    Agreed.

4      Q.    Did there come a time when you were

5    asked to represent a client in connection

6    with the purchase of the River City Property?

7      A.    Yes.

8      Q.    When was that?

9      A.    I can't remember the exact date.

10   This is a long time ago.

11     Q.    It is.

12                    -  -  -

13       (P-102 marked for identification.)

14                    -  -  -

15   BY MS. BROWN:

16     Q.    If you look at P-102, perhaps that

17   will help you.

18     A.    Okay.  Where am I here?  Oh, here.

19     Q.    Here's the next one.

20     A.    Okay.

21     Q.    Mr. Naselsky, this is an e-mail from

22   you to a Marcia Steele and a Jenna Lampe

23   dated Tuesday, March 14, 2006 talking about a

24   new matter.  Does this help refresh your

CHARLES M. NASELSKY

Page 55

1           didn't hear that.

2    BY MS. BROWN:

3      Q.    What was your understanding of the

4    transaction?  What were you supposed to do?

5      A.    Clients intended to acquire a parcel

6    of land, and I was engaged to provide

7    transaction management on the turnkey

8    acquisition financing of the asset.

9      Q.    And was the parcel of land the River

10   City Property?

11     A.    Yes.

12     Q.    Who represented the seller?

13     A.    I can't -- in fact, it's -- the name

14   of the lawyer is in a prior page here.  I can

15   read you the name if you want.

16     Q.    Was it Randy Amengual from Katsky

17   Korins?

18     A.    Yes.  Yes.

19     Q.    You negotiated the Agreement of Sale

20   for the River City Property on behalf of the

21   purchaser, correct?

22     A.    Correct.

23                     -  -  -

24        (P-104 marked for identification.)

CHARLES M. NASELSKY

Page 57

1    Q.    If I suggest the name James Kennedy,

2  does that help you at all?

3    A.    It could very well be true.

4    Q.    Would it be fair to say that whatever

5  the legal bills say with respect to work on

6  that, who worked on that matter are the

7  attorneys that assisted you?

8    A.    Yes.

9                    -  -  -

10        (P-107 through P-114 marked for

11              identification.)

12                    -  -  -

13  BY MS. BROWN:

14    Q.    I want you to look at a number of

15  documents.  So this should go fairly quickly,

16  I hope, but it's P-107 through P-114.

17    A.    Okay.  So, when you say you want me

18  to look at them, just be specific in what you

19  want me to do.

20    Q.    Just want you to quickly look at

21  them.  I'm going to represent to you --

22    A.    I'm going to look at them at whatever

23  speed I need to look at them.  But I'm going

24  to look at them for you.  Okay?

Page 58

1    Q.    Absolutely.

2    A.    Okay.

3    Q.    Absolutely.  Why don't I ask you the

4    question and maybe that will help you get to

5    the answer?

6    A.    Okay.  So hold on.  Let's go through

7    the numbers.  107?

8    Q.    107 to 114.

9    A.    All right.  107?

10   Q.    I'm going to represent to you --

11   A.    107 to 114, okay.

12   Q.    -- that these were produced by the

13   Cozen firm in this litigation --

14   A.    Okay.

15   Q.    -- and that they appear to be drafts

16   of an Agreement of Sale.

17   A.    Okay.

18   Q.    And all I'm trying to do is to see if

19   107 to 114 appear to you to be drafts you had

20   seen in representing your client in the

21   transaction.

22   A.    Okay.  All right.  Just give me a

23   second.

24   Q.    Sure.

CHARLES M. NASELSKY

Page 59

1    A.    Let me page through it.

2    Q.    And as you go through it, if you see

3    handwriting that's yours, just tell me which

4    ones the handwriting is yours.

5    A.    Okay.  I'm looking at 107.  Let me

6    see.  Okay, 107 looks like a draft of an

7    Agreement of Sale.  I don't see any

8    handwriting in it that would --

9    Q.    I agree.

10   A.    -- be distinguishable as mine, so...

11         108, okay, 108 appears to be another

12   version of that agreement with handwritten

13   comment, markups.  They are not my

14   handwriting.

15         Okay, 109 seems to be another draft.

16   Again, not my handwriting.

17   Q.    Okay.

18   A.    Okay, 110 appears to be another

19   draft, and it contains my handwriting.

20   Q.    Okay.

21   A.    Now, this is not an agreement.

22   Q.    111 is an e-mail with a blackline

23   draft and a cleaned copy that is sent to

24   Katsky Korins.

CHARLES M. NASELSKY

Page 60

1    A.    Okay.

2    Q.    But it has no handwriting on it, I

3    can represent that to you.

4              MR. HARVEY:  I don't know, I

5         don't know what that -- I'm going to

6         object to the form, if that was a

7         question.

8              THE WITNESS:  All right.  So

9         what I'm looking at at Number 111 is

10        it looks like an e-mail.  I did not

11        author this, I did not author the

12        e-mail.

13   BY MS. BROWN:

14   Q.    You're copied on it.  Are you not?

15   A.    Copied, yes.  I didn't author it.

16   And there's two documents attached to it.

17   One is a draft that looks like it's been

18   blacklined.  I don't know what the

19   blacklining compares to.  And then another

20   one looks like it's a draft with no

21   blacklining.  In the spirit, it's the same

22   subject matter property.

23   Q.    River City?

24   A.    Yes, same subject matter property.

CHARLES M. NASELSKY

Page 61

1    Q.    How about --

2    A.    None of these are signed.

3    Q.    Correct.

4    A.    Right.

5    Q.    All drafts?

6    A.    Uh-huh.

7    Q.    How about 112?

8    A.    All right.  Okay.

9              MR. WELSH:  Do you have all the

10        spellings?

11             THE COURT REPORTER:  Yes.

12             THE WITNESS:  I'm not looking

13        at these for substance.

14   BY MS. BROWN:

15   Q.    Understood.

16   A.    Okay.  This is a blacklined, 112, a

17   blacklined version with some handwritten

18   writing.  It appears to be mine.

19   Q.    Do you see on the second page, which

20   is COZEN-1202, --

21   A.    Yes.  No, I --

22   Q.    -- "CMN Markup" at the top?

23   A.    Right.  Yes.  It appears to be mine,

24   right.  All right, you want me to go to 113?

CHARLES M. NASELSKY

Page 62

1    Q.    113 and 114.

2    A.    Okay.

3    Q.    That's it.

4    A.    All right, 113.  Okay, 113 is another

5    draft of the agreement.  No handwriting, but

6    it's blacklined.

7          114, okay, 114 is a, it's -- it looks

8    like it's a clean version with markup.  I

9    don't know -- I don't think it's mine.  This

10   writing is not mine.

11   Q.    Okay.

12   A.    There's writing here that's not my

13   handwriting.  This is not my handwriting.

14   Q.    Fair enough.

15   A.    Okay.  This is signed also.

16   Q.    By -- on 114, on the first page of

17   that, the purchasing entity appears to be

18   JFK BLVD Acquisition GP, LLC as Buyer,

19   correct?

20   A.    Yes.  Yes.

21   Q.    Did you take steps to form that

22   entity?

23   A.    I believe we did, yes.

24                      -   -   -

CHARLES M. NASELSKY

Page 63

1          (P-115 marked for identification.)

2                    -   -   -

3     BY MS. BROWN:

4        Q.    If you could look at P-115?

5        A.    Okay.

6        Q.    A string of e-mails between

7     Mr. Kennedy from Cozen, Jenna Lampe.  Who is

8     Jenna Lampe?

9        A.    She was a paralegal at Cozen at the

10    time.

11       Q.    And at the top, she's reporting that

12    she had formed JFK BLVD Acquisition GP, LLC,

13    correct?

14       A.    Yes.

15       Q.    Now, at this time, March of 2006, --

16       A.    March.

17       Q.    -- who owned JFK BLVD Acquisition GP,

18    LLC?

19       A.    Who owned it?  I don't know if we had

20    actually identified an owner.  It's probably

21    just the, it's probably just the party that

22    formed the enterprise, but I don't think

23    there's been an operating agreement prepared

24    that would identify an owner yet.

CHARLES M. NASELSKY

Page 64

1    Q.    Who was the party that formed the

2    enterprise?

3    A.    Oh.  Cozen O'Connor formed it on

4    behalf of the clients.  That's standard

5    operating --

6    Q.    Who did you understand to own that

7    entity when it was formed?

8    A.    Oh.  Oh.  It would be Richard Zeghibe

9    affiliates.  There would be a tax planning

10   involved in choosing who owns it and how it's

11   owned, et cetera, at some point before we

12   close.

13   Q.    But it would be totally owned by

14   Richard Zeghibe ultimately?

15   A.    That would be decided by Richard when

16   the time comes.  It's not my decision.

17   Q.    What did you understand the

18   relationship to be between Ravi and Richard

19   with respect to JFK BLVD Acquisition GP, LLC

20   in March of 2006?

21   A.    My understanding was that they both

22   were considering the project and decided that

23   Richard would be the buyer of the project.

24   And I was representing the entity to --

CHARLES M. NASELSKY

Page 72

```
 1                    -  -  -

 2       (P-118 marked for identification.)

 3                    -  -  -

 4    BY MS. BROWN:

 5       Q.    If you could look at P-118?

 6       A.    P-118.

 7               MR. HARKINS:  I'm sorry?

 8               MS. BROWN:  P-118.

 9               MR. HARKINS:  Thank you.

10               MS. BROWN:  And, Counsel, I

11          will represent for the record that

12          this agreement had been marked before

13          in this case as P-88 but without the

14          schedules.  So this indeed is a

15          complete, purportedly a complete and

16          full copy of the Agreement of Sale

17          along with all amendments and

18          schedules.

19    BY MS. BROWN:

20       Q.    Have you seen this agreement before,

21    Mr. Naselsky, P-118?

22       A.    I'm going to take a look at it now.

23       Q.    You do that.

24       A.    Okay, give me a second.  Okay.  Okay.
```

CHARLES M. NASELSKY

Page 73

1              MR. HARVEY:  Jayne, when you

2         said this is a complete copy with

3         exhibits, did you mean to say it's a

4         complete copy with the subsequent

5         amendments?

6              MS. BROWN:  I did.

7              MS. RISK:  You mean Mary Kay.

8              MR. HARVEY:  Mary Kay, excuse

9         me, yes.  Thanks.

10             MS. BROWN:  Get us confused,

11        Bill?

12             MR. HARVEY:  No.

13             MR. TEITELMAN:  She answered.

14             MR. HARVEY:  With the

15        subsequent amendments?

16             MS. BROWN:  Absolutely.

17             MR. HARVEY:  Okay, thank you.

18             THE WITNESS:  Okay.  Okay.  So

19        it appears to be an agreement with --

20        through fourth amendment.  I can see

21        the agree- -- I can't comment on all

22        the other stamps and stuff on them,

23        but they seem to be complete.

24   BY MS. BROWN:

CHARLES M. NASELSKY

Page 74

1    Q.    And by "stamps", you mean the Bates

2    numbers at the bottom of the page?

3    A.    Whatever these little notes, this is

4    not part of the agreement.

5    Q.    Understood.

6    A.    Okay.

7    Q.    And you were the attorney who

8    negotiated those various amendments?

9    A.    I was one of them, yes, absolutely.

10   Q.    On behalf of the buyer?

11   A.    Absolutely.

12   Q.    Mr. Naselsky, if only Richard was

13   going to be the owner of the special purpose

14   entity, in this case, JFK BLVD Acquisition

15   GP, LLC, --

16   A.    Uh-huh.

17   Q.    -- why was World Acquisition Partners

18   on the conflict check?

19   A.    Oh.  Because they came in together.

20   It was a referral from Ravi.  And they were

21   considering doing the project together.  And

22   they did, made a business decision to have

23   Richard as the sole buyer.  That's --

24   Q.    And you would be representing Richard

CHARLES M. NASELSKY

Page 82

1    Q.    And he's with Daroff Designs,

2    correct?

3    A.    Yes.

4    Q.    And you are aware that Mr. Rappoport

5    prepared architectural drawings and

6    schematics with respect to a potential

7    project to be built on the River City

8    Property, correct?

9    A.    Yes.

10   Q.    And you had seen those drawings and

11   schematics, correct?

12   A.    Yes.

13   Q.    In fact, there was a website that, if

14   you had a code, you could access and you

15   could see those drawings and schematics,

16   correct?

17   A.    I don't think I ever saw a website --

18   Q.    You never went on the website?

19   A.    -- to see drawings.  No.

20   Q.    You had seen them in a hard-copy

21   format?

22   A.    Oh, absolutely.  Absolutely.

23   Q.    And in fact, Mr. Rappoport showed you

24   a video of the River City Project, correct?

CHARLES M. NASELSKY

Page 83

1    A.    A -- I had, I had seen a video

2  presentation of a fly-through I guess you

3  could call it.

4    Q.    That's a fly-over the property?

5    A.    Yes.

6    Q.    The perspective is from up above

7  looking down.  Is that correct?

8    A.    They call it a massing fly-through or

9  fly-over, massing.

10   Q.    And that showed, that fly-over video

11  showed 10 tall towers on the site, correct?

12   A.    You know, I didn't count.  But it's

13  a -- that's what it is.  It's a massing

14  fly-over.

15   Q.    And -- all right.  Let's put the

16  number "10" aside.

17   A.    Okay.

18   Q.    A number of tall, pencil-thin

19  buildings, correct?

20   A.    Yes.  Yes.

21   Q.    And you had seen that video more than

22  once?

23   A.    I don't know how many times I saw it.

24  Not many, I'll tell you that.

CHARLES M. NASELSKY

Page 84

1    Q.    Not many?

2    A.    Not many.

3    Q.    What were the occasions that you saw

4    that video?

5    A.    I saw it in my office.  That's all.

6    I got a link to where it was, and I just saw

7    it in my office.

8    Q.    Okay.  Mr. Rappoport had also

9    prepared a memorandum that outlined the

10   as-of-right potential development for the

11   River City Property, correct?

12   A.    I guess so.  You'd have to refer me

13   to a specific document and I can tell you if

14   that's what it is.

15   Q.    Fair enough.  Before we do that, --

16   A.    Yes.

17   Q.    -- do you understand what the phrase

18   "as-of-right" means?

19   A.    For the most part, yes.

20   Q.    As a real estate transactional

21   lawyer, --

22   A.    Right.

23   Q.    -- tell me what that means.

24   A.    As a non-zoning but a real estate

CHARLES M. NASELSKY

Page 88

1  foot, 8.2 acre air rights development plan,

2  correct?

3    A.    That's what he says.

4    Q.    At some point in time, Cushman &

5  Wakefield of Pennsylvania was engaged to

6  perform an as-is appraisal on the River City

7  Property, correct?

8    A.    Yes.

9    Q.    And you actually engaged Cushman &

10  Wakefield to perform the appraisal?

11            MR. HARVEY:  Object to the

12        form.

13            MS. RISK:  Object to the form.

14  BY MS. BROWN:

15    Q.    Did you actually engage Cushman &

16  Wakefield to perform the appraisal on the

17  River City Property?

18    A.    The client engaged them under my

19  authority.

20    Q.    And who was the client?

21    A.    At the time -- gosh, I don't know

22  what the letter said, my engagement letter.

23  I don't know.  If you show it to me, I will

24  refresh your recollection.

CHARLES M. NASELSKY

Page 89

1    Q.    Was the client supposed to be the

2  buying entity of the River City Property?

3    A.    Not necessarily.

4             MS. RISK:  Objection to form.

5             MR. HARVEY:  Yes.

6             THE WITNESS:  Not necessarily.

7  BY MS. BROWN:

8    Q.    Okay.  And I'll show you the letter.

9    A.    Yes.

10   Q.    I will.

11   A.    Not necessarily.

12   Q.    Did you have any input in choosing

13  the appraisal firm?

14   A.    No.

15   Q.    Did someone ask you to engage Cushman

16  & Wakefield to perform the appraisal?

17   A.    Yes.

18   Q.    Who?

19   A.    Richard Zeghibe.

20   Q.    Did you know any of the appraisers at

21  Cushman & Wakefield in let's say May of 2006?

22   A.    Know them?  What do you mean by "know

23  them"?

24   Q.    Have you ever used, did you ever use

CHARLES M. NASELSKY

Page 90

1    Cushman & Wakefield before?

2    A.    No, I had never engaged them before.

3    Q.    Did you know Jerry McNamara?

4    A.    No.

5    Q.    Did you know Dan McNeil?

6    A.    No, ma'am.

7    Q.    What was the purpose of the

8    appraisal?

9              MR. HARVEY:  Object to the

10        form.

11             MS. RISK:  Object to form.

12             THE WITNESS:  You got to ask

13        the client what the purpose is.

14   BY MS. BROWN:

15   Q.    Well, did you not engage Cushman &

16   Wakefield on behalf of the client?

17   A.    I did.

18   Q.    Do you have an understanding of why

19   an appraisal was --

20   A.    Appraisal determines value.

21             MS. BROWN:  Are you all right,

22        Kim?

23             THE WITNESS:  Appraisal is

24        designed to determine value.

CHARLES M. NASELSKY

Page 112

1          MS. RISK:  -- instead of

2      directing the witness.

3          MS. BROWN:  Bates Number 25.

4          MS. RISK:  Thank you.

5          MS. BROWN:  First page of the

6      e-mail, bottom of the page, e-mail

7      dated June 5, 2006.

8          THE WITNESS:  Okay.  And

9      what's, what is the question?

10  BY MS. BROWN:

11   Q.   Is that when you sent the engagement

12  letter?  It just says Subject:  Re:

13  Engagement Letter - JFK Land, from you to

14  Craig and Jerry McNamara.

15   A.   I don't know.

16   Q.   If you could turn to P-66, which is

17  the next page, there's an e-mail that says,

18  "Houston, we are engaged".  You're not copied

19  on that e-mail, but that's how it starts.

20          And attached to it is a signed copy

21  of the engagement letter with Cushman &

22  Wakefield, correct?

23          MS. RISK:  Objection to form.

24          THE WITNESS:  Yes, that's what

CHARLES M. NASELSKY

Page 113

1        this is.

2    BY MS. BROWN:

3      Q.    And that's your signature on Bates

4    Page 61?

5      A.    Yes, ma'am.

6      Q.    And it's dated June 6, sorry, June 7,

7    2006?

8      A.    Yes, ma'am.

9      Q.    Okay.  If you could go back to the

10   first page of that engagement letter, which

11   is Bates stamp 60, I want to look at the

12   client name again.  Here, under The Parties

13   To This Agreement, it says, "Cushman &

14   Wakefield of Pennsylvania, Inc. and JFK

15   Acquisition GP, LLP".  Do you see that?

16     A.    Uh-huh.

17                 THE COURT REPORTER:  Yes?

18                 THE WITNESS:  Yes.

19   BY MS. BROWN:

20     Q.    Is that another mistake, "LLP" as

21   opposed to "LLC"?

22     A.    I would agree that's, that's -- there

23   should be a "C" instead of a "P".

24     Q.    So the intended -- by this point in

CHARLES M. NASELSKY

Page 118

1    Q.    Did you have --

2    A.    As of today, I don't have a

3   recollection.

4    Q.    Did you have any role in determining

5   what information would be provided to the

6   appraisers?

7    A.    I don't have a recollection of what,

8   to what extent I participated in that, in

9   that issue.

10    Q.    Could you look at P-71?  Which is in

11   the same binder.

12    A.    Okay.

13    Q.    Mr. Naselsky, this is an e-mail from

14   a Mr. Dan McNeil sent to you on Friday,

15   June 23rd, and he says, "Here it is".  And

16   attached appears to be --

17    A.    No, it's not an e-mail to me.  It's

18   not.

19    Q.    I'm sorry.  To Olivia --

20              MS. RISK:  Objection.

21   BY MS. BROWN:

22    Q.    To Olivia Baer.  You're absolutely

23   right.  I apologize for that.

24    A.    No, that's fine.

CHARLES M. NASELSKY

Page 119

1    Q.    To Olivia Baer.

2    A.    That's fine.

3    Q.    And she -- he says, "Here it is".

4    I'd like you to look at what is attached,

5    "Here it is".

6              MS. RISK:  Objection.

7              THE WITNESS:  Okay.  So

8         attached to this e-mail is a document

9         cover sheet, looks like complete

10        appraisal report, appraisal of real

11        property, and there's a list of

12        tracts of land.

13             It's titled it's a Self

14        Contained Appraisal Report.  It's an

15        as of August 1, 2006 predicted date,

16        the inspection date, prepared for me

17        on behalf of client, named, and it's

18        the named LLC here.  And it's

19        Prepared By and it's got the author's

20        name.

21             And it's accompanied by a

22        letter which appears to be a -- I'm

23        not reading it for substance.

24   BY MS. BROWN:

CHARLES M. NASELSKY

Page 120

1    Q.    No, there's no need for you to read

2  it for substance.  I'll represent to you that

3  it's a draft appraisal with a value of

4  $57 million prepared by Cushman & Wakefield.

5  Did you see this draft appraisal?

6    A.    Let me see.  Yes, it looks like a

7  draft -- it looks like an unsigned appraisal,

8  right.

9    Q.    And on page Bates stamp 96, you can

10 --

11   A.    Where do you want me to go?

12   Q.    96.

13   A.    Oh.

14   Q.    It's probably the next page there.

15   A.    All right.

16   Q.    The middle of the page there's an

17 As Is Market Value As Of August 1, 2006,

18 $57 million?

19   A.    That's what it says.

20   Q.    And do you recall getting this draft

21 appraisal?

22   A.    I suspect I got this, yes.

23   Q.    And do you recall reviewing it?

24   A.    Absolutely.

CHARLES M. NASELSKY

Page 121

1    Q.    In detail?

2    A.    Yes.

3    Q.    Did you speak to anybody about the

4  report?

5    A.    I don't have a specific recollection

6  of precise conversations.

7    Q.    Do you have a general recollection?

8    A.    It would be normal for me to

9  communicate with client principals.  It would

10  be normal for me to communicate with other

11  people in the office regarding the substance

12  of the appraisal and to the appraiser.

13    Q.    Did you speak to Richard?

14    A.    I suspect I did.

15    Q.    Did you speak to Ravi?

16    A.    I suspect I did.

17    Q.    I would suggest to you, and you're

18  welcome to look at it, that if you go to

19  P-103 to the Cozen time sheets you will find

20  on the date June 23rd -- and that's Bates

21  stamp COZEN-1870.

22    A.    This is not -- 103 there's no June.

23  Maybe there is.  Hold on.

24    Q.    Yes, they're separated by month.

CHARLES M. NASELSKY

                                                        Page 122

1    A.    Give me a second.  Okay.  What date

2    am I looking at?

3    Q.    So it's June 23, 2006.

4    A.    Okay.

5    Q.    That's at the bottom of 1870.

6    A.    Okay.

7    Q.    And in the middle of that -- the

8    initials "CMN", that's you, right?

9    A.    Yes.

10   Q.    In the middle of that task

11   description, it says, "RECEIVE AND REVIEW

12   APPRAISAL; TELEPHONE CONFERENCE WITH RICHARD

13   ZEGHIBE; TELEPHONE CONFERENCE WITH RAVI

14   CHAWLA".  Do you see that?

15   A.    I don't see -- oh, yes.  Yes.  You're

16   not reading in the order that's listed here.

17   Q.    We can start if you'd like to,

18   "TELEPHONE CONFERENCE WITH RICHARD

19   ZEGHIBE; --

20   A.    Right.

21   Q.    -- PREPARE MEMO ON DUE DILIGENCE;

22   RECEIVE AND REVIEW APPRAISAL; TELEPHONE

23   CONFERENCE WITH RICHARD ZEGHIBE; TELEPHONE

24   CONFERENCE WITH RAVI CHAWLA".  Do you see

CHARLES M. NASELSKY

Page 123

1    that?

2      A.      Correct.   That's the entry.

3      Q.      For a total of 1.8?

4      A.      Yes.

5      Q.      So does this refresh your

6    recollection that you discussed the appraisal

7    with Ravi and then -- with Richard and then

8    with Ravi?

9      A.      I don't know exactly what I discussed

10   with them, but I think it's reasonable to

11   conclude that I did discuss the appraisal.

12     Q.      Do you have any recollection of that,

13   either one of those discussions?

14     A.      I don't have specific recollection of

15   the substance of these discussions from over

16   ten years ago.

17     Q.      Okay.

18     A.      Yes.

19                    -   -   -

20       (P-122 marked for identification.)

21                    -   -   -

22   BY MS. BROWN:

23     Q.      P-22, please -- I'm sorry.   P-122.

24     A.      All right.   Hold on.

CHARLES M. NASELSKY

Page 124

1    Q.    Mr. Naselsky, P-122 is a string of

2    e-mails between you and Mr. Zeghibe and you

3    and Mr. Chawla and on June 23, 2006.  I'm

4    looking at the bottom e-mail first.

5    A.    Okay.

6    Q.    All right?  From Ravi to you --

7    A.    At 2:54 p.m.?

8    Q.    Correct.

9    A.    Okay.

10    Q.    From Ravi to you, CC'g Richard.

11    "Charlie, please do your magic and push the

12    value over 100 million".  Do you see that?

13    A.    That's what it says.

14    Q.    Does that refresh your recollection

15    of whether you had a conversation with at

16    least Ravi regarding the appraisal prior to

17    this e-mail?

18    A.    I think my answer before was I didn't

19    say I did have a conversation.  I don't know

20    the substance of the conversation.

21    Q.    Do you recall now whether the

22    substance was you attempting to push the

23    value over 100 million?

24    A.    Well, that's his instructions to

CHARLES M. NASELSKY

Page 125

1    me --

2       Q.    Okay.

3       A.    -- in this e-mail.

4       Q.    And this is Ravi's instructions to

5    you, right?

6       A.    With copies to Richard, right.

7       Q.    And at this point, June 23, 2006, was

8    Ravi a principal in the client?

9       A.    Was he a principal?  No, I don't

10   think -- I think he was a -- he was a

11   prospective partner in the transaction, and I

12   would consider him a principal, yes.

13      Q.    In what way?

14      A.    In the sense that he was providing

15   instructions to me with Richard's joint

16   communications.  But he wasn't the contract

17   buyer.  I don't know who -- the contract

18   buyer is an enterprise.  It's a special

19   purpose entity.  Who owns it in the end of

20   the day is a subject that's normally

21   addressed minutes before you close.  It's

22   just the normal the way you do deals.  That's

23   transaction management.

24           It may not even be, the contract

CHARLES M. NASELSKY

Page 126

1    purchaser may not even be the buying

2    enterprise.  It's just there's structuring;

3    there's tax issues.  It's the way it works.

4    That's why there are assignment clauses in

5    Agreements of Sale that allow for that

6    negotiation.  Standard operating procedure.

7       Q.    So are you saying that as of June 23,

8    2006 you considered Ravi to be a principal in

9    the transaction?

10      A.    I was taking instructions from

11   Richard and Ravi on a joint basis, yes.  Yes.

12      Q.    And what was Ravi's role in the

13   purchase of the River City Property as of

14   June 23, 2006?

15      A.    From my perspective?

16      Q.    Uh-huh.

17      A.    He was providing instructions along

18   with Richard and managing the transaction.

19      Q.    Was he Richard's agent?

20      A.    I don't, I don't know.  You got to

21   ask him.

22      Q.    Were you representing them both?

23      A.    I was representing an enterprise.

24   The enterprise has spokespersons.

CHARLES M. NASELSKY

Page 127

1    Q.    And what was the enterprise?

2              MR. HARVEY:  Objection.  Asked

3         and answered.

4    BY MS. BROWN:

5    Q.    Was it JFK BLVD Acquisition GP, LLC?

6    A.    Yes, ma'am.

7    Q.    What do you mean when you say

8    "enterprise"?

9    A.    Well, there's a placeholder entity

10   and that's a contract purchaser.  This is a

11   generic answer, not one specific to this

12   transaction.  That's the contract buyer.

13            Between contract and closing, it is

14   standard operating procedure to determine who

15   will be the buying enterprise, to create the

16   entities and to close.  And the record owners

17   of those entities may or may not be subjects

18   that the seller even is concerned with.  It's

19   the way it is, all right.

20   Q.    Did you have an understanding as to

21   why Mr. Chawla wanted you to do your magic

22   and push the value over 100 million?

23            MR. HARVEY:  Object to the

24        form.

CHARLES M. NASELSKY

Page 128

1         MS. RISK:  Object to the form.

2         MR. HARVEY:  Calls for

3    speculation.

4  BY MS. BROWN:

5    Q.   Did you have an understanding as to

6  why he wanted you to do that?

7    A.   I can proceed and answer?

8         MR. WELSH:  Whenever there's an

9    objection, --

10        THE WITNESS:  I'm making sure.

11        MR. WELSH:  -- answer.

12        THE WITNESS:  Okay.  My, my

13   role as an advocate is to maximize

14   the opportunity, and the opportunity

15   here was to make sure that all

16   information with regard to this

17   property and its attributes were

18   provided to the appraisal.  And

19   there's nothing inconsistent with

20   that charge to communicate to the

21   appraiser what they may or may not

22   have considered.

23  BY MS. BROWN:

24    Q.   Did you have an understanding as to

CHARLES M. NASELSKY

Page 129

1    why Ravi wanted the value over 100 million?

2      A.    No.

3                    MR. HARVEY:  Same objection.

4                    THE WITNESS:  I'm sorry.

5                    MR. HARVEY:  That's okay.

6                    THE WITNESS:  I have no

7              understanding of why he chose the

8              word "100 million".

9    BY MS. BROWN:

10     Q.    Having gotten this charge from

11   Ravi -- strike that.

12                By June 23, 2006, did you understand

13   that you would be the person responsible for

14   at least discussing the valuation issue with

15   Cushman & Wakefield?

16                    MS. RISK:  Objection to form.

17                    MR. HARVEY:  Object.  Same

18              objection.

19                    THE WITNESS:  The client is

20              asking me to do this.  I don't know

21              what I did in response to this.  I

22              can't recall.  But I'm telling you

23              that their instructions are for me to

24              do what you just said.

CHARLES M. NASELSKY

Page 130

1                    Again, this is ten years ago.

2          I don't know what act I took in

3          response to it.

4    BY MS. BROWN:

5      Q.    At the top of P-122, Mr. Naselsky, is

6    a separate e-mail from Richard Zeghibe to

7    Mr. Chawla and to you.  And he says, "There

8    are numerous comps in the marketplace that

9    show both investors and developers are

10   willing to pay on the basis of what can be

11   created.  No investor would pay 57M for the

12   property that we have with an income stream

13   of 1M, but they would pay a lot more based

14   upon what the final product might be.  I'm

15   preaching to the choir.  We all know these

16   fundamentals to be true".  Do you see that?

17     A.    That's what it says.

18     Q.    Okay.  And "M", did you understand

19   "M" to mean "million" --

20     A.    Yes.

21     Q.    -- when you received this e-mail?

22     A.    Uh-huh.

23     Q.    Essentially, Richard is giving you a

24   rationale for a higher value, correct?

CHARLES M. NASELSKY

Page 131

```
 1                  MR. HARVEY:  Object to the
 2         form.
 3                  MR. TEITELMAN:  Object.
 4                  MS. RISK:  Objection to form.
 5                  MS. BROWN:  All right.  I'll
 6         rephrase that.
 7    BY MS. BROWN:
 8      Q.    When you received this e-mail, did
 9    you understand that Richard was giving you a
10    rationale for a higher market value?
11                  MR. HARVEY:  Same objection.
12                  MS. RISK:  Same objection.
13                  THE WITNESS:  Richard is --
14         yes.  Yes.
15    BY MS. BROWN:
16      Q.    Richard says "an as-is appraisal".
17    Did you have an understanding as to what an
18    "as-is appraisal" is?
19      A.    Well, I don't know where -- where
20    does it say?
21      Q.    I'm sorry.  I strike that.  Strike
22    that.
23                       -  -  -
24         (P-123 marked for identification.)
```

Page 156

1                  MR. HARVEY:  Objection.  Asked

2          and answered.

3    BY MS. BROWN:

4      Q.    You can answer.

5      A.    I, again, I have no recollection as

6    of, today, of that issue at all.

7      Q.    Did you ever see a CBRE appraisal on

8    the River City Property?

9      A.    I don't believe I've ever seen one.

10     Q.    Okay.  Could you look at P-68?  Which

11   is in the old binder, so it's in this one.

12     A.    All right.  I'm just going to switch.

13   What was the number again?

14     Q.    P-68.

15     A.    All right.

16     Q.    Mr. Naselsky, P-68 is a document

17   that's been previously marked in this

18   litigation, and it is an e-mail from you to

19   Jerry McNamara on July 4, 2006.

20     A.    Uh-huh.

21     Q.    Do you see that?

22     A.    Yes.

23     Q.    Did you send this e-mail?

24     A.    I assume I did.

CHARLES M. NASELSKY

Page 157

1   Q.    Have you seen this e-mail before?

2   A.    Since writing it, no.

3   Q.    You didn't see it in preparation for

4   your deposition today?

5   A.    I don't remember seeing this e-mail

6   in preparation.

7   Q.    You write to Mr. McNamara -- who did

8   you understand him to be at Cushman &

9   Wakefield?

10   A.    Yes.

11   Q.    And you say, "Jerry, I would like to

12   set up a time to meet with you on Monday, the

13   10th, preferably in the afternoon.  I now

14   have carefully review the entire appraisal

15   and I am concerned with several provisions,

16   findings and assumptions.  In essence, the

17   number is conveniently close to the contract

18   price where the factors that go into play for

19   a development assemblage of this type seem to

20   be missing".  Did I read that --

21   A.    Yes.

22   Q.    -- correctly?

23            MS. RISK:  Objection.

24         Actually, you omitted a few words in

CHARLES M. NASELSKY

Page 174

1              MS. BROWN:  I'll go on.

2              MR. TEITELMAN:  No, that's

3        okay.  That's a good question.

4              THE WITNESS:  Say -- R&F Penn

5        and --

6    BY MS. BROWN:

7    Q.    JFK BLVD Acquisition GP, LLC.

8    A.    I have not drafted one, no.

9    Q.    Have you ever seen one?

10   A.    I don't think I've ever seen one.

11   No, I will say I've never seen one.

12   Q.    Have you ever seen a $50 million

13   contract between anybody --

14   A.    Yes, ma'am.  Yes, I have.

15   Q.    -- involving the sale --

16   A.    A lot of them.  I've represented

17   hundreds of people that have walked in with

18   $50 million.

19   Q.    Let me try to narrow it down.  Let me

20   just finish, Mr. Naselsky, if you wouldn't

21   mind?

22   A.    All right.  I'm sorry.

23   Q.    Have you ever seen a $50 million

24   contract involving the sale of the River City

CHARLES M. NASELSKY

Page 175

1    Property or the rights to the River City

2    Property?

3    A.    Yes, I have.

4    Q.    Okay.  What contract have you seen?

5    A.    I've seen an agreement between the

6    contract purchaser, JFK Boulevard

7    Acquisition, LLC, and I can't recall "party"

8    but another party.  I can't recall the name,

9    okay, but it's somebody else is a contract

10   purchaser of that agreement.

11   Q.    And when did you see that?

12   A.    I don't know the exact date.

13   Q.    Did you see --

14   A.    I'm sure you're going to remind me of

15   it, but I don't know the exact date.

16   Q.    Did you see it in connection with

17   your preparation for this deposition?

18   A.    Did I see it?  I think I did.  I

19   think I did.  Yes.

20   Q.    But you don't recall the party at

21   this point?

22   A.    Yes, I -- you know, there were a lot

23   of names being mentioned.  So I can't recall

24   exactly.

CHARLES M. NASELSKY

Page 176

1   Q.   This contract that you saw between

2  JFK BLVD and another party for $50 million,

3  did you draft that contract?

4   A.   No, ma'am.

5   Q.   Do you recall when it was entered

6  into?

7   A.   No, ma'am.  Or if it was entered

8  into, I don't know.

9   Q.   Was it signed?

10   A.   I have no idea.  As we sit here

11  today, I don't know.

12   Q.   In that e-mail that we looked at, and

13  I'm happy if you want to look at it again,

14  where you talk about --

15   A.   Just point me over.  Which one again?

16   Q.   Sure.

17   A.   Oh.  It's the diligence one?

18   Q.   It's the one where you say the

19  contract is conveniently close.

20   A.   Oh, okay.  Okay.  I'm good.  I got

21  it.

22            MS. SIGYARTO:  What number are

23       we on?

24            MS. BROWN:  It's P- -- we don't

CHARLES M. NASELSKY

Page 178

1            THE WITNESS:  One second.

2        Okay.  Okay.

3    BY MS. BROWN:

4      Q.    So this is an e-mail back to you from

5    Mr. McNamara the same day, July 5th -- I mean

6    the next day, July 5th.  And he advises you

7    that he's going on vacation, correct, and --

8    but you can meet with Dan McNeil, correct?

9      A.    Yes, that's what it says.

10     Q.    Okay.  Now, did you know who -- had

11   you ever talked to Mr. McNeil prior to this

12   July 5th e-mail?

13     A.    I have no recollection.

14     Q.    Did you speak with Mr. McNamara after

15   he advised you that he couldn't make this

16   meeting you wanted?

17     A.    No recollection.

18     Q.    You met with Mr. McNeil, correct?

19     A.    I think I did.  I don't, can't

20   remember anything beyond "I did" I mean in

21   the sense that I don't know the date or the

22   time of the day or whatnot.

23     Q.    Do you recall where it occurred?

24     A.    No.  No.

CHARLES M. NASELSKY

Page 179

1    Q.    Do you know who was present?

2    A.    No.  I mean besides myself, no.

3    Q.    Can you recall what the purpose of

4    the meeting was?

5    A.    I was to review the appraisal.

6    Q.    And was it also your purpose to

7    convince him to come to a higher valuation?

8    A.    Of course.

9              MR. HARVEY:  Object to the

10         form.

11             MS. RISK:  Objection to form.

12             THE WITNESS:  My purpose was to

13         advocate for facts that were not

14         considered by the appraiser in

15         reaching their conclusion.

16   BY MS. BROWN:

17   Q.    Do you recall if at that meeting you

18   spoke about how the Contract of Sale was

19   characterized under the Sales History portion

20   at Page 111 of the draft appraisal?

21             MR. HARVEY:  Object to form.

22             MS. RISK:  Objection to form.

23             THE WITNESS:  I cannot recall

24         any substance of the conversation

CHARLES M. NASELSKY

Page 180

1           today that occurred ten years ago.

2      BY MS. BROWN:

3         Q.    Did Mr. McNeil ever ask you for a

4      copy of the Contract of Sale that is

5      described on Page 111 of the draft appraisal?

6         A.    I don't remember.  I do not remember.

7         Q.    Did you ever give him a copy of the

8      R&F Penn Center Associates Agreement of Sale

9      with JFK BLVD Acquisition GP, LLC for

10     32.5 million?

11        A.    I do not remember.

12        Q.    Did anyone ever direct you not to

13     give him a copy of that contract?

14        A.    No.  No.

15        Q.    I know you don't remember a lot about

16     what happened at the meeting, but I'm going

17     to ask you these questions.  And if you don't

18     remember, you don't remember.

19        A.    Okay.

20        Q.    Did you tell Mr. McNeil at the

21     July 10th, I'll represent to you it was

22     July 10, 2006, --

23        A.    Okay.

24        Q.    -- meeting that the River City

CHARLES M. NASELSKY

Page 181

1    Property had not been marketed?

2              MS. RISK:  Objection to form.

3              THE WITNESS:  "Had not been" --

4         I don't even know what that means.  I

5         don't think I could say those words.

6         I don't know what that means.

7    BY MS. BROWN:

8    Q.    Listed on the open market for

9    purchase or sale.

10             MS. RISK:  Objection.  Same

11        objection.

12             THE WITNESS:  Okay.  So --

13   BY MS. BROWN:

14   Q.    Exposed to the market.

15   A.    Yes, the answer is --

16             MS. RISK:  Same objection.

17             THE WITNESS:  -- I don't recall

18        anything to do with that subject

19        other than -- yes, no.  No.

20   BY MS. BROWN:

21   Q.    Did you tell Mr. McNeil at the

22   meeting that the River City Property was

23   being sold without brokers?

24   A.    No.

CHARLES M. NASELSKY

Page 182

1    Q.    Did you tell Mr. McNeil at the

2    meeting that the acquisition of the River

3    City Property was not an arm's length

4    transaction?

5    A.    I do not recall.

6    Q.    The sale of the River City Property

7    from R&F Penn to JFK BLVD was an arm's length

8    transaction, correct?

9              MR. HARVEY:  Object to the

10         form.

11             MS. RISK:  Objection.  Same.

12         Join.

13             THE WITNESS:  That's --

14             MR. TEITELMAN:  Join.

15             THE WITNESS:  That's a --

16         you're asking my opinion?

17    BY MS. BROWN:

18    Q.    Well, you've been a real estate

19    lawyer --

20    A.    Right.

21    Q.    -- for how many years?

22    A.    I was a real estate lawyer.

23    Q.    You were a real estate lawyer for how

24    many years?

CHARLES M. NASELSKY

Page 192

1    Q.    Okay.

2    A.    I mean...

3    Q.    You eventually received a second

4  draft of the Cushman & Wakefield appraisal,

5  right?

6    A.    I take --

7              MS. RISK:  Objection to form.

8              THE WITNESS:  I take your word

9        on it.  I don't know.

10  BY MS. BROWN:

11    Q.    Go to P-73.

12    A.    Okay.

13    Q.    That would be the old binder.

14    A.    All right, one second.  One second.

15  One second here.  Okay, I'm here.

16    Q.    P-73 is an e-mail from Mr. McNeil to

17  you dated Thursday, July 20, 2006, and

18  attached to it appears to be a draft

19  appraisal of Cushman & Wakefield.  It is

20  unsigned and it has a market value of

21  77 million, which you could see at Page 238.

22    A.    Okay.

23    Q.    Did you receive this draft appraisal?

24    A.    I did by e-mail, yes.

CHARLES M. NASELSKY

Page 193

1    Q.    Do you have any recollection of

2   communicating with Mr. McNeil between the

3   meeting you had with him and July 10, 2006?

4    A.    I have no specific recollection.

5    Q.    Did you have any communications with

6   Mr. McNamara between July 10th and July 20th?

7    A.    I don't have any specific

8   recollection today.

9    Q.    You saw the -- did you review the

10  appraisal, the draft $77 million appraisal?

11   A.    Today?

12   Q.    No.  No.  No.  Back then.

13   A.    Oh, yes, sure.

14   Q.    Was the $77 million valuation

15  acceptable to your clients?

16              MR. HARVEY:  Object to the

17         form.

18              MS. RISK:  Object to form.

19              MR. TEITELMAN:  Object.

20              THE WITNESS:  I don't know if

21         it's acceptable, but that was the

22         value that was issued, so...

23  BY MS. BROWN:

24   Q.    Did you discuss it with them?

CHARLES M. NASELSKY

Page 252

1   gets put on a document like this that you

2   received by e-mail?

3    A.    Yes.  It's the -- it's identical

4   sequence as I described.  I believe the firms

5   use different software for the integration of

6   their e-mail with the document management

7   system.  I don't know the name of the system.

8          But I think the process was

9   substantially identical, including the manner

10  in which you selected the location of the

11  stamp and -- yes, the location of the stamp.

12  The stamp is not negotiable.  You must always

13  put the client number and the document

14  number.  That's structured within the firm.

15  There's nothing you can do about it.

16   Q.    Okay.  At some point, you determined

17  to leave Cozen O'Connor, correct?

18   A.    I did.

19   Q.    Okay.  And do you know the date you

20  left?

21   A.    I don't know the exact date.  July

22  blank, 2006.

23   Q.    And at the time you left, you had

24  clients for which you were the billing

CHARLES M. NASELSKY

Page 253

1    attorney at Cozen who owed money to Cozen,

2    correct?

3     A.    Yes.

4     Q.    In fact, Ravi and Hardeep Chawla and

5    their entities owed approximately $390,000

6    through June of 2006 to Cozen O'Connor,

7    correct?

8              MR. TEITELMAN:  Object to form.

9          I know you're using shorthand, so I'm

10         not going to make you break it down

11         on each one.

12              THE WITNESS:  I take your word

13         on the number.

14                   -  -  -

15         (P-141 marked for identification.)

16                   -  -  -

17   BY MS. BROWN:

18    Q.    Could you look at P-141?

19    A.    Okay.

20    Q.    Mr. Naselsky, P-141 is a letter dated

21   July 28, 2006 from you to Mr. Ravi Chawla.

22   Is that your signature on Bates Number 11525?

23    A.    It is.

24    Q.    And did you send this letter to

CHARLES M. NASELSKY

Page 254

1    Mr. Chawla?

2       A.     I believe I did.

3       Q.     And you say in the first line, "As

4    you may already know, as of July 28, 2006 I

5    will no longer be associated with Cozen

6    O'Connor".  Do you see that?

7       A.     Yes.

8       Q.     So does that refresh your

9    recollection as to the date which was your

10   last day with Cozen O'Connor?

11      A.     I guess, I guess it does, yes.

12      Q.     And then it says, "Effective

13   July 31st, I will be joining Blank Rome,

14   LLP".  Do you see that?

15      A.     Yes, ma'am.

16      Q.     Does that refresh your recollection

17   about the day you started with Blank Rome?

18      A.     It does.

19      Q.     In this letter, you set forth some

20   balances that are owed by Mr. Chawla and his

21   associated entities for legal fees to the

22   Cozen O'Connor firm, correct?

23      A.     Yes, ma'am.

24      Q.     And I'll represent to you I added

CHARLES M. NASELSKY

Page 265

1    Q.    Okay.  When did you first become

2    aware of the height ordinance?

3    A.    Sometime in or about mid August of

4    2006.

5                    -  -  -

6        (P-145 marked for identification.)

7                    -  -  -

8    BY MS. BROWN:

9    Q.    Can you look at P-145?

10   A.    Okay.

11   Q.    P-145 is an e-mail string that starts

12   on Page 9969 from Richard Zeghibe to Ravi

13   Chawla.  It says, "The bill was passed 15-0

14   and is sitting on the Mayor's desk.  Look

15   carefully at the boundaries.  Richard".

16   A.    Yes.

17   Q.    And this does get sent to you

18   eventually, at the top, on August 7, 2006?

19   A.    I'm a little -- my mid to second week

20   of August and the first week, yes.  It was

21   August of 2006.

22   Q.    Is it your understanding that this

23   was the first time you learned about the

24   height ordinance, August 7, 2006?

Page 266

1    A.    Yes, ma'am.

2    Q.    You were at Blank Rome at the time,

3    correct?

4    A.    Yes, ma'am.

5    Q.    And after receiving the e-mail and

6    the ordinance from originally Mr. Zeghibe,

7    did you speak to anybody about it?

8    A.    I spoke to a fair number of people.

9              MR. HARKINS:  Your --

10             THE WITNESS:  I spoke to a fair

11         number of people.

12             MR. HARKINS:  The Latin phrase

13         is "magna voce".

14             THE WITNESS:  Yes.  Yes, I will

15         speak with confidence.

16    BY MS. BROWN:

17    Q.    Did you speak to Christopher Wright?

18    A.    I cannot tell you if I had a specific

19    conversation with Christopher Wright.  But I,

20    at some point, I had communication with

21    Mr. Wright.

22         "Speak", it means oral communication,

23    written communication?  Tell me what you mean

24    by "speak".

CHARLES M. NASELSKY

Page 267

1    Q.    If you look at P-34, which is the

2    Blank Rome time sheets on --

3    A.    Let me -- okay.  I got to go to that.

4    P-134?

5    Q.    P-34.

6    A.    Okay, just give me a second.

7    Q.    P-34, first page.

8    A.    Okay, go ahead.

9    Q.    On August 7, 2006, under your name,

10   it's telephone conference with R. Chawla,

11   telephone conference with Chris in Councilman

12   Kelly's office, review of legislation and

13   related history.  Do you see that?

14   A.    Okay.  And you've answered the

15   question.

16   Q.    You did have a conversation with

17   Christopher Wright --

18   A.    Yes.

19   Q.    -- on August 7th?

20   A.    I did.

21   Q.    And who is Christopher Wright?

22   A.    At the time, Mr. Wright was Chief of

23   Staff of City Councilman, I forgot his first

24   name, but Kelly.

CHARLES M. NASELSKY

Page 333

```
 1          document that he's not even copied

 2          on.  So I'm just objecting to the

 3          fact that, you know, I don't even

 4          understand what you're doing.

 5                MS. BROWN:  I pointed it out,

 6          and he said this was news to him.

 7                MR. TEITELMAN:  Exactly.

 8                MS. BROWN:  All right.

 9                MR. TEITELMAN:  That's what I

10          mean, news to him.  But I'm not sure

11          what the news was, the document or

12          the fact that Mr. Sahaya thought

13          there would be something that

14          Mr. Sahaya told him.

15   BY MS. BROWN:

16     Q.   At the top, this talks about a deal

17   sheet for JFK and 2040.

18     A.   Uh-huh.

19     Q.   At some point in time, did you become

20   aware that there was a deal to sell both JFK,

21   meaning River City, and 2040 Market?

22     A.   Yes.  Well, there were transactions

23   involving the sale of both parcels.

24     Q.   Do you know when you became --
```

CHARLES M. NASELSKY

Page 334

1    A.    No.  No.  No.  Stop.  I got to, I got

2    to make sure I say this correctly.  There was

3    a transaction involving the sale of 2040, but

4    I'm not aware of a transaction involving the

5    sale of River City.  I was not engaged to do

6    that.

7    Q.    You were unaware of a transaction

8    involving the sale of River City?

9    A.    We were not engaged to represent

10   anyone in the sale of River City.  Only to

11   the acquisition of River City.

12   Q.    Okay.  So you're unaware of a

13   transaction --

14   A.    As counsel, we're not, we're not --

15   Q.    Are you unaware of --

16   A.    Personally?  Yes, you've showed me

17   documents talking about some other

18   transactions.  But as a lawyer, I was not

19   engaged to do any work in connection with the

20   sale of property.  I was represen-, we were

21   representing a client in acquisition of the

22   property.

23   Q.    Do you have any knowledge of the sale

24   of -- let's call it a Nominee Agreement.  Do

CHARLES M. NASELSKY

Page 335

1   you have any knowledge of a Nominee Agreement

2   between JFK BLVD and Eliyahu Weinstein?

3      A.    I don't have -- I don't think I have

4   any knowledge of Mr. Weinstein himself.   I

5   have been given copies of Nominee Agreements

6   and other agreements.   You showed me that

7   today.

8      Q.    I don't believe I --

9      A.    I'm not sure -- you showed me Nominee

10  Agreements today.

11     Q.    With Philadelphia, --

12     A.    Yes.

13     Q.    -- JFK Philadelphia, LLC?

14     A.    You just asked me a generic question

15  as to am I aware of any transactions, and the

16  answer is yes.

17     Q.    No, with Eliyahu Weinstein.

18     A.    Oh.

19              MR. HARVEY:  Let's not quarrel.

20         Let's go back to question-and-answer.

21              THE WITNESS:  Why don't you ask

22         me the question?

23  BY MS. BROWN:

24     Q.    Are you aware of any Nomination

CHARLES M. NASELSKY

Page 336

1    Agreement between JFK BLVD Acquisition GP, LP

2    and Eliyahu Weinstein?

3      A.    I was not aware of one, no.  To the

4    best of my recollection, no.

5                        -  -  -

6        (P-245 marked for identification.)

7                        -  -  -

8    BY MS. BROWN:

9      Q.    Could you look at 245?

10     A.    Okay.

11     Q.    This is a string of e-mails between

12   you and Mr. Teitelman, September 20, 2006.

13   And you can see from the --

14     A.    No, that's not an accurate statement.

15     Q.    If I look at the first page of P-245,

16   is that not an -- you're right.

17           This is an e-mail at the bottom from

18   Andrew Teitelman to Mr. Chawla and

19   Mr. Zeghibe that gets forwarded to you.  Is

20   that a fair statement?

21     A.    That's correct.

22     Q.    Did you receive this e-mail?

23     A.    I did.

24     Q.    Okay.  And it has as an attachment

CHARLES M. NASELSKY

Page 337

1   listed here a "Contingent Judgment Promissory

2   Note and Security Agreement.DOC".  Do you see

3   that?

4       A.    Okay.

5       Q.    All right.  And if you go to the

6   second page, which would be 9107?

7       A.    Okay.

8       Q.    Do you see that there are some

9   e-mails at the bottom from a William

10  Martin --

11      A.    Uh-huh.

12      Q.    -- to Mr. Teitelman?

13      A.    Yes.

14      Q.    And the Subject is JFK Edits to the

15  Contingent Judgment Promissory Note?

16      A.    Okay.

17      Q.    And it talks about, "Please see the

18  black line of the Note attached.  I think

19  changes are required to clarify that payment

20  is only due, once Eli or his designee decide

21  to have the Nominee transfer the Property",

22  and it goes on.  Do you see that?

23      A.    Yes.

24      Q.    Does this refresh your recollection

CHARLES M. NASELSKY

Page 338

1    that you had some knowledge of the Contingent

2    Judgment Promissory Note with Eli Weinstein

3    in September of 2006?

4       A.    No, it doesn't change anything.  I

5    got an e-mail dated Wednesday,

6    September 20th, at 8:02 p.m., from Ravi with

7    an attachment that says no instructions.  It

8    doesn't mean anything to me.  It doesn't tell

9    me what to do with it.  It doesn't tell me to

10   read it.  I do nothing with it.

11      Q.    So you didn't --

12      A.    No, I never --

13      Q.    -- read it?

14      A.    I didn't respond to it.

15                    -   -   -

16        (P-246 marked for identification.)

17                    -   -   -

18   BY MS. BROWN:

19      Q.    And similarly, P-246, the next

20   document, --

21      A.    Okay.

22      Q.    -- this is an e-mail forwarded to

23   you --

24      A.    Uh-huh.

CHARLES M. NASELSKY

Page 339

1    Q.    -- that has, by Mr. Chawla to you,

2    that says Nominee Agreement.DOC?

3    A.    Right.

4    Q.    So it's still September 20, 2006.

5    A.    Right.

6    Q.    Do you recall this e-mail?

7    A.    I obviously got it, but it doesn't

8    tell me to do anything.  I just says, "Hey,

9    here's this".

10   Q.    So --

11   A.    There's no instructions for me to do

12   anything with it.  I don't need to read it.

13   I don't need to be aware of it.  It's just --

14   I would never even be concerned with it.

15   Q.    So, to the best of your recollection,

16   you didn't read either one of those --

17   A.    No, ma'am.

18   Q.    -- attachments?

19   A.    Absolutely not, no.  No.

20   Q.    Mr. Naselsky, I want to ask you a

21   question about a document that we looked at

22   and I neglected to do so earlier.  It's P-37.

23   A.    Okay.

24   Q.    And this is the e-mail that you

CHARLES M. NASELSKY

Page 343

1   Mr. Weinstein?

2      A.    Oh, with Weinstein?  No.  The answer

3   is no, I have never seen, to my knowledge,

4   I've never seen a Nominee Agreement with him.

5      Q.    When is the first time you heard the

6   name Eliyahu Weinstein?

7      A.    Gosh.  It was sometime in the fall.

8   I can't tell you the exact date.  It was

9   sometime in the fall.

10     Q.    Of 2006?

11     A.    Yes.  Yes.

12     Q.    And in what connection did you hear

13  his name?

14     A.    I heard his name because he was

15  attending a fundraiser for then seeking

16  re-election when Governor Rendell, and I was

17  asked to attend as well.  And the client

18  pointed out that that's one of their

19  associates, Mr. Weinstein.  I never met him.

20  I never shook his hand.

21              MR. FIEBACH:  Can you keep your

22        voice up?

23              THE WITNESS:  I never met him.

24        I never shook his hand.  I think

ELITE LITIGATION SOLUTIONS, LLC

CHARLES M. NASELSKY

Page 370

1   BY MS. BROWN:

2      Q.    If you look at 182?

3      A.    Okay.

4      Q.    It's a string of e-mails.  And I'm

5   concentrating on the top one, but you can

6   look at as many as you need to.

7      A.    Uh-huh.

8      Q.    It's from Mr. Chawla to you on

9   September 20, 2006.

10     A.    Uh-huh.

11     Q.    And he says, "Charlie, let's talk

12  before you talk to the buyer's attorney at

13  Fox Rothschild".  Do you see that?

14     A.    Uh-huh.

15     Q.    Does this help you remember or

16  recollect who he's talking about "the buyer"?

17     A.    No, I don't -- I'm not representing

18  them as a seller of anything.  So, if my --

19  if the clients want to ask me to speak with

20  somebody regarding the diligence work that

21  we've done for them as the buyer, I'm happy

22  to comply.  But we're not -- I'm not

23  engaged -- there's no transaction services

24  being provided to the client with respect to

CHARLES M. NASELSKY

Page 371

1    the sale of anything.

2           So this is how he's describing this

3    other person.  That's fine with me.  I don't

4    know what a "buyer" means in this context.  I

5    don't -- it could be investor.  It could be a

6    lender.  I don't know.

7           But the bottom line is I'm not

8    representing anyone at this moment in time

9    nor did I or Blank Rome represent anybody in

10   connection with the sale of any aspect of

11   River City nor were we asked to represent

12   them in any aspect of the sale of River City.

13      Q.    I have that.

14      A.    Yes, okay.

15      Q.    So, putting aside whether you were

16   asked to represent him or not, --

17      A.    Right.

18      Q.    -- my question is just:  Were you

19   aware --

20      A.    Oh.

21      Q.    -- on September 20, 2006 that the

22   client was attempting to sell the property?

23      A.    No, I'm not aware of that.

24      Q.    Did you ask him, did you ask

CHARLES M. NASELSKY

Page 382

1   Q.    Again, this is a string of e-mails.

2   And I would like you to look at it if you

3   could.

4   A.    Okay.  Do you want me to go

5   backwards?

6   Q.    Please.

7   A.    Okay, I read them.

8   Q.    At the very top, Mr. Chawla is

9   writing to you on October 9th and he says,

10  "The deal is very alive.  Additional

11  1 million is due on October 27 on JFK.

12  Buyers is uncomfortable till we get a term

13  sheet from our lender".

14       Do you know what deal he was talking

15  about on October 9th?

16  A.    Well, the deal has got to be JFK

17  because that's the RE.

18  Q.    "Additional 1 million is due on

19  October 27 on JFK"?

20  A.    I guess if you look at the amendments

21  we'll find out if that's correct.

22  Q.    Do you believe this is a million

23  dollar deposit by JFK BLVD?

24  A.    I don't know.

CHARLES M. NASELSKY

Page 383

1    Q.    You don't know?

2    A.    I don't know.

3    Q.    "Buyer is uncomfortable till we get a

4    term sheet from our lender".

5    A.    Okay.

6    Q.    Who is the "buyer"?

7    A.    I don't know.  I'm not representing

8    them in any sale.  So it's not relevant to me

9    in my scope of services.  Remember, they have

10   in-house counsel, other lawyers that do other

11   deals around the world that I don't know

12   about.

13                   -  -  -

14      (P-189 marked for identification.)

15                   -  -  -

16   BY MS. BROWN:

17   Q.    189, please, Mr. Naselsky?

18   A.    Okay.

19   Q.    This is an e-mail from you to

20   Mr. Chawla and Mr. Zeghibe regarding 2040 and

21   JFK, and you say you've been working on tax

22   treatments of these transactions.

23   A.    Correct.

24   Q.    You go on to say in the middle, "That

CHARLES M. NASELSKY

Page 392

1    Q.    What was your task?

2    A.    My task was to evaluate tax issues

3    that flow to the client as a result of

4    transactions.

5    Q.    At the point that you drafted these

6    notes, was there a WAPC Contract of Sale in

7    place?

8    A.    I don't know if there was a contract.

9    The client provided us with a variety of

10   agreements that are all reflected in a memo,

11   P-193.  We didn't, we did not prepare any of

12   those agreements other than the R&F/JFK

13   agreement and then the rest for tax analysis,

14   preparation for this closing and the client

15   provided us all these other agreements.

16   Q.    Did you ever see a WAPC assignment?

17   A.    I can't recall if I had seen it, no.

18   Q.    Were you trying to determine whether

19   it would be best to accomplish the

20   transaction by either a WAPC contract of a

21   sale versus an assignment versus a nominee

22   agreement?

23   A.    No, I don't think that's the task.  I

24   think the task is what I said earlier.  The

CHARLES M. NASELSKY

Page 401

1   document?

2    A.    Yes, this is my handwriting.

3              MS. RISK:  And you're

4         referring, Counsel, I'm sorry?

5              MS. BROWN:  P-199.

6              MS. RISK:  Okay, thank you.

7   BY MS. BROWN:

8    Q.    And is this a proposed Financing

9   Request with Kennedy Funding?

10    A.    This is, yes, this is a term sheet

11   Letter of Intent draft.

12    Q.    And your clients were looking for

13   $45 million in funding?

14    A.    That's absolutely correct.

15    Q.    Under Guarantors, you've crossed out

16   "Ravinder S. Chawla" and put in "Jatinder"?

17    A.    Yes.

18    Q.    Do you know who Jatinder is?

19    A.    That's Ravinder's spouse.

20    Q.    And why did you do that?

21    A.    I believe the client told me that she

22   would be the guarantor.

23    Q.    At some point, Mr. Naselsky, do you

24   recall receiving a final Cushman & Wakefield

CHARLES M. NASELSKY

Page 402

1  appraisal in November of 2006?

2      A.    You know, I did.  I don't know the

3  date.  I'm sure if I saw it I could reflect,

4  but I did receive a final appraisal, yes.

5                    -  -  -

6      (P-201 marked for identification.)

7                    -  -  -

8  BY MS. BROWN:

9      Q.    If you look at P-201, that might help

10  you, P-201?

11     A.    Okay.

12     Q.    A series of e-mails between you and

13  Ms. Olivia Baer from Cushman & Wakefield.

14     A.    Okay.

15     Q.    Do you recall that the report was

16  delivered but it said Cushman -- Charles

17  Naselsky at Cozen O'Connor?

18     A.    Right.  I remember now that they had

19  to just change the address for me.

20     Q.    Did you know in November of 2006 that

21  there had also been a change to the Cushman

22  appraisal to reduce the exposure time to six

23  months?

24               MS. RISK:  Objection to form.

CHARLES M. NASELSKY

Page 404

1    A.    Okay.  I'm not really familiar with

2    that nomenclature.

3    Q.    At all?

4    A.    It's not something that, a term of

5    art I use, no.

6    Q.    When you received the final appraisal

7    in November of 2006, did you tell anyone at

8    Cushman that the transaction referred to in

9    the Sales History had not taken place?

10    A.    I did not.

11              MS. RISK:  Objection to form.

12              THE WITNESS:  Okay.  No, I did

13         not communicate with Cushman.  I

14         don't think I communicated with them

15         at all since July.

16    BY MS. BROWN:

17    Q.    Of 2006?

18    A.    '06, yes.  I don't think I had any

19    subsequent conversations with them.

20    Q.    Did you have any --

21    A.    Or August.  I can't remember the

22    exact date, but it was summer.

23    Q.    Once receiving the final appraisal in

24    November of 2006, did you have any

CHARLES M. NASELSKY

Page 440

1    to you.  And he says, "I know what it's like

2    to be caught in the middle in unpleasant

3    situations.  You are correct that Cozen will

4    be paid.  And you also understand that can't

5    happen until we get past the deals that are

6    slated for December".  Do you see that?

7        A.    Okay.

8        Q.    What did you understand him to mean

9    by, "the deals that are slated for December"?

10       A.    I assume he's talking about all these

11   closings.

12       Q.    Mr. Naselsky, there was a meeting

13   that took place on December 6, 2006 at the

14   offices of Mr. Rappoport at Daroff Designs in

15   which Mr. Rappoport presented to certain

16   potential investors, including my client

17   Mr. Berger.  Were you at that --

18       A.    Say that again?

19       Q.    Including my client Mr. Berger.

20       A.    There was a meeting at --

21       Q.    Rappoport's office on December 6, --

22       A.    -- Rappoport's office on December

23   6th, right.

24       Q.    -- 2006 --

CHARLES M. NASELSKY

Page 441

1     A.     Okay.

2     Q.     -- where a presentation was made on

3   the River City Property to my client

4   Mr. Berish Berger.  Were you at that meeting?

5     A.     No.

6     Q.     Were you aware that meeting was going

7   to take place?

8     A.     No.

9     Q.     Did anyone tell you about that

10  meeting?

11    A.     No.

12    Q.     Were there efforts to try to get the

13  Logan Square Neighborhood Civic Association

14  to change the Clarke ordinance to take

15  Parcels D and E out of it?

16    A.     That would not be the -- I believe

17  that members of the Blank Rome land use team

18  met with a representative or two of the Logan

19  Square Civic Association to discuss the

20  subject of the ordinance, okay.

21    Q.     Did that meeting go well?

22    A.     I don't -- I think I attended a

23  portion of it, but I don't remember attending

24  it at all.  There was too many lawyers

CHARLES M. NASELSKY

                                          Page 445

1    noon".

2       A.    Okay.

3       Q.    What was your understanding about

4    Mr. Weinstein's connection to the JFK

5    transaction?

6       A.    I have no understanding.

7       Q.    At this point?

8       A.    I have no understanding with it.

9    Because I'm not representing them in this

10   aspect.  This is from Andy Teitelman, not

11   from me.

12      Q.    Did you have an understanding at this

13   state, though, that Mr. Weinstein was to put

14   $13 million into escrow?

15      A.    According to this sheet, yes, sure.

16      Q.    But you had no idea why?

17      A.    Not relevant.

18      Q.    You didn't even know who Eli

19   Weinstein was?

20      A.    Well, I know who he is because you

21   showed me agreements, but --

22      Q.    He was on the Nominee Agreement, --

23      A.    Right.

24      Q.    -- and you had reviewed that, right?

CHARLES M. NASELSKY

Page 446

1    A.    Yes.  Well, reviewed it for tax

2    purposes but not for the transaction.

3    Q.    So what was your understanding about

4    how Eli Weinstein was connected to the JFK

5    transaction?

6              MS. RISK:  Objection to form.

7              THE WITNESS:  I have no

8         relationship with Eli Weinstein and

9         the JFK transaction with respect to

10        the scope of services that Blank Rome

11        or Cozen did.

12   BY MS. BROWN:

13   Q.    I understand that.  I'm asking what

14   your understanding was as to what his

15   relationship was to the JFK transaction?

16   A.    I have no understanding at all, none.

17   Q.    No understanding whatsoever?

18   A.    No.  No.  He's not a party in any of

19   the client relationships that I have.  He's

20   not a signatory to any documents that I have.

21   I'm not asking him to execute any closing

22   instruments.  I'm not asking him to sign

23   anything on my side.  I don't know what --

24   his existence has no bearing on my ability to

CHARLES M. NASELSKY

Page 447

1  close the transaction within the confines of

2  my assignment, none.

3                    -  -  -

4      (P-229 marked for identification.)

5                    -  -  -

6  BY MS. BROWN:

7      Q.    Could you look at P-229?

8      A.    Sure.

9      Q.    It's an e-mail between you and

10  Mr. Teitelman.  It's actually a string of

11  e-mails.  He talks about the buyer.

12      A.    Okay.

13      Q.    Now, this is with respect to the 2040

14  Market Street transaction, correct?

15      A.    Okay.

16      Q.    Who was the buyer for the 2040 Market

17  Street transaction in or about November 2006?

18      A.    I don't remember the name of the

19  buyer.

20      Q.    Was it Eli Weinstein?

21      A.    I don't know.  No.

22      Q.    Did you close that transaction, the

23  2040?

24      A.    I thought that was an equity

CHARLES M. NASELSKY

Page 467

1

2                    CERTIFICATE

3

4

5            I HEREBY CERTIFY that the

6    witness was duly sworn by me and that the

7    deposition is a true record of the testimony

8    given by the witness.

9

10

11

12

13            Kimberly S. Gordon, a

14            Registered Professional Reporter,

15            Certified Court Reporter

16            and Notary Public

17            Dated:  JULY 30, 2016

18

19

20                    (The foregoing certification

21    of this transcript does not apply to any

22    reproduction of the same by any means,

23    unless under the direct control and/or

24    supervision of the certifying reporter.)

ELITE LITIGATION SOLUTIONS, LLC

# ACKNOWLEDGMENT OF DEPONENT

I, _Charles M Naselsky_, do hereby certify that I have read the foregoing pages, _____ - _____, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_(signature)_            _8·8·2016_
**SIGNATURE**                **DATE**

Subscribed and sworn to before me this _____ day of _____, 20____.

_____
                            **Notary Public**

My commission expires: _____