IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KILBRIDE INVESTMENTS LIMITED, BUSYSTORE LIMITED IN LIQUIDATION, and BERGFELD CO. LIMITED,** Plaintiffs, | **CIVIL ACTION** |
| v. | **NO. 13-5195** |
| **CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., BLANK ROME LLP, and COZEN O'CONNOR, P.C.,** Defendants, | |
| and | |
| **CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC.,** Third Party Plaintiff, | |
| v. | |
| **CHAIM ZEV LEIFER, HASKEL KISH and JFK BLVD. ACQUISITION G.P., LLC,** Third Party Defendants. | |

DuBois, J.                                                    February 16, 2018

**M E M O R A N D U M**

## I.    INTRODUCTION

This is a fraud case in which Kilbride Investments Limited, Busystore Limited,

and Bergfeld Co. Limited (collectively, "plaintiffs"), allege that defendants, Cushman &

Wakefield of Pennsylvania, Inc. ("C & W"), Blank Rome LLP ("Blank Rome"), and Cozen

O'Conner, P.C. ("Cozen"),[1] induced them into investing at least $27 million in a real-estate development project called "River City," in Philadelphia, Pennsylvania, by fraudulently misrepresenting the applicable zoning restrictions, the feasibility of the project, and the valuation of the real estate.

Before the Court are two Motions for Summary Judgment filed by defendant Cozen O'Connor and Cushman & Wakefield, and four *Daubert* Motions filed by plaintiffs and defendants. This Memorandum addresses Cozen's Motion for Summary Judgment. For the reasons that follow, Cozen's Motion for Summary Judgment is granted in part and denied in part.

## II.     BACKGROUND

### A.     Naselsky's Work at Cozen O'Connor

The River City Property consisted of 8.2 acres, divided into five parcels located along JFK Boulevard in Philadelphia, Pennsylvania. Def. Cozen's Statement of Undisputed Material Fact in Supp. Mot. Summ. J. ¶ 8 ("Cozen's SOF") (Document No. 117, filed April 17, 2017). In the spring of 2006, Ravinder Chawla and Richard Zeghibe developed a plan to purchase and flip the River City Property. Pls.' Counterstatement of Material Facts in Opp. to Mot. Summ. J., ¶¶ 36–40 ("Pls.' SOF") (Document No. 149, filed May 24, 2017). On or about March 14, 2006, Chawla and Zeghibe, through their entities, World Acquisition Partners Corporation ("WAP")[2] and Patriot Properties, Inc. ("Patriot),[3] retained real estate attorney Charles Naselsky of Cozen

_____

[1] By Order dated August 17, 2017, the Court granted the Joint Motion of Defendants, Cushman & Wakefield of Pennsylvania, Inc., Blank Rome LLP, and Cozen O'Connor P.C., for Summary Judgment as to the Claims of Plaintiffs Berish Berger, Ardenlink Limited, and Towerstates Limited for Lack of Subject-Matter Jurisdiction Based Upon Want of Standing.
[2] Ravinder Chawla was the sole owner of WAP, a corporate entity which focused on commercial and residential real estate development. Pls.' SOF ¶ 12, 14; Cozen SOF ¶ 7.
[3] Richard Zeghibe was the principal of Patriot. Cozen SOF ¶ 7. Although Cozen's client intake form refers to Patriot Properties, Inc.; the actual name of the entity owned by Zeghibe was Patriot Parking, Inc. Pls. SOF ¶ 57.

O'Connor to represent them in connection with the acquisition of the River City Property. *Id.* at ¶¶ 2,3, 6.[4]

Naselsky formed an entity called JFK BLVD Acquisition GP, LLC ("JFK Blvd."), on or about March 30, 2006, for the purpose of purchasing the River City Property from its owner at that time, R&F Penn Associates, L.P. ("R&F Penn"). Cozen SOF ¶¶ 8, 9; Pls' SOF, Ex. PSJX-11, Deposition of Andrew Teitleman, 40: 14–21. Naselsky drafted an agreement of sale, executed by R&F Penn and Zeghibe as the managing member of JFK Blvd., on May 12, 2006, providing for the sale of the River City Property to JFK Blvd. for $32.5 million. Cozen SOF ¶ 10; Pls.' SOF ¶67. Architect James Rappoport was also hired to design a development concept for the property to attract prospective investors. Cozen SOF ¶18; Pls.' SOF ¶ 76.

In May 2006, Naselsky engaged Cushman & Wakefield ("C&W") to appraise the River City Property. Cozen SOF ¶ 11; Pls.' SOF ¶ 113. On May 18, 2006, Gerald McNamara, one of the appraisers at C&W, emailed a draft engagement letter to Naselsky in connection with the appraisal of the River City Property. Pls.' SOF ¶ 118. Naselsky responded to the draft engagement letter with proposed edits, which included changing the client name from Cozen O'Conner to "JFK Acquisition G.P., LLC"[5] and expanding the intended users section of the appraisal to include, not just the client, but "its professionals, investors and potential lenders." Pls.' SOF ¶¶ 126 –28, 130.

C&W issued a draft appraisal on June 23, 2006, which appraised the property at $57 million. Pls.' SOF ¶ 140; Cozen SOF ¶ 30. The June 2006 draft appraisal stated that the River City Property "is currently reported to be under a contract of sale, dated January 2006, for a

---

[4] Although plaintiffs contend that the identity of Naselsky's other clients are in dispute, they do not dispute that both WAP and Patriot were Naselsky's clients. Pls.' Resp. to SOF of Def. in Supp. Mot. Summ. J. ("Pls.' Resp. to Cozen SOF") ¶ 6.
[5] JFK Acquisition G.P., LLC, is a misnomer for JFK Blvd. Acquisition G.P., LLC. Pls.' SOF ¶ 127.

reported consideration of $50,000,000." Cozen SOF ¶ 31; Pls.' SOF ¶ 142. The June 2006 draft appraisal misstated both the sale price and date of the contract between JFK Blvd. and R&F Penn; the contract was executed in May 2006, not January 2006, and the sale price was $32.5 million, not $50 million.

Upon receipt of the June 2006 draft appraisal, Chawla emailed Naselsky instructing him to: "Please do your magic and push the value over $100 million." Cozen SOF, Ex. 23, Email from Ravinder Chawla to Charles Naselsky and Richard Zeghibe; Pls.' SOF ¶ 158. Zeghibe also provided feedback with respect to the June 2006 draft appraisal and expressed his belief that the appraised value should be higher given the River City Property's development potential. Cozen SOF, Ex. 24, Email from Richard Zeghibe to Charles Naselsky and Ravi Chawla.

Naselsky emailed McNamara on July 4, 2006, expressing concern about the $57 million figure in the June 2006 draft appraisal, stating: "[i]n essence, the number is conveniently close to the contract price where the factors that need to go into play for a development assemblage of this type seem to be missing." Pls.' SOF ¶ 170. On July 10, 2006, Naselsky met with Daniel McNeil, the C&W employee who drafted the June 2006 draft appraisal, to discuss his concerns. *Id.* at ¶ 172; Cozen SOF ¶ 34. Ten days later, McNeil submitted a revised draft appraisal ("the July 2006 draft appraisal") of the River City Property with a new appraised value of $77 million. Pls.' SOF ¶ 191; Cozen SOF ¶ 36. The July 2006 draft appraisal again listed the sale price of the property between R&F Penn and JFK Blvd. as $50 million, not the actual sale price of $32.5 million. Pls.' SOF ¶ 192.

On June 27, 2006, Naselsky emailed Zeghibe and Chawla, attaching an "Agreement of Sale" by which JFK Blvd. was to sell the River City Property to WAP for $50 million. Pls.' SOF, Ex. P-132; Cozen SOF ¶ 22. According to plaintiffs, the transaction never occurred.

Instead, the purported transaction was an "internal flip" used to "increase[] valuations based on agreements of sale that were never intended to close." Pls.' SOF ¶ 220.

Naselsky left his employment with Cozen on July 28, 2006. Cozen SOF ¶ 4. On July 31, 2006, Naselsky commenced employment with Blank Rome LLP ("Blank Rome"). *Id.* ¶ 5. In his role at Blank Rome, Naselsky continued to work with Chawla and Zeghibe on the River City Property. Pls.' SOF ¶ 234.

## B. Post-Cozen: The Proposed Zoning Ordinance, and Eli Weinstein

On August 7, 2006, Naselsky received an email from Chawla notifying him that the City Council had passed a Proposed Zoning Ordinance.[6] Cozen SOF ¶ 53. Shortly before Chawla and Zeghibe began working to acquire the River City Property in the spring of 2006, the Philadelphia City Council introduced Bill No. 060292, titled "An ordinance amending Section 14-1611 of the Philadelphia Code, entitled 'Benjamin Franklin Parkway Controls,'" (the "Proposed Zoning Ordinance"). Cozen SOF ¶ 43. On May 25, 2006, the Proposed Zoning Ordinance was amended to expand the territory impacted to include two of the five parcels of the River City Property.[7] *Id.* ¶ 49. The Proposed Zoning Ordinance, passed by the Philadelphia City Council on June 8, 2006, imposed a height limit of 125 feet on the impacted territory, including two of the five River City Property parcels. *Id.* ¶ 48.

Despite the height limitations imposed by the Proposed Zoning Ordinance, Chawla and Zeghibe solicited investors to purchase the River City Property. On August 29, 2006, Chawla and Zeghibe met with Eli Weinstein, who expressed an interest in purchasing the River City Property. Cozen SOF ¶ 68; Pls.' SOF ¶ 291. Weinstein was a real estate investor who lived in

---

[6] Plaintiffs dispute that this is the first time Naselsky learned of the Proposed Zoning Ordinance. Instead, they argue that he learned of the Proposed Zoning Ordinance in "early summer of 2006." Pls.' Resp. to Cozen SOF ¶ 53.

[7] Plaintiffs dispute the use of the word "proposed" with respect to the zoning ordinance, because, they argue that pursuant to the Pending Ordinance Doctrine, the City began enforcing the ordinance prior to its enactment on June 8, 2006. Pls.' Resp. to Cozen SOF ¶ 49. The Court will use "Proposed Zoning Ordinance" to avoid confusion.

Lakewood, New Jersey and is a member of the Orthodox Jewish community there. Cozen SOF ¶ 67.

On September 26, 2006, Weinstein agreed to purchase the River City Property for $70 million. Cozen SOF ¶ 69, ex. 47, "Nominee Agreement between World Acquisition Partners Corp. and Eli Weinstein"; Pls.' SOF ¶ 296.[8] Weinstein sought potential investors in the River City Property, including Berish Berger. Cozen SOF ¶ 106. Berger is a real estate investor who lives in London, and is a member of the Orthodox Jewish community there. *Id.* at ¶¶ 82, 83. On December 6, 2006, Berger was present at a meeting in Philadelphia attended by Weinstein, Chawla, and Rappoport,[9] at which Rappoport presented his designs for the River City Property. Pls' SOF ¶ 407; Cozen SOF ¶ 113. Following the December 6, 2006, meeting, Berger received a copy of the C&W appraisal which valued the River City Property at $77 million. Cozen SOF ¶ 117; Pls.' SOF ¶¶ 427–29. Berger agreed to partner with Weinstein to purchase the River City property. Cozen SOF ¶ 120.

On December 18, 2006, plaintiff Kilbride, a discretionary family trust established by Berger's father, sent $12 million to Montgomery Abstract Company, a title company which held funds for the purchase of the River City Property. Cozen SOF ¶¶ 84, 121; Pls.' SOF ¶ 451. Upon Berger's request, plaintiff Busystore Limited, a United Kingdom company formed by Berger and his wife to conduct real estate business, wired $9.5 million to Weinstein and his entity, Pine Projects LLC. Pls.' SOF ¶ 455. On January 19, 2007, plaintiff Bergfeld, a real

---

[8] The September 2006 Nominee agreement was later replaced with the December 2006 Nominee Agreement.
[9] The parties agree that Weinstein, Chawla, and Rappoport were in attendance at the meeting but disagree as to whether others were also present. *See* Pls.' Resp. to Cozen SOF ¶¶ 111, 113.

estate company of which Berger is one of nine directors,[10] wired $5 million to Pine Projects. Cozen SOF ¶ 137; Pls.' SOF ¶479.[11]

Berger later discovered that Weinstein had misappropriated the funds sent to Pine Projects. As a consequence, plaintiffs never obtained an interest in the River City Property. Cozen SOF ¶141.

## III.  PROCEDURAL HISTORY

This case is the fourth civil action filed by Berish Berger and/or plaintiffs arising from the River City development project. The Court detailed the procedural history of this case at length in its Memorandum dated August 18, 2017, (Document No. 177) and sees no need to repeat it. The Court notes only that, after issuance of the Memorandum and Order dated August 18, 2017, by which the Court granted the Motion By Defendants, Blank Rome LLP, Cozen O'Connor, P.C., and Cushman & Wakefield of Pennsylvania, Inc., for Summary Judgment as to the Claims of Plaintiffs Berish Berger, Ardenlink Limited, and Towerstates Limited for Lack of Subject-Matter Jurisdiction Based Upon Want of Standing, the remaining plaintiffs are Kilbride Investments Limited, Busystore Limited In Liquidation, and Bergfeld Co. Limited.

## IV.  APPLICABLE LAW

A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that

---

[10] The other directors of Bergfeld are his siblings and siblings-in-law. Pls.' SOF ¶ 479.
[11] Two other Berger entities, Towerstates Limited and Ardenlink Limited, wired $12.5 million to Pine Projects. Cozen SOF ¶¶ 135, 136; Pls.' SOF ¶¶ 474, 475. Towerstates Limited and Ardenlink are no longer plaintiffs in this case.

a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing summary judgment must identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## V. DISCUSSION

Plaintiffs seek to hold Cozen liable for the actions of its employee, Naselsky, for conspiracy to commit fraud, and for aiding and abetting fraud, under a theory of *respondeat superior*. Am. Compl. ¶¶ 167–76. The Court next turns to those issues.

### A. Count I: Liability for Conspiracy Under *Respondeat Superior*

The Court must first determine whether Cozen can be held liable for conspiracy to commit fraud under a theory of *respondeat superior*. The Court concludes that it may.

As an initial matter, Cozen does not dispute the existence of an employee-employer relationship with Naselsky. Under the theory of *respondeat superior*, an employer is liable for torts of its employees "which cause injuries to a third party, provided that such acts were committed during the course of and within the scope of the employment*." Costa v. Roxborough Memorial Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998) (citing *Fitzgerald v. McCuthceon*, 410 A.2d 1270, 1271 (1979)). "This applies to intentional conduct as well as negligent conduct." *Shaup v. Jack D's, Inc.*, 2004 WL 187030, at *2 (citing *Costa*, 708 A.2d at 493); *see Bowman v. Home Life Ins. Co. of America*, 243 F.2d 331 (3d Cir. 1957) (intentional and even criminal torts can be within scope of employment).

Pennsylvania courts have not spoken on whether Pennsylvania law permits liability for civil conspiracy under a theory of *respondeat superior*. Cozen argues that liability for civil conspiracy and the doctrine of respondeat superior are "intellectually irreconcilable" because, while civil conspiracy requires "action in concert," *respondeat superior* imposes liability on an employer vicariously, absent any evidence of consent or agreement on the part of the employer. Cozen Mem. Law Supp. Mot. Summ. J., at 60–61. Cozen cites to *Baker Stewart Title & Trust of Phoenix, Inc.*, 197 Ariz. 535, 542 – 43 (Ariz. Ct. App. 2000), in which the court concluded that liability for civil conspiracy through *respondeat superior* would impose "double vicarious liability"—the employee would be liable for a tort that "she did not personally perform" as a member of the conspiracy, and *respondeat superior* would then impose liability on the employer for a tort the employee did not commit. *Id.* at 256. The Court of Appeals determined that these two layers of liability rendered "[t]he nexus between [the employer] and [the injured parties] . . . too remote." *Id.* at 257.[12]

The United States District Court for the Southern District of New York rejected the *Hall Brake* decision in *In re Parmalat Sec. Litig.*, noting that the *Hall Brake* court "cited no authority for [its] interesting holding." No. 06-CV-2991, 2007 WL 5008628, at *2 (S.D.N.Y. Feb. 21, 2007). The court further stated that "[i]f *Hall Brake* were applied literally, a corporation could not be held liable for fraud carried out pursuant to a conspiracy organized by the corporation's chief executive officer pursuant to a resolution of the board of directors if the fraudulent representation were made by a co-conspirator rather than the CEO." *Id.*

---

[12] To the extent that Cozen relies on case law holding that municipalities cannot be held liable for §1983 claims under the doctrine of *respondeat superior*, the Court is not persuaded. The context of those cases is entirely different. The Supreme Court decision in *Monell v. Dep't Soc. Serv.*, 436 U.S. 658 (1978) rejecting liability of an employer under *respondeat superior* was based on a determination of Congressional intent, and is distinguishable.

This Court agrees with the *Parmalat* court. Pennsylvania courts long imposed liability on employers through *respondeat superior* where there is no evidence that the employer had knowledge of, or authorized, the tortious conduct "on the ground of public policy, that it is more reasonable that when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger." *Aiello v. Ed Saxe Real Estate, Inc.,* 499 A.2d 282, 285 (Pa. 1985). A contrary holding would "permit the person who held out his agent as worthy of trust and confidence to escape liability for his agent's deceits and frauds, while at the same time reaping the fruits of his agent's fraud, all at the expense of an innocent third party." *Id.* at 287. Cozen's argument that conspiracy liability and *respondeat superior* are inconsistent fails because the very purpose of *respondeat superior* liability is to impose liability on the employer regardless of knowledge of or participation in the alleged tortious conduct. Accordingly, the Court concludes that Cozen may be held liable for conspiracy under the theory of *respondeat superior.*

Liability under *respondeat superior* is, however, limited to acts committed "*during the course of* and within the scope of employment." *Costa*, 708 A.2d at 493 (emphasis added). Accordingly, Cozen's potential liability is not unlimited; instead Cozen may only be held liable under a theory of *respondeat superior* for action taken in furtherance of the conspiracy during Naselsky's employment.

Cozen concedes that Naselsky was acting within the scope of his employment in his work with Chawla and Zeghibe through "negotiating a purchase agreement for his clients, forming a special-purpose entity to acquire the property, communicating legal advice to his clients, and engaging various vendors . . . on behalf of his client." Memo. Supp. Mot. Summ. J. at 53–54.

Cozen may, therefore, only be held liable for actions taken in furtherance of the conspiracy that occurred prior to July 28, 2006, at which time Naselsky left his employment with the firm.

### B. Civil Conspiracy

Having concluded that Cozen may be held liable under a theory of *respondeat superior*, the Court must determine whether plaintiffs produced evidence to show the existence of a conspiracy and the underlying fraud while Naselsky worked at Cozen.

Cozen argues that Weinstein alone defrauded plaintiffs by inducing them to invest in the River City Property and failing to inform Berger and his entities, of the Proposed Zoning Ordinance, and then misappropriating plaintiffs' funds. Memo. Supp. Mot. Summ. J. at 30. Because Naselsky did not conspire with Weinstein while he was at Cozen, Naselsky cannot be liable for Weinstein's fraud and Cozen cannot be liable under a theory of *respondeat superior* for that fraud. *Id.* at 40. But plaintiffs' evidence is not limited to Weinstein's conduct. Plaintiffs have presented evidence that Naselsky and Chawla took numerous steps to fraudulently inflate the price of the River City Property and concealed from investors the height limitations imposed by the proposed zoning ordinance for the purpose of misleading potential investors into purchasing the Property. Accordingly, the Court must determine whether plaintiffs have established a prima facie case upon which a jury could conclude that Naselsky conspired with Chawla to defraud plaintiffs as potential investors in the River City Property.

Liability for civil conspiracy under Pennsylvania law occurs upon a showing of "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir. 2003). The existence of a conspiracy may be proved by

circumstantial evidence, but mere suspicion or the possibility of a guilty connection is not sufficient. *Lawson v. City of Coatesville*, 42 F.Supp.3d 664, 685 (E.D.Pa. 2014) (citing *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 473)).

With respect to whether Naselsky entered into a conspiracy with Chawla, the Court concludes that there are genuine issues of material fact, precluding the entry of summary judgment. Plaintiffs presented evidence that Naselsky had a longstanding relationship with Chawla beginning around the year 2000. Pls.' SOF ¶¶ 17, 22. Plaintiffs further presented evidence that Chawla and his brother "began compensating Naselsky directly, separate and apart from the legal fees" owed to Cozen. Pls.' SOF ¶ 23. In return, Naselsky omitted legal fees owed to Cozen on the settlement sheets at real estate closings so that Chawla would not be required to use closing proceeds to pay for legal services performed in connection with the transaction, allowing him to delay payment until receipt of funds from an investor to avoid using his own money to pay for closing costs. Pls. SOF ¶¶ 32-36.[13] It is against this backdrop that plaintiffs assert Naselsky continued to represent Chawla's entity, WAP, in connection with the purchase of the River City Property.

Plaintiffs have further provided evidence that Naselsky took the following overt actions in furtherance of the conspiracy: (1) Naselsky asked C&W to revise the engagement letter for the 2006 Appraisal to expand the "Intended Users" section so that the appraisal "could be shown to JFK GP, LLC's potential lenders and potential investors . . . and used to defraud them," Pls.' SOF ¶¶ 128, 129; (2) Naselsky failed to correct information in both the June and July 2006 draft appraisals that he knew to be false—that the River City Property was under contract of sale for $50 million when in fact the sale price was $32.5 million; (3) Naselsky misrepresented to C&W

---

[13] When Naselsky left Cozen, Chawla and his entities owed the firm over $462,000 for legal services. Cozen did receive payment in full by February 2007. Pls.' SOF ¶ 35, Ex. PSJX-2, Cozen 30(b)(6) Dep. At 70:5-71:10.

that the agreement of sale for the River City Property was a private sale with no brokers involved, when he knew that to be false; (4) Naselsky met with C&W appraiser to persuade him to increase the appraisal value from $57 million to $77 million; and (5) Naselsky negotiated and drafted the June 26, 2006, "Agreement of Sale," which he knew was an "internal flip" designed to fraudulently increase the value of the River City Property; (5) and that Naselsky assisted the financing of the conspiracy by leaving Cozen's legal fees "off the sheets" at closing, thus allowing Chawla and Zeghibe to delay payment to Cozen until they received funds from an investor.

Plaintiffs have also presented evidence that Naselsky learned of the height ordinance while he worked at Cozen. Pls' SOF ¶25. On this issue, plaintiffs cite Naselsky's trial testimony in 2010:

> Q. When is the earliest date by which you were aware that the Philadelphia City Council was considering an ordinance to limit the height of buildings in the Ben Franklin overlay district which included River City?
>
> A. I'm going to have to give you a time period, not exact date. Have to be early summer of 2006.
>
> PSJX-29 at 76:7-12.

Cozen argues that there is no other evidence that Naselsky was aware of the proposed ordinance while at Cozen, and all other evidence on this issue supports finding that Naselsky was not aware of the Proposed Ordinance until August 7, 2006, after he left Cozen. The Court disagrees. Naselsky left his employment with Cozen on July 28, 2006. If Naselsky learned of the proposed ordinance during the "early summer of 2006," that could certainly have occurred prior to July 28, 2006, while Naselsky was still employed at Cozen.

Construing the foregoing evidence in the light most favorable to plaintiffs, the Court concludes that a fact-finder could conclude that Naselsky agreed with Chawla to fraudulently

inflate the price of the River City Property and conceal the existence of the proposed height ordinance in order to sell it to unwitting investors.

Plaintiffs argue that there is evidence of one additional overt act taken in furtherance of the conspiracy during the time in which Naselsky was employed at Cozen. The Court disagrees. Plaintiffs argue that there is evidence that "Naselsky or Rappoport" provided C&W with false information regarding the purported $50 million sale. Pls.' Resp. to Cozen's Mot. Summ. J. at 2. However, this statement is based on deposition testimony that *either* Naselsky or Rappoport provided that information to C&W. There is no other evidence with respect to that issue. Without more evidence, a juror would be required to speculate with respect to the source of this information. *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (an inference based on speculation or conjecture does not create a genuine factual dispute sufficient to defeat summary judgment). Accordingly, Cozen cannot be held liable for the providing of the false, $50 million contract price by Naselsky to C&W.

### C.    The Underlying Fraud

The Court's inquiry does not end there. "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing the vicarious liability for the underlying tort." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396 (3d Cir. 2000). Therefore, if a court concludes that no tort was committed, there can be no civil conspiracy to commit that tort. *Turevsky v. FixtureOne Corp.*, 904 F. Supp. 2d 454, 462 (E.D. Pa. 2012).

The underlying tort in this case is fraud. The elements of fraud under Pennsylvania law are: "1) a misrepresentation, 2) material to the transaction, 3) made falsely, 4) with the intent of misleading another to rely on it, 5) justifiable reliance resulted, and 6) injury was proximately

caused by the reliance." *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 136 (3d Cir. 2005) (citing *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534 (Pa. Super. Ct. 2003)).

Cozen argues that plaintiffs cannot prove the existence of the underlying fraud, because plaintiffs cannot establish that Naselsky or Chawla's conduct was the proximate cause of plaintiffs damage. They further contend that plaintiffs are collaterally estopped from asserting the existence of an underlying fraud with respect to Chawla, because a jury in a prior action already determined that Chawla was not liable for fraud. The Court addresses each argument in turn.

### a. *Proximate Causation*

Cozen argues that Weinstein's fraud, not any fraud on the part of Naselsky or Chawla, proximately caused plaintiffs' damages. Memo. Supp. Mot. Summ. J. at 36–37. The Court concludes that plaintiffs have raised a genuine issue of material fact as to whether misrepresentations made by Naselsky and Chawla during the time that Naselsky worked at Cozen proximately caused plaintiffs' damages.

"Pennsylvania courts utilize the 'substantial factor' test from the Restatement (Second) of Torts to ascertain proximate cause. *Heeter v. Honeywell International, Inc.*, 195 F.Supp.3d 753, 758 (E.D.Pa. 2016) (citing *Whitner v. Von Hintz*, 263 A.2d 889, 89 –94 (Pa. 1970). "Where a jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, the fact that there is a concurring cause does not relieve the defendant of liability." *Powell v. Drumheller*, 653 A.2d 619, 622 (Pa. 1995). The substantial factor need not be the only factor responsible for bringing about the alleged harm. *Id.* "Indeed, '[t]wo or more causes may contribute to and be the proximate cause of an injury." *Simmons v. Simpson House,*

*Inc.*, 224 F.Supp.3d 406, 420 (E.D.Pa. 2016) (citation omitted).  The court may only decide

proximate causation as a matter of law if it concludes that the jury could not reasonably differ as

to the question of proximate cause.  *Heeter*, 195 F.Supp.3d, at 758 (citing *Chetty Holdings Inc. v.*

*NorthMarq Capital, LLC*, 556 Fed. App'x 118, 121 (3d Cir. 2014)); *see also Powell*, 653 A.2d,

at 622 (The question of concurrent causation is normally one for a jury).

Plaintiffs present evidence that Berger relied on C&W appraisal of the River City

Property when he caused the entity plaintiffs to wire money to Weinstein.  Plaintiffs have

presented evidence that Naselsky and Chawla worked together to fraudulently inflate the

appraisal value of the River City Property through misrepresenting information to the C&W

appraisers and failing to correct information in both the June and July 2006 draft appraisals and

by effectuating a "sham sale" of the River City Property to inflate its value.  Based on that

evidence, the Court concludes that plaintiffs have demonstrated that there is a genuine issue of

material fact as to whether Naselsky and Chawla's actions during the time that Naselsky was

employed by Cozen constituted a "substantial factor" in bringing about plaintiff's harm.

### b.  Collateral Estoppel

Cozen further argues plaintiffs are collaterally estopped from asserting a fraud

claim because a jury already determined that Chawla was not liable for fraud and thus they

cannot prove the existence of the underlying fraud to support a conspiracy.

Under Pennsylvania law,[14] the party seeking to apply issue preclusion has the burden to

show that "(1) the issue decided in the prior case is identical to the one presented in the later

action; (2) there was a final adjudication on the merits; (3) the party against whom the plea is

asserted was a party or in privity with a party in the prior case; (4) the party or person privy to

---

[14] The preclusive effect of a prior judgment by a federal court applying substantive state law is determined by "the law that would be applied by state courts in the State in which the federal diversity court sits." *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).

the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment." *Office of Disciplinary Counsel v. Kiesewetter*, 899 A.2d 47, 50-51 (Pa. 2005). Cozen has not met that burden, because it has failed to show that the issue decided in the prior case is identical to the one presented in the instance case.

A jury trial was held in *Berish Berger, et al v. Richard Zeghibe, et al* ("*Berger II/III*") and the jury returned a verdict on July 30, 2010. In relevant part, the jury found Weinstein and Pine Projects liable for fraud and conspiracy to defraud, and Chawla and WAP liable for conspiracy to defraud. The jury, however, did not find Chawla liable for the underlying fraud.[15] Cozen asserts that whether Chawla committed fraud was directly at issue in *Berger II/III*. On the record presently before the Court, the Court cannot determine whether the issue decided in *Berger II/III* was the same as the issue presented in the instant case. In *Berger II/III*, the jury determined that Chawla did not conspire with Weinstein to defraud plaintiffs. Naselsky was not a party to the action and Cozen provides no information regarding evidence presented in that case with respect to Naselsky's role in the alleged fraud. Because a conspiracy between Naselsky and Chawla is directly at issue in this case, the Court cannot conclude, without more evidence, that the issue in this case—whether Chawla and Naselsky conspired to defraud plaintiffs—is identical to the issue that was presented in *Berger II/III*.

### D. Intracorporate Conspiracy Doctrine

Cozen further argues that it cannot be held liable for the actions taken by Naselsky in furtherance of the conspiracy while employed at Cozen, because the intracorporate conspiracy doctrine precludes liability for attorneys who conspire with their clients.

---

[15] The verdict form with respect to this issue stated: "Have plaintiffs proven by clear and convincing evidence that any of the following defendants are liable for fraud against the plaintiffs?" Cozen SOF, Ex. 69.

Under the intracorporate conspiracy doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1867 (2017). The rationale behind this rule is that "when two agents of the same legal entity make an agreement in the course of their official duties," their acts are attributed to the principal and accordingly, an agreement has not been formed between two or more separate persons as required for conspiracy liability. *Id.*[16]

The intracorporate conspiracy doctrine has been extended to the attorney-client relationship to preclude conspiracy liability for attorneys alleged to have conspired with clients because "a client and a lawyer, acting in an agency relationship, constitute a single entity." *Bowdoin v. Oriel*, No. 98-CV-5539, 2000 WL 134800, at *14 (E.D.Pa. Jan. 28, 2000); *See Heffernan v. Hunter*, 189 F.3d 405 (3d Cir. 1999) (extending the intracorporate conspiracy doctrine to the attorney-client relationship); *Robinson v. Canterbury Village, Inc.*, 848 F.2d 424, 430 (3d Cir. 1988) (applying intracorporate conspiracy doctrine in §1985 case)' *Doherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984) (collecting cases). In *Doherty*, plaintiff alleged that his *nolo contendere* plea was invalid because AMC, the corporation, had conspired with its in-house counsel and outside counsel to violate 42 U.S.C. § 1985(2) by coercing him into taking a plea deal.[17] *Id.* at 339. The court stated that "'[j]ust as a corporation cannot act except through its agents and officers, it generally cannot participate in litigation

---

[16] The Supreme Court first addressed the intracorporate conspiracy doctrine in the antitrust context with its decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), in which it concluded that a corporation could not be liable under the Sherman Antitrust Act for conspiring with its subsidiary. In so concluding, the Supreme Court stated that "the very notion of an 'agreement' in Sherman Act terms between a parent and a wholly owned subsidiary lacks meaning," because liability is premised on whether "the conspirators had a unity of purpose or a common design and understanding. . . ." *Id.* at 772. The nature of the parent-subsidiary relationship is such that "their objectives are common . . .their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." *Id.* at 771.

[17] Plaintiff in *Doherty* worked for American Motors Corporation, a corporation which was indicted for bribery and conspiracy to bribe a United States government official in connection with the sale of automobiles to the U.S. Naval Base in the Philippines. Doherty entered a plea of *nolo contendere* for his alleged role in the bribery. *Doherty*, 728 F.2d, at 336.

except through counsel.'" *Id.* at 340 (quoting *Burch v. Snider*, 461 F.Supp. 598, 601 (D.Md. 1978); *see also Travis v. Gary Community Mental Health Center, Inc.*, 921 F.2d 108 (7th Cir. 1990) ("[t]hreatening involvement of a lawyer as the key unlocking § 1985 would discourage corporations from obtaining legal advice before acting, hardly a sound step to take.").

The Third Circuit, relying on *Doherty*, affirmed the district court decision that the intracorporate conspiracy doctrine precluded attorney liability for conspiring with his client to violate § 1985 by seeking to intimidate a witness testifying in an insider trading investigation by filing a frivolous lawsuit. *Heffernan*, 189 F.3d at 412–13. The court reasoned that "the right of a litigant to independent and zealous counsel is at the heart of our adversary system . . . ." *Id.* at 413. And in *General Refractories Co.*, the Third Circuit concluded that outside counsel representing an insurance company could not be held liable for allegedly engaging in a conspiracy with the insurance company to violate the Pennsylvania bad faith statute and to abuse process in connection with prior litigation. 337 F.3d at 302–03 (noting that even bad faith or illegitimate actions taken by the attorney are protected from liability by the intracorporate conspiracy doctrine). If, however, independent third parties joined the conspiracy, the intracorporate conspiracy doctrine does not apply. *See Robinson*, 848 F.2d at 431.

Cozen argues that Naselsky is accused of conspiring with his clients, WAP and Patriot and the principals of these entities, Chawla and Zeghibe, respectively, and accordingly cannot be held liable for conspiracy. Plaintiffs argue that an exception to the intracorporate conspiracy

doctrine applies because third parties—Rappoport, C&W, Mark Sahaya, and Weinstein[18]—were involved in the conspiracy.[19]

The parties have identified one case in which a court in this district addressed the application of the intracorporate conspiracy doctrine to attorney-client relationships in the context of an alleged conspiracy to commit fraud. In *Marshall v. Fenstermacher*, 388 F.Supp.2d 536 (E.D.Pa. 2005), the district court declined to apply the intracorporate conspiracy to an alleged conspiracy between an attorney and his client to conceal the clients assets from creditors, because "the conspiracy alleged in this action encompassed individuals other than [the attorney and his client], thereby expanding the alleged conspiratorial activities beyond the attorney-client relationship." *Id.* at 554; *see also Dunlap v. Peco Energy Co.*, No. 96-CV-4326, 1996 WL 617777, at *3 (E.D.Pa. Oct. 23, 1996) ("By including [a] third party in an otherwise intracorporate endeavor, plaintifs have pleaded an actionable 'conspiracy' under §1985(3).").

Here too, plaintiffs argue that the conspiracy encompassed individuals beyond the scope of the attorney-client relationship and accordingly, Cozen cannot rely on the intracorporate conspiracy doctrine. Specifically, plaintiffs have presented evidence that Naselsky, Chawla, and Zeghibe, joined with individuals and entities, including C&W, Rappoport, and Sahaya, Chawla's business partner and real estate broker, in the conspiracy. The Court agrees that plaintiffs present sufficient evidence at this stage of the litigation to raise an issue of material fact as to the involvement of others in the conspiracy during the time Naselsky was employed by Cozen. Accordingly, the intracorporate conspiracy doctrine is inapplicable.

---

[18] To the extent that plaintiffs assert that Weinstein constituted a third party involved in the conspiracy, for the reasons outlined above, the Court considers only those persons and entities involved in the conspiracy during the time that Naselsky was employed at Cozen. There is no evidence that Weinstein was engaged in the conspiracy during the time Naselsky was employed by Cozen.

[19] Plaintiffs also argue that summary judgment is inappropriate because there is a question of fact as to who Naselsky's clients were while at Cozen. Because the Court finds that third party involvement in the conspiracy precludes the application of the intracorporate conspiracy doctrine, it will not address this argument.

### E. Count II: Aiding and Abetting Fraud

Plaintiffs also seek to hold Cozen liable for aiding and abetting fraud through Naselky's provision of substantial assistance to Chawla under a theory of *respondeat superior*. As a threshold matter, the Court rejects Cozen's argument that Pennsylvania has not recognized a cause of action for aiding and abetting.

"Pennsylvania law now recognizes a civil claim for aiding and abetting fraud." *Panthera Rail Car LLC v. Kasgro Rail Corp*, No. 13-CV-679, 2013 WL 4500468, at *8 (W.D.Pa. Aug. 21, 2013). Beginning with the Pennsylvania Supreme Court's decision in *Skipworth ex rel. Williams v. Lead Ind. Ass'n, Inc.*, 690 A.2d 169, 173-74 (Pa. 1997), in which the court endorsed § 876(a) of the Second Restatement's "concert of action" theory, Pennsylvania courts have allowed claims for the provision of substantial assistance or encouragement to another tortfeaser. *Id.* at *9; s*ee Sovereign Bank v. Valentino*, 914 A.2d 415, 422-24 (Pa. Super. Ct. 2006) (discussing *Skipworth* and recognizing aiding and abetting fraud as a cause of action); *Koken v. Steinberg*, 825 A.2d 723, 731-32 (""[T]his Court is convinced by this language in *Skipworth* that Section 876 is a viable cause of action in Pennsylvania."); *see also Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 311, 989 A.2d 313, 339 (2010) (*"Under present Pennsylvania law as established by the Commonwealth Court as the highest appellate court which has reached the issue, aiding and abetting a breach of fiduciary duty is a recognized cause of action."). A number of federal courts have similarly predicted that the Pennsylvania Supreme Court would permit a cause of action for aiding and abetting tortious conduct. *See Panthera Rail Car LLC*, 2013 WL 4500468, at *9 (collecting cases). The Court agrees with those courts that have concluded that the Pennsylvania Supreme Court would recognize a claim for aiding and abetting fraud.

The elements of aiding and abetting fraudulent misrepresentation are (1) a fraudulent misrepresentation;[20] (2) knowledge of the fraud by the aider and abettor; (3) substantial assistance or encouragement by the aider and abettor in committing the fraud. *See Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999) (defining elements of aiding and abetting under New Jersey law using § 876), *abrogated on other grounds by Potente v. Cty. of Hudson*, 900 A.2d 787 (N.J. 2006); *Matlack Leasing, LLC v. Morison Cogen, LLP*, No. 09-CV-1570, 2010 WL 114883, at *11 (E.D. Pa. Jan. 13, 2010) (defining of elements of aiding and abetting breach of fiduciary duty on Pennsylvania law"); *Monsen v. Consol. Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir. 1978) (defining elements in aiding and abetting claims arising under federal securities law).

As detailed above, plaintiffs in this case have presented evidence of an actionable underlying fraud by Chawla. The Court further concludes that plaintiffs have provided evidence upon which a trier of fact could conclude that Naselsky aided and abetted Chawla in committing that fraud. The record includes evidence that Naselsky concealed from C&W the true price of the sale agreement between JFK Blvd. and R&F Penn for the sale of the River City Property and that he misrepresented to C&W the nature of the sale between R&F Penn and JFK Blvd. as a sale using a private broker, which he knew to be false. Plaintiffs have also presented evidence that Naselsky drafted the June 2006 "Agreement of Sale" between WAP and JFK for the purpose of inflating the value of the River City Property, despite knowledge that the sale would never actually be completed. And finally, plaintiffs have presented evidence that Naselsky assisted the financing of the conspiracy by leaving Cozen's legal fees "off the sheets" at closing, thus

---

[20] As stated above, the elements the underlying tort of fraud under Pennsylvania law are: "1) a misrepresentation, 2) material to the transaction, 3) made falsely, 4) with the intent of misleading another to rely on it, 5) justifiable reliance resulted, and 6) injury was proximately caused by the reliance." *Santana Products, Inc.*, 401 F.3d at 136 (citing *Viguers*, 837 A.2d at 540).

allowing Chawla and Zeghibe to delay payment until they received funds from an investor, "which met their goal of not putting their own money into the deal." Pls. SOF ¶¶ 32-36. The Court determines that, based on this evidence, a jury could conclude that Naselsky, while he was employed at Cozen, provided substantial assistance to Chawla in committing the fraud. Accordingly, Cozen's motion for summary judgment with respect to Count II is denied.

## VI. CONCLUSION

For the foregoing reasons, Cozen's Motion for Summary Judgment is denied to the extent that plaintiffs seek to hold Cozen liable for actions taken by Naselsky in furtherance of the conspiracy that occurred while Naselsky was employed at Cozen. The motion is granted in all other respects.