## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KILBRIDE INVESTMENTS LIMITED, BUSYSTORE LIMITED IN LIQUIDATION, and BERGFELD CO. LIMITED,     Plaintiffs, <br><br> v. <br><br> CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC., BLANK ROME LLP, and COZEN O'CONNOR, P.C.,     Defendants, <br><br> and <br><br> CUSHMAN & WAKEFIELD OF PENNSYLVANIA, INC.,     Third Party Plaintiff, <br><br> v. <br><br> CHAIM ZEV LEIFER, HASKEL KISH and JFK BLVD. ACQUISITION G.P., LLC,     Third Party Defendants. | CIVIL ACTION <br><br><br> NO. 13-5195 |

DuBois, J.                                                                                     April 25, 2018

## M E M O R A N D U M

## I.    INTRODUCTION

This is a fraud case in which Kilbride Investments Ltd., Busystore Limited in Liquidiation, and Bergfeld Co. Ltd. (collectively, "plaintiffs"), allege that defendants, Cushman & Wakefield of Pennsylvania, Inc. ("C&W"), Blank Rome LLP ("Blank Rome"), and Cozen O'Conner, P.C. ("Cozen"), induced them into investing at least $27 million in a real-estate development project called the River City Property (sometimes referred to as "River City" or the

1

"Property"), in Philadelphia, Pennsylvania, by fraudulently misrepresenting the nature of that project. Plaintiffs' Amended Complaint alleges one count against defendant C&W — a count for fraudulent misrepresentation. Presently before the Court are C&W's Motion to Exclude the Testimony of Stephen D. Roach, C&W's Motion to Exclude the Testimony of Albert R. Hughes III, and C&W's Motion for Summary Judgment.

## II.    BACKGROUND

The River City Property is an 8.2 acre stretch of land along JFK Boulevard divided into five parcels. Pls.' Resp. to Def. C&W's Statement of Undisputed, Material Facts ¶2 ("Pls.' Resp. SOF") (Document No. 158, filed May 24, 2017); C&W's Statement of Undisputed, Material Facts ¶2 ("C&W SOF").

In the spring of 2006, non-parties Ravinder Chawla and Richard Zeghibe developed a plan to purchase and flip the Property. Pls.' Resp. SOF ¶¶ 3, 44; C&W SOF ¶¶ 3, 44. Chawla and Zeghibe retained Charles Naselsky, an attorney at Cozen, and later at Blank Rome, in connection with the acquisition of River City from its owner at the time, R&F Penn Center Associates, L.P. ("R&F Penn"). Pls.' Resp. SOF ¶4; C&W SOF ¶¶14. Through JFK Blvd.—a single purpose entity established to purchase River City—Chawla and Zeghibe contracted to purchase River City from R&F Penn for $32.5 million. C&W SOF ¶ 5. JFK Blvd. retained architect James Rappoport to develop a mixed-use design plan (the "Rappoport Plan") for the Property featuring ten high-rise towers and twelve million square feet of available space for the purpose of marketing River City to potential investors. C&W SOF ¶ 8; Pls.' Resp. SOF ¶ 8.

Prior to contracting for the purchase of River City from R&F Penn, Naselsky retained C&W to appraise the Property. Pls.' Resp. SOF ¶ 14; C&W SOF ¶14. On May 18, 2006, C&W's Managing Director, Gerald McNamara sent Naselsky a draft engagement letter, which

listed C&W and Cozen as the "Parties to this Agreement" and listed the "Intended User" as Cozen. C&W SOF, Ex. P 61, "May 18, 2006, Email from McNamara to Naselsky with Draft Engagement Letter." Naselsky revised the Draft Engagement Letter to change the "Parties to This Agreement" to JFK Acquisition, G.P., LLC, and "The Intended User" from Cozen to read "client, together with its professionals, investors, + potential lenders may consider the appraisal without further permission." C&W SOF, Ex. P-120, "Revisions to draft engagement letter." Naselsky also changed the date of value to "First Date of Inspection." PCSF ¶ 127. C&W accepted the proposed changes. C&W SOF ¶ 23; PCSF ¶ 130. McNamara assigned the task of appraising the Property to Daniel McNeil, an appraiser at C&W. PCSF ¶ 135.

On June 23, 2006, C&W submitted a draft appraisal ("June 2006 Draft Appraisal") to Naselsky which valued the Property at $57 million. C&W SOF, Ex. P-71, Cushman & Wakefield Appraisal for JFK Properties – Date of Inspection 6-9-06; PCSF ¶ 138. After reviewing the June 2006 Draft Appraisal, Naselsky sent McNamara an email in which he stated that he was "concerned with several provisions findings and assumptions," and wished to meet with McNamara to discuss the appraisal. PCSF ¶ 170; C&W SOF ¶ 38. McNeil met with Naselsky on July 10, 2006, to discuss the June 2006 Draft Appraisal. PCSF ¶ 175; C&W SOF ¶ 39. On July 20, 2006, McNeil emailed Naselsky a revised appraisal ("July 2006 Draft Appraisal"), although the date of the appraisal stated that it was issued on June 23, 2006. PCSF ¶¶190, 194.

During the spring of 2006, the Philadelphia City Council began to consider a proposed height ordinance that is at the heart of this lawsuit. On April 20, 2006, Philadelphia City Councilman Darrell Clarke introduced an ordinance which imposed a height limit of 125 feet on buildings near the Benjamin Franklin Parkway. PCSF ¶ 241; C&W SOF ¶¶147, 148. On May

25, 2006, City Council amended the ordinance to expressly include two of the five parcels constituting River City.  PCSF ¶ 241, 244; C&W SOF ¶¶149–51.  City Council passed the amended ordinance on June 8, 2006, but it was not signed by the mayor.  C&W SOF, Ex. C-54, "Legislative History Summary of Bill No. 060292."  The amended ordinance was reintroduced in City Council on September 14, 2006, and on November 8, 2006, City Council issued notice of a public hearing to be held on November 28, 2006, regarding the amended ordinance. PCSF ¶ 326; C&W SOF, Ex. CW-59.  Following the November 28, 2006, public hearing, the amended ordinance was voted favorably out of committee.  C&W SOF ¶ 153.  City Council passed the amended ordinance on December 14, 2006, and on January 23, 2007, the mayor signed it.  PCSF ¶¶ 378, 380.

On November 16, 2006, C&W issued its final appraisal report for the Property (the 2006 Final Appraisal Report), valuing the Property at $77 million. PCSF ¶330, Ex P-78.  Although the appraisal was issued on November 16, 2006, the 2006 Final Appraisal Report continued to bear the date of June 23, 2006, as the date of the appraisal.  *Id.*  The 2006 Final Appraisal Report stated that there was no height limitation in the zoning for the Property and made no mention of the amended height ordinance.  *Id.*

In September 2006, Zeghibe and Chawla contracted with Eli Weinstein, a New Jersey based real estate investor who was a member of the Orthodox Jewish community, for the purchase of River City for $62.5 million.  C&W SOF ¶¶ 51, 56; PCSF ¶ 296. Weinstein, along with Chawla and others, solicited Berish Berger and his various corporate entities—including plaintiffs—as investors in the Property.  Am. Compl. ¶ 28. Plaintiffs allege that, as a result of fraudulent misrepresentations regarding the height limitation, the feasibility of the proposal, and

the appraisal of the real estate, they invested at least $27 million in River City between December 2006 and January 2007.  *Id.*

On December 18, 2012, plaintiffs filed suit in the United States District Court for the Southern District of New York.  Defendants filed a Motion to Change Venue on January 31, 2013.  On February 25, 2013, plaintiffs filed an Amended Complaint.  On August 28, 2013, Judge Paul Oetken granted the Motion to Change Venue and transferred the case to the Eastern District of Pennsylvania.  On April 17, 2017, C&W filed the pending Motion for Summary Judgment, Motion to Exclude the Expert Testimony of Stephen D. Roach, and Motion to Exclude the Expert Testimony of Albert R. Hughes. The Court first addresses the *Daubert* Motions, relevant to the Motion for Summary Judgment, before turning to C&W's Motion for Summary Judgment.

## III.    DAUBERT MOTIONS

### A.    <u>Applicable Law</u>

Federal Rule of Evidence 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), this gatekeeping function extends beyond scientific testimony to testimony based on "technical" and "other specialized" knowledge.  Using the *Kumho* analysis, a court must determine whether an expert "employs in the courtroom the same level of intellection rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

Rule 702 has "a liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception and not the rule." FED. R. EVID. 702, advisory committee's note. "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).

In this case, defendant challenges only the reliability of plaintiffs' experts. The reliability requirement of *Daubert* "means that . . . the expert must have 'good grounds' for his or her belief." *In re Paoli II*, 35 F.3d at 742 (quoting *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993)). The test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141–42 (emphasis omitted). In determining whether the reliability requirement is met, courts examine the following factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non–judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004) (citing *In re Paoli II*, 35 F.3d at 742 n. 8). This list is not exhaustive and all the factors are not applicable in every case. *Kannankeril*, 128 F.3d at 806–07. Under the *Daubert* reliability prong, the party proffering the expert "do[es] not have to demonstrate to the judge by a preponderance of the evidence that the

assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli II*, 35 F.3d at 744 (emphasis omitted). "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross–examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Mitchell*, 365 F.3d at 244 (quoting *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

**B.** **Discussion**

C&W moves to exclude the testimony of plaintiffs' experts Stephen Roach and Albert Hughes. The Court addresses these motions in turn.

**1. Testimony of Stephen Roach**

Stephen Roach is a certified member of the Appraisal Institute and a Principal at Jones, Roach & Caringella, Inc., an appraisal firm. Resp. Opp. Mot. Exclude Roach Expert Testimony, Document No. 152, May 24, 2017, Ex. 1, Roach Expert Report ("Roach Report"), 59. Roach has worked in the appraisal field since 1979 and has testified as an expert witness before several courts. *Id.*

For this litigation, Roach prepared an appraisal report in which he reviewed C&W's 2006 Final Appraisal Report. Appraisals and appraisal reviews are governed by the Uniform Standards of Professional Appraisal Practice ("USPAP"), which establishes mandatory standards and methodology for performing appraisal work. *See* 49 PA. CODE §36.51 (2010). USPAP defines an appraisal as "the act or process of developing an opinion of value." C&W Mot. to Exclude Roach Exp. Testimony, Ex. D-95, 2016 – 2017 USPAP, at 1:8 ("Mot. Exclude Roach"). Standard 1 of USPAP establishes the requirements for the development of an

appraisal. Standard 3 of USPAP governs the requirements for an appraisal review. The purpose of a Standard 3 report is to "develop a credible opinion of the quality of another appraiser's work that was performed as part of an appraisal or appraisal review assignment." Mot. Exclude Roach, Ex. D-95, 2016 – 2017 USPAP, at 29:877–78. Roach prepared a Standard 3 appraisal review in which he examined C&W's 2006 Final Appraisal Report.

In his report, Roach concluded that the C&W appraisal analysis "relied upon unsupported and illogical assumptions," which led to a value conclusion that was not credible and misleading appraisal report. Roach Report at 1. Roach further concluded that the C&W appraisal was "performed recklessly and was so full of errors and omissions that it is essentially impossible to conclude that the Cushman & Wakefield signatories actually believed in the conclusions." *Id.* As part of the appraisal review process, Roach examined multiple drafts of the 2006 Appraisal and the 2006 Final Appraisal Report. *Id.* at 2. He personally inspected the Property and materials relied upon by the C&W appraisers, including the land sale data used by the C&W appraisers. *Id.* Roach also compared the 2006 Final Appraisal to the 2004 Appraisal of the Property conducted by C&W. *Id.* at 4.

C&W moves to exclude Roach's testimony as unreliable on the ground that Roach's report fails to comply with industry standards as outlined by USPAP. Plaintiffs argue in response that compliance with USPAP is not required under *Daubert* and is relevant only to the weight, not admissibility, of Roach's testimony. The Court first addresses whether compliance with USPAP is required for admissibility under Rule 702 before turning to C&W's other arguments.

## 2. Whether Compliance with USPAP is required

Plaintiffs assert that noncompliance with USPAP is irrelevant for purposes of admissibility and instead is relevant only to the weight of the expert's testimony. The Court disagrees.

Plaintiffs rely primarily on *Whitehouse Hotel Ltd Partnership v. C.I.R.*, in which the Fifth Circuit concluded that USPAP compliance was not the *sole* determining factor as to whether an expert report was reliable and instead went to the weight of expert's report, not admissibility. 615 F.3d 321, 332 (5th Cir. 2010) (emphasis added)). The Third Circuit has concluded, however, that compliance with industry standards is one factor a court may consider to determine reliability under *Daubert*. *See e.g. Murray v. Marina Dist. Development Co.*, 311 Fed. App'x 521, 524 (expert testimony inadmissible where deviation from industry standards corresponded with failure to demonstrate methodology and would not withstand peer review). Accordingly, while noncompliance with USPAP is not dispositive, it is one factor that the Court will consider in determining whether Roach's testimony is reliable.

## 3. Reliability

### a) *Whether Roach impermissibly exceeded the scope of a Standard 3 Appraisal by providing his own value opinion*

C&W asserts that Roach's testimony must be excluded because his Report exceeds the scope of a Standard 3 appraisal by rendering "opinions that affect the value of the property." A reviewer who provides a value opinion must comply with USPAP Standard 1. Mot. Exclude Roach at 8. The Court disagrees.

Under USPAP, when an appraisal reviewer is asked to develop his or her own opinion of value, the reviewer must comply with Standard 1. Mot. Exclude Roach, Ex. D-95, 2016–2017 USPAP at 32: 990-995. USPAP cautions appraisal reviewers who do not conduct a Standard 1

appraisal to avoid language which would lead a reader to believe that the reviewer conducted an appraisal: "If the language of such rejection is based on errors or inconsistencies in the original work and does not include any qualifiers that would relate to a direction in value, it does not imply an appraisal by the reviewer." *Id.* at 138: 216–18.

C&W provides several examples of statements in the Roach Report which it believes render value opinions and are unsupported by evidence as required by Standard 1. For example, C&W argues that the Roach Report's statement that, "there is not adequate demand in the market to support the subject project" constitutes a value opinion that lacks evidentiary support. Mot. Exclude Roach at 17. The Court disagrees and concludes that Roach's conclusion is based on perceived errors or inconsistencies in the original appraisal, in compliance with USPAP Standard 3. In addition to examining the market analysis in the 2006 Final Appraisal, Roach reviewed condominium sales in Philadelphia in the four years preceding the 2006 Final Appraisal and concluded that the Property would have had to sell condominiums at a price which exceeded the average for new condominium sales for the preceding year by 43%. Roach Report at 11–12. Roach also compared the volume of condominium sales in the vicinity of the Property in the four years leading up to the 2006 Final Appraisal and determined that the proposed development project would have provided twenty-six times the number of units sold in downtown Philadelphia in the previous four years. *Id.* at 12. Roach thus determined that the 2006 Final Appraisal lacked credibility because of "the high prices concluded to be required by the appraisers for the project to be financially feasible, [and] the extraordinary inventory of the project against historic sales volumes . . . ." *Id.*

The Court declines to review each Roach statement which C&W asserts implies a value opinion. C&W's arguments with respect to these statements are not a basis for excluding

Roach's testimony.  To the contrary, Roach does not render a value opinion, but instead complies with the requirement of USPAP Standard 3 that an appraisal reviewer "develop an opinion as to the completeness, accuracy, adequacy, relevance, and reasonableness of the analysis in the work under review . . ." Ex. D-95, 2016–2017 USPAP, 32: 979–82.  As a consequence, the Court concludes that the fact that Roach did not conduct his own Standard 1 appraisal of the Property is not a basis for excluding his testimony.

### b)    *Whether Roach Misrepresented Information in the 2006 Appraisal*

C&W  also contends that Roach's testimony must be excluded because his Report misrepresented information in the 2006 Appraisal by selectively quoting from the 2006 Appraisal to support his own conclusions.    The Court rejects this argument as a basis for excluding Roach's testimony.

C&W's objections to Roach's characterization of the 2006 Appraisal are predicated on disagreements over his conclusions.  For example, C&W asserts that Roach mischaracterizes the 2006 Appraisal's conclusion regarding office market demand, because he quoted the 2006 Appraisal as stating that office market "has moved away from equilibrium" while omitting the 2006 Appraisal's statement that the commercial office market "still reflects an improvement over the past year."  Mot. Exclude Roach, at 23.  C&W asserts that the conclusion to be drawn from the 2006 Appraisal is that "demand in the real estate market was increasing" and that "the market for office space was strong."   Mot. Exclude Roach at 23.  However, "an expert is . . . permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon*, No. 01-CV-4106, 46 Fed. App'x 691, * 695 – 96 (3d Cir. September 17, 2002).  To the extent that C&W disagrees with Roach's ultimate conclusions based on his failure to include portions of the 2006 Appraisal that it views as pertinent, such

objections are appropriately addressed on cross-examination. *Id.* at *696; *see also In re Processed Egg Prods. Antitrust Litig.*, No. 08-MD-2002, 2016 WL 4582236, *11 (E.D.Pa. September 1, 2016) ("To the extent that the plaintiffs contend that [the expert] misrepresented aspects of the factual record, they will have opportunity to cross examine him on those points at trial.").

          *c)*     **Whether Roach improperly compared the 2004 and 2006 Appraisals**

C&W further objects to Roach's testimony on the ground that he improperly compared C&W's 2006 Appraisal to its 2004 Appraisal, without conducting a Standard 3 review of the 2004 Appraisal. C&W argues that in doing so, Roach improperly assumed the validity of the 2004 Appraisal and failed to recognize significant distinctions between the 2004 and 2006 Appraisals. The Court disagrees with C&W that Roach's failure to conduct a complete Standard 3 review of the 2004 Appraisal renders his report so unreliable as to preclude its admissibility.

Roach testified that he "considered [the 2004 Appraisal] in the context of and in comparison with the 2006 appraisal report." Mot. Exclude Roach, Ex. CW-70, Roach Dep. at 302:6–8. For example, in the 2004 Appraisal, C&W concluded that the same easement would have been "an extraordinary burden on the utility and value of the subject property" and could not value two parcels of the Property because the air rights over an active SEPTA rail line were too speculative. Roach Report at 4, 31. Just two years later, C&W appraisers concluded that the SEPTA easement actually increased the value of the Property by "interconnecting the aggregate site through the elevated overpasses." Roach Report at 5. Roach relied on his comparison of the two appraisals, an interview with an urban design planner, and testimony by McNeil that C&W relied exclusively on Rappoport in determining the feasibility of connecting the property through an elevated railroad, to conclude that the 2006 Appraisal "does not contain sufficient rationale

for the significant change in the premise of the appraisal" with respect to the railroad easement. Roach Report at 43.

UPSAP requires an appraisal reviewer to "develop an opinion as to the completeness, accuracy, adequacy, relevance, and reasonableness of the analysis in the work under review." USPAP, Standard 3, 32-32: 972 – 78.  Roach examined the 2004 Appraisal to develop an opinion on the reliability of the 2006 Final Appraisal and the methodology used by the C&W appraisers. Roach's conclusions are supported by other data, including, *inter alia*, multiple draft appraisals, interviews with Philadelphia City planners and real estate consultants,[1] and market data set forth in the Report.   As a consequence, the Court concludes that Roach's failure to conduct a Standard 3 Appraisal review of the 2004 Appraisal does not render Roach's testimony inadmissible.  *In re Paoli II*, 35 F.3d at 746 (stating that the Court "should only exclude evidence if the flaw [in the expert's investigative process] is large enough that the expert lacks 'good grounds' for his or her conclusions.").

C&W also contends that a comparison of the 2004 and 2006 Appraisals is inappropriate because the Report "assumes a parity that does not exist on the face of the two appraisals."  Mot. Exclude Roach at 13.  Specifically, C&W avers that in the 2006 Final Appraisal, it appraised all five parcels of the Property, while the 2004 Appraisal included only three of the five parcels in its value opinion.  And the stated purpose of the two appraisals differed: in 2004, C&W's client was a lender in the process of updating mortgage files without any active efforts to sell or

---

[1] C&W also asserts that Roach impermissibly relies on opinions of others without personally verifying the information received.  This is not a basis for excluding Roach's testimony.  Evidence relied on by an expert need not be admissible if it is the "type of evidence reasonably relied upon by experts in the field in forming opinions or inferences about the subject." *In re Paoli II*, 35 F.3d at 748.   USPAP requires appraisal reviewers to support their conclusions with "sufficient information to enable the client and intended users to understand the rationale for the opinions and conclusions." Ex. D-95, 2016–2017 USPAP, 34: 1068–69.  The Court concludes that Roach's reliance on others knowledgeable in the field—and at least one individual upon whom he has relied in completing nearly twenty appraisal assignments—is not prohibited by USPAP and is the type of evidence relied on by experts in the appraisal field.

develop River City or the associated air rights, whereas in 2006, C&W's client was a prospective buyer who sought to develop the Property and make use of the associated air rights.

The Court concludes that the differences between the 2004 and 2006 Appraisals are not a basis for excluding Roach's testimony. The Report acknowledges that only three of the five parcels of the Property were considered in the 2004 Appraisal's value opinion. Roach Report at 42–43. The Report explains the significance of the 2004 Appraisal's conclusion that two of the five parcels were too speculative: "It is apparent that no such engineering report was provided for the 2006 appraisal report either, and an itemization of the extraordinary cost of developing the entirety of the subject was not completed." Roach Report, at 31. Thus, while neither the 2004 Appraisal nor the 2006 Appraisal relied on an engineering report or any other assessment of the cost of developing the air rights over the SEPTA rail line, in valuing River City for investors in 2006, C&W priced the parcels notwithstanding the uncertainty over the impact of the SEPTA rail line.

The Court also agrees with plaintiffs that C&W fails to explain why a difference in the stated purpose of the two Appraisals renders comparison inappropriate. To the contrary, USPAP states that "[a]n appraiser must not allow the intended use of an assignment or a client's objectives to cause the assignment results to be biased." USPAP, Ex. D-95, 15: 449–50.

The Court rejects C&W's challenge to Roach's testimony based on his comparison of the 2004 Appraisal and the 2006 Appraisal and concludes that Roach's methodology " 'may be explored at trial,' and 'the trier of fact may properly consider [any such] deficiencies in determining the weight to be accorded to his ultimate conclusions.'" *Blood Reagents*, 2015 WL 6123211, at *13 (quoting *Poust v. Huntleigh Healthcare*, 998 F. Supp. 478, 498 (D.N.J. 1998)).

#### d) *Whether Roach improperly opined on the motivation of the C&W appraisers*

Finally, C&W argues that Roach inappropriately opined about the motivation of the appraisers in violation of USPAP. The Report states that the "appraisal was performed recklessly and was so full of errors and omissions that it is essentially impossible to conclude that the Cushman & Wakefield signatories actually believed in the conclusions." Roach Report, 1. The Report also states: "It boggles the mind that a professional appraiser would incorporate over $3 *billion* in sales revenue in a residual valuation model with no support whatsoever." *Id.* at 15.

The few courts which have addressed this issue have concluded than an appraisal reviewer may not testify as to the appraisers' state of mind. In *Federal Housing Finance v. Nomura Holding America, Inc.*, No. 11-CV-6201, 2015 WL 353929, at *5 (S.D.N.Y. Jan. 28, 2015), the court precluded the expert appraisal reviewer from testifying that the original appraisers believed that the appraisal accurately reflected the property's value, concluding that the expert could not testisfy "on the subjective beliefs of the appraisers." *Id.*; *see also Massachusetts Mut. Life Ins. Co. v. DB Structured Products, Inc.*, No. 11-CV-30039, 2015 WL 2130060, at *12 (D.Mass. May 7, 2015) (precluding expert from testifying as to the original appraisers' state of mind)). Because "it is the function of the jury to decide the facts and to assess the credibility of witnesses," *United States v. Rockwell*, 781 F.2d 985, 990 (3d Cir. 1986), the Court agrees with those courts which have concluded that an appraisal reviewer may not testify as to the state of mind of the appraisers.

Roach may, however, testify as to whether the 2006 Appraisal is credible. USPAP defines an appraisal review as "the act or process of developing and communicating an opinion about the quality of another appraiser's work . . ." Mot. Exclude Roach, Ex. D-95, USPAP at 1:

23– 24.  USPAP permits an appraisal reviewer to develop an opinion about the quality of another appraiser's work, including stating that an appraisal is not credible.  *Id.* at 2: 38–39; 137: 170 – 183 (appropriate language in an appraisal review includes, *inter alia*, "I reject the value conclusion as lacking credibility due to the errors and/or inconsistencies found").  Accordingly, Roach is permitted to testify as to the credibility of the 2006 Appraisal. *See Federal Housing Finance*, 2015 WL 35329, at *6 (concluding that credibility of the appraisal "is a distinct inquiry from the issue of an individual appraiser's belief and whether it was honestly held"); *Mass. Mut. Life Ins.*, 2015 WL 2130060, at *13 (permitting reviewer to testify as to the appraisals' credibility).

### e)    Conclusion

Excepting only Roach's conclusions with respect to state of mind and credibility of the C&W appraisers, the Court concludes that plaintiffs have shown by a preponderance of the evidence that Roach's opinion is reliable. Subject to that qualification, the Roach motion is denied.  Roach's report was consistent with the requirements of a Standard 3 appraisal review. He examined the 2006 Appraisal and the 2004 Appraisal and stated the reasons for his disagreement with the C&W appraisers. Roach's qualifications—39 years of experience in the appraisal field—provide further assurance that his opinion is reliable. *Elcock*, 223 F.3d at 749 ("[A]n expert's level of expertise may affect the reliability of the expert's opinion.").

### 4.  Testimony of Albert Hughes

Plaintiffs also offer the testimony of Albert Hughes, a real estate appraiser and principal of A.R. Hughes & Company.  Hughes has worked as an appraiser for over 30 years.  Affidavit of Albert R. Hughes III at 1.   He is a certified general appraiser, a member of the Appraisal Institute, and an approved Appraisal Institute Instructor.  Qualifications of Hughes, Ex. D-102.

Hughes conducted a retrospective appraisal of River City for the pending litigation to determine the value of the Property as of August 1, 2006. Hughes concluded that the market value of the Property on that date was $30,500,000. Hughes Report at 2, 50. As part of his investigation, Hughes researched market trends, collected data regarding the physical characteristics of the Property, analyzed information relating to existing or proposed physical improvements on the subject site, conducted a physical inspection of the Property and its vicinity, performed a sales comparison analysis, and determined the highest and best use of the Property. Hughes Report at 13. In addition, Hughes examined, *inter alia*, C&W's 2006 Final Appraisal and draft appraisal, land sale deeds, zoning regulations effective in 2006, and various environmental reports analyzing the Property.

C&W moves to exclude Hughes's testimony on the ground that it is unreliable. The Court concludes that C&W seeks to exclude the testimony of Hughes primarily because it disagrees with Hughes's conclusions. The Court declines to exclude Hughes's testimony and denies the Hughes motion.

### 5.    Reliability of Hughes' Opinion

C&W raises numerous challenges to the reliability of Hughes' opinion on the grounds that Hughes's opinions are unsupported by data and are the product of flawed methodology. Specifically, it argues that (1) the Hughes Report contains "no market information or analysis" to support his conclusions; (2) Hughes's determination of the highest and best use of the Property is flawed; and (3) Hughes failed to select appropriate Comparable Sales and applied arbitrary adjustments to those Comparable Sales which he selected. Mot. Exclude Hughes at 9–10. The Court addresses each argument in turn.

### a) *Whether Hughes Failed to Analyze Relevant Market Information*

C&W first contends that Hughes failed to conduct an absorption analysis to consider demand for residential properties, office space, or hotels. Mot. Exclude Hughes at 16. C&W believes that "analysis of demand for a large parcel such as River City Property would require an appraiser to analyze the supply that a development project on the property would create, evaluate the rate at which new inventory would be absorbed by the market, and confirm that new units could be sold at prices that would support the proposed development." Mot. Exclude Hughes at 13. Plaintiffs argue that C&W simply disagrees with Hughes's failure to appraise the Property as envisioned by the Rappoport Plan,—a design created by architect James Rappoport which envisioned the Property with ten high-rise towers featuring a combination of condominium, hotel, retail, and commercial space—which is not a basis for excluding Hughes testimony. The Court agrees with plaintiffs.

Hughes testified that an absorption analysis was "not necessary" for the purpose of this appraisal because "[w]e did not appraise that [Rappoport] development plan . . . [w]e appraised the value of the land." Ex. CW-32, Hughes Dep. 246:19 –24, 247:1. Hughes also stated that he did not consider the Rappoport development plan because "it was too speculative" given "the density of the project . . ." Therefore, Hughes "valued [the Property] according to the land sales in terms of what land sales in the City of Philadelphia . . . ." *Id.* 270:1-3. Moreover, the Hughes Report addressed demand for office space and concluded that "the only significant large-scale office buildings delivered in Center City since 1993 . . . . were constructed with a major lead tenant in tow (Comcast, Dechert Price, Glaxo Smithkline) and in two cases (Cira Centre and Comcast) included varying levels of tax breaks and/or aid to come to fruition." Hughes Report at 17–18. And Hughes testified that "[w]e track the office market repeatedly over the 25-year

period. The total inventory of the office space has stayed exactly even." Ex. 32, Hughes Dep. 267: 13–16. Hughes reasoned that "[b]ecause there was no increase in demand, you would have had to have taken a tenant from some other building, and that's too speculative to do a valuation on." *Id.* 273:11–16.

Hughes determined based on thirty years of experience that appraising the property as envisioned by the Rappoport Plan was too speculative based on his assessment of the market. He therefore appraised the land value of the Property. And Hughes's appraisal of the land value of the Property is based on, *inter alia*, an assessment of the population growth in the Philadelphia region and the vicinity of the Property, real estate and tax assessments of the subject Properties, and an extensive zoning analysis. That Hughes based his conclusions in part on his own experience in the appraisal industry is not a basis upon which to exclude his testimony. *See Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Schneider v. Fried*, 320 F.3d 396, 399 (3d Cir. 2003) (admitting expert testimony where expert relied in part "on his broad knowledge . . . and his own experience . . ."); *Comcast Cable Commc'ns, LLC v. Spring Commc'ns Co., LP*, 203 F.Supp.3d 499, 545 (E.D.Pa. 2016) (finding that expert testimony based on review of relevant evidence and own expertise "sufficient foundation for reliability")). C&W also relies on its own expert, Peter Korpacz, who stated that Hughes failure to conduct an analysis of the residential market and demand for retail and hotel space was "a missed opportunity." Mot. to Exclude Expert Testimony of Hughes at 14, 15. A disagreement among experts is also not a basis upon which to exclude testimony. *See In re Processed Egg Prods. Antitrust Litig.*, 2016 WL 4582236 at *14 ("Should [plaintiffs] wish to criticize [expert's]

conclusions on the basis they are contradicted by . . . opinions from their own experts, they will certainly be provided the opportunity to do so.").

### b) Whether Hughes's Determination of the Highest and Best Use of the Property is Unreliable

C&W also assigns a number of errors to Hughes's determination of the highest and best use of River City, including that: (1) Hughes ignored the value of the Property as an assemblage of five properties; (2) Hughes assumed that the pending ordinance limited construction on Parcels D and E; and (3) Hughes ignored the development potential of three of the five parcels of the Property.

Under USPAP, an appraiser must "develop an opinion of the highest and best use of the real estate." Ex. D-95, 2016–2017 USPAP at 20:577. The "highest and best use" is defined as the "reasonably probable and legal use of vacant land or an improved property that is physical possible, appropriately supported, financially feasible, and that results in the highest value." Ex. CW-75, Appraisal Institute, *The Appraisal of Real Estate*, 14th Ed., at 333. In doing so, "[a]n appraiser must analyze the relevant legal, physical, and economic factors to the extent necessary to support the appraiser's highest and best use conclusion(s)." *Id.* at 20:578–79.

C&W argues that Hughes's failure to consider "the possibility of a comprehensive development plan" and to instead "focus on individual parcels rather than the assemblage of the Property" renders his conclusion with respect to the highest and best use of the Property unreliable. C&W focuses specifically on Hughes's calculation of the floor area ratio ("FAR") of the Property, which is defined as "the relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands." Ex. CW-78, DICTIONARY OF REAL ESTATE APPRAISAL at 94. C&W asserts

that Hughes undervalued the property by improperly "fail[ing] to consider a plan that connected and made use of all five parcels." Mot. Exclude Hughes at 21.

The Court rejects this argument as a basis for excluding Hughes's testimony. Hughes was not hired to value the Property as envisioned by the Rappoport Plan. Hughes's Report states that the FAR is dictated by local zoning codes, which assign a base FAR number according to commercial zone. Hughes Report at 28–29. The zoning code also allows for "incentive area bonuses" in FAR values for properties that are located in certain areas of the city, including those properties located along JFK Blvd. *Id.* at 30. Hughes concluded that Parcel E did not qualify for the incentive area bonus because it "does not have qualifying frontage for the incentive area." *Id.* at 31. The Report states that: "a buyer would not give parcel E credit for the . . . incentive area as part of a consolidated development plan with Parcel D since feasibility of the entirety of parcels D/E . . . would not be likely in a reasonable time frame, and thus any such application even if made would be done to speculatively attempt to explain such density." *Id.* at 31. The fact that C&W's expert does not view a combined development project between Parcels D and E as too speculative is not a basis for excluding Hughes's testimony.

C&W next asserts that the Hughes Report mistakenly assumes that Bill 060292—the height ordinance—applied to the property as of August 1, 2006, and imposed a height limit of 125 feet on parcels D and E, when the ordinance had no legal effect on the property at that time. Mot. Exclude Hughes at 24–25. The Report states: "the Philadelphia Zoning Code was Amended on 1/23/2007 (post-effective date) to restrict the height limit to 125 feet for newly constructed buildings in the vicinity of the Benjamin Franklin Parkway . . . . Parcels D and E at the subject property were subject to these new height limits. The Bill was originally passed by City Council on 6/8/2006 but it was not signed into law by the Mayor until 1/23/2007. However,

it was the City's policy to enforce zoning per pending bills once out of committee; therefore, a market buyer would have valued the subject as of the effective date assuming the height limit would apply to their eventual development plan." Hughes Report at 31. Hughes testified that his partner on the appraisal, Bob Myers, interviewed a city planner who stated that "the zoning line is on the property line between D and E . . . and the pending ordinance would be in place and in control as of that June 8th date." Ex. 32, Hughes Dep. 168:3–6.

C&W asserts that an appraiser who relies on the "work" of a third-party must independently verify the information provided by the third party or allow the third party to review the final appraisal report. Mot. Exclude Hughes at 25. USPAP states that when a signing appraiser relies on work done by others, "the signing appraiser is responsible for the decision to rely on their work, . . . [must] have a reasonable basis for believing that those individuals performing the work are competent . . . [and] must have no reason to doubt that the work of those individuals is credible." Ex. D-95, 2016–2017 USPAP at 28:858–62. C&W presents no reason to doubt that seeking information from a city planner familiar with Philadelphia zoning regulations is an unreliable method for determining which zoning ordinances would have impacted the Property in 2006.

C&W further contends that Hughes's determination of the highest and best use of the property is flawed because Hughes speculates about "market preferences" and the financial feasibility of construction on all parcels without providing any evidentiary support. With respect to knowledge of the market in conducting an appraisal, USPAP states that "the scope of work necessary to ensure an adequate knowledge of the market for the subject property may range from very little . . . to extensive new research. If the subject property is of a type frequently appraised and in a locality where the appraiser regularly provides services, there may be little

need for extensive market research beyond confirmation that the data available for analysis is current, adequate, relevant, and credible. Ex. D-95, 2016–2017 USPAP, Advisory Opinion 22 at 152:145 – 49. Hughes testified: "I'm in this area all the time. So my market research is - - in the course of my doing business, I'm researching constantly what's happening there. So I've done that over time on the market for office, for land and so forth." Ex. PSJX-191, Hughes Dep. at 142: 3–9. And Hughes testified that he has appraised "office buildings, shopping centers, retail shopping centers . . . vacant land, both for commercial and residential purposes, mixed-use properties . . . ." *Id.* 46:12–17. Hughes further testified that in a typical appraisal, he researches: "[a]rea, neighborhood analysis, submarket analysis, description of the site, description of the improvements . . . zoning, real estate taxes." Ex. CW-32, Hughes Dep. at 123:12–15. Based on his knowledge of the marketplace and experience conducting appraisals, and a review of relevant evidence, Hughes concluded that because of the Property's "atypical requirement to incorporate the rail lines into any development project . . . market buyers would not attribute any value" to three of the five River City parcels without first conducting detailed engineering studies. Hughes Report at 33. The Court concludes that is sufficient.[2]  *See Comcast Cable Commc'ns, LLC., LP*, 203 F.Supp.3d at 545.

---

[2] C&W argues that Hughes's testimony should be excluded because he relied on a statement by Bud Hirsch, a real estate broker in Philadelphia who represented the buyer of River City in 2006, identified by C&W as JFK Blvd. Based on the conversation with Hirsch, the Report states that "a broker who marketed the subject property . . . stated that the 2006 buyer did not attribute any value" to the parcels over the rail line. Hughes Report at 33. C&W argues that the statement made by Hirsch—that the buyer did not attribute any value to parcels over the rail line—is unreliable because "it was purportedly uttered by a party that had every reason to hide its interest in Parcels A, B, C, and D." Mot. to Exclude Hughes Expert Testimony at 28. Experts may rely on hearsay testimony if it is the kind normally relied on by experts in the field. FED. R. EVID. 703. Information from a real estate broker working in the relevant market at the time of the sale of the property is the kind of evidence would certainly inform an appraiser's retrospective appraisal of a property. C&W may attack perceived weaknesses in Hughes's reliance on Hirsch on cross-examination. *See United States v. 275.71 Acres of Land*, No. 09-CV-233, 2013 WL 989956, at *14 (W.D.Pa. Mar. 13, 2013)(In case involving expert testimony of appraiser, "supposed deficiencies . . . such as [expert's] deposition testimony that he talked to a county official who indicated it was difficult to raise crops on reclaimed mine lands . . . are appropriate topics for cross-examination, not exclusion.").

C&W next argues that the Hughes Report is unreliable based on the Report's discussion of the cost to build above the rail lines or the "plinth"—a "platform to build over the rail lines." Mot. Exclude Hughes at 29; Resp. Opp. to C&W Mot. Exclude Hughes at 24 n. 6.  C&W argues that Hughes considered the cost of developing all five parcels as an assemblage and improperly considered the Rappoport Plan in the context of determining the cost of the plinth, while ignoring the development plan in other parts of the Report.  The Report states that Hughes used the estimated cost of developing a plinth contained in the 2006 Appraisal—determined in the Rappoport Plan—and applied that estimate to his calculation of the FAR.  From those calculations, Hughes determined that the cost of developing the plinth exceeded the value of the land and accordingly, development of the property as described in the C&W Appraisal and the Rappoport plan was not feasible.  Hughes Report at 33; Ex. PSJX-191, Hughes Dep. 250:2–9; 251:17–23.  There is nothing unreliable about Hughes' consideration of the cost of the plinth set forth in the C&W Appraisal to support his conclusion that the development of a rail line across the Property was not feasible.

### c) Whether Hughes's Comparable Sales Analysis is Flawed

Finally, C&W argues that Hughes's testimony must be excluded because his comparable sales analysis is flawed and unreliable.  Using the sales comparison approach, Hughes compared the subject property with five similar properties, examining the "prices paid for similar properties, prices asked by owners, and offers made by prospective purchasers."  Hughes Report at 36.  C&W states that the Property had "the capacity to be developed as a world-class complex of office, residential, retail and hotel uses" and accordingly should have been compared to sites like Hudson Yard or the World Trade Center.  Mot. Exclude Hughes at 33.  C&W further contends Hughes erred in applying adjustments to the comparable sales properties, which are

"necessary to reflect characteristics for which the comparables are deemed inferior . . . [or] to account for superiorities at the comparables relative to the subject [property]." Hughes Report at 44. The fact that C&W's own expert would have selected different properties than Hughes to which to compare the Property is not a basis for excluding his testimony. And C&W does not object to Hughes use of adjustments in analyzing comparables; it merely objects to the manner in which he applied the adjustments. The Court concludes that such objections go to the weight, not the admissibility of Hughes's testimony. *See Loenard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 391 (3d Cir. 2016) ("disagreement with the calculation methodology and the underlying assumptions . . . goes to the weight given to [expert's] testimony, rather than admissibility").

### d) *Whether Hughes may offer his November 3, 2016, letter as a rebuttal*

On November 3, 2016, Hughes submitted a letter to counsel in this case in which he responded to the report prepared by Peter Korpacz on behalf of C&W. C&W asserts that the Court should prevent Hughes from testifying about this letter because Hughes stated that he did not conduct a rebuttal and he did not conduct a Standard 3 review of Korpacz's review. Specifically, Hughes testified: "I didn't do a rebuttal . . . I read his review and then responded to comments about his review." Hughes Dep. 308: 16, 22–23. Plaintiffs argue that Hughes's notes, while not labeled a rebuttal, constitutes a rebuttal to Korpacz's review. Moreover, noncompliance with Standard 3 in rebutting Korpacz's review goes to weight, rather than admissibility.

"The proper function and purpose of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party." *In re Tropicana Orange Juice Marketing and Sales Practices Litig.*, No. 11-CV-7382, 2017 WL 2362848, at *5 (D.N.J. May 31, 2017) (quoting *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974)). Hughes's letter does just that

and is directed at explaining or counteracting C&W's expert. That it is not labeled a rebuttal or that Hughes himself was unaware that his response could constitute a rebuttal is irrelevant. Accordingly, the Court rejects C&W's argument that Hughes's rebuttal testimony contained in the November 3, 2016 letter must be excluded.

### e) Conclusion

For the foregoing reasons, the Court concludes that C&W's objections to Hughes's testimony are based on disagreements over his conclusions, rather than his methodology. Accordingly, C&W's Motion to Exclude Hughes's Testimony is denied.

## IV.     MOTION FOR SUMMARY JUDGMENT

### A.     Applicable Law

A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing summary judgment must identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

## B. **Discussion**

Plaintiffs assert three fraudulent misrepresentations with respect to C&W's Appraisal. First, they argue that the Appraisal affirmatively stated that River City was not subject to any height restrictions when in fact, the Property was subject to a pending zoning ordinance that limited the height of any building on the site to 125 feet. Second, plaintiffs argue that the Appraisal fraudulently misrepresented that it complied with USPAP when it did not. Lastly, plaintiffs claim that C&W's Appraisal fraudulently misrepresented the value of River City at $77 million, when the actual value was much less.

Under Pennsylvania law, a plaintiff must prove six elements to prove fraud: "1) a misrepresentation, 2) material to the transaction, 3) made falsely, 4) with the intent of misleading another to rely on it, 5) justifiable reliance resulted, and 6) injury was proximately caused by the reliance." *Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 136 (3d Cir. 2005) (citing *Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534 (Pa. Super. Ct. 2003)).

C&W argues that the plaintiffs cannot establish: (1) that C&W made a misrepresentation because there was no height limitation applicable to the Property at the time the Appraisal was submitted and as a consequence, plaintiffs cannot provide any evidence that the Appraisal's $77 million valuation was incorrect; (2) that C&W misrepresented hat it complied with USPAP (3) that C&W intended to defraud plaintiffs or induce their reliance upon the Appraisal; (4) that plaintiffs justifiably relied on the Appraisal because they were not among its "Intended Users"; (5) or that plaintiffs losses were proximately caused by the C&W Appraisal.

The Court addresses each argument in turn.

### a) *Misrepresentation of Pending Height Ordinance*

C&W argues that it did not misrepresent the value of River City or the existence of a height ordinance, because as of the effective date of the Appraisal on August 1, 2006, the Property was not subject to any height restrictions. Memo. Supp. Summ. J. at 48. Plaintiffs contend that pursuant to the pending ordinance doctrine, the height restriction impacted the Property as early as May 1, 2006, well before the submission of the final Appraisal on November 16, 2006.

Under the pending ordinance doctrine, zoning ordinances that are pending before City Council are treated as law even if they are not yet adopted. *See Casey v. Zoning Hearing Bd. of Warwick Tp.*, 328 A.2d 464, 467 (Pa. 1974) ("When there has been a 'sufficient public declaration' of an intent to amend the existing zoning ordinance, . . the pending amendment governs the issuance of such permits.") (citing *Lhormer v. Bowen*, 188 A. 2d 747 (Pa. 1963))). An ordinance is "pending" when the City Council "has resolved to consider a particular scheme of rezoning and has advertised to the public its intention to hold public hearings on the rezoning." *Id.* (quoting *Boron Oil Co. v. Kimple*, 284 A.2d 744, 747 (Pa. 1971)). Whether a particular zoning regulation is "pending" is a factual determination.

The parties dispute the date on which the ordinance was first advertised for public hearing. Plaintiffs allege that the ordinance was initially advertised for public hearing on April 28, 2006, and that the first notice for public hearing was published in the *Philadelphia Daily News* on May 1, 2006, in advance of the May 10, 2006 hearing. Pls.' Resp. SOF ¶ 152. The notice advertised public hearings on Bill No. 060292, which would impose "additional height controls in the vicinity of the Benjamin Franklin Parkway, under certain terms and conditions." Pls.' Resp. SOF ¶ 152. Plaintiffs argue that River City is "well within the 'vicinity of the

Benjamin Franklin Parkway'" and accordingly, was within the scope of the proposed rezoning as introduced on April 20, 2006. Resp. Opp. Mot. Summ. J. at 27. C&W asserts that the ordinance was first advertised for public hearing before Philadelphia City Council's Committee on Rules on November 8, 2006. C&W SOF ¶ 152. The Court concludes that there is sufficient evidence upon which a jury could conclude that the height ordinance applied to the Property before August 1, 2006, the date listed on the Appraisal.

As initially introduced on April 20, 2006, the proposed height ordinance did not apply specifically to River City, but instead applied to buildings near the Benjamin Franklin Parkway. PCSF ¶ 241; C&W SOF ¶¶147, 148. Plaintiffs have presented evidence, and C&W now admits, that the height ordinance applied to parcels D & E of the Property by May 25, 2006. PCSF ¶ 241, 244; C&W SOF ¶¶149–51. Moreover, C&W asserts that August 1, 2006, is the date upon which the Appraisal was finalized. However, plaintiffs have presented evidence that the Appraisal was finalized and issued on November 16, 2006, despite the Appraisal's valuation date of August 1, 2006. Accordingly, by C&W's own timeline, the Appraisal issued on November 16, 2006, was subject to the pending ordinance doctrine because the ordinance was advertised for public hearing on November 8, 2006, prior to the date the Appraisal was finalized and issued. Finally, the Court concludes that plaintiffs have raised a genuine issue of material fact with respect to whether River City was subject to the April 27, 2006, notice, because the Property is located only a few blocks from the Benjamin Franklin Parkway, which is arguably within the vicinity of the Benjamin Franklin Parkway.

### b) *Misrepresentation Based on Failure to Comply with USPAP and Valuation*

Plaintiffs also allege that the Appraisal fraudulently misrepresented that it complied with

USPAP, when in reality, the Appraisal violated USPAP in several respects. C&W asserts that there is no evidence that C&W Appraisal failed to adhere to USPAP standards in reaching its valuation of the Property. The Court concludes that plaintiffs have raised a genuine issue of material fact with respect to whether C&W's Appraisal misrepresented its compliance with USPAP and the stated $77 million value of the Property.

Plaintiffs have presented evidence through their expert Stephen Roach, *inter alia*, that: C&W failed to verify the purported $50 million contract of sale for the Property from JFK to Chawla's entity, World Acquisition Partners; C&W failed to adequately analyze the feasibility of developing the Property by its failure to analyze absorption rates in the market with respect to residential use and office space; C&W failed to adequately evaluate the financial feasibility of the Property because the cost of building an elevated plane over the SEPTA rail lines would have rendered the development unbuildable. *See* Roach Report at 8,9, 37; PSJX-73, McNamara Dep. at 240: 5–241: 18; 244:3–244:9. Plaintiffs have also presented evidence that C&W failed to disclose extraordinary assumptions[3] and hypothetical conditions relevant to its Appraisal, including that the proposed project would be approved via a master plan and must conform with zoning regulations and the height ordinance. Roach Report at at 27. And plaintiffs have presented evidence that when C&W appraised the Property in 2004, it concluded that two parcels of the Property could not be reliably valued due to SEPTA's air rights, but in 2006, C&W relied on the same data but assumed away the problem of SEPTA's air rights. *Id.* at 43. Finally, plaintiffs have presented evidence in the Hughes Report that the value of the property as of

---

[3] Under USPAP, an "extraordinary assumption" is defined as "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. . . . Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property." Resp. Opp. Mot. Summary J. at 30 n. 14.

August 1, 2006, was approximately $30 million, significantly less than the $77 million valuation in the 2006 Final Appraisal.  Hughes Report at 2.

Viewed in the light most favorable to plaintiffs, the Court concludes that plaintiffs have raised a genuine issue of material fact with respect to whether C&W misrepresented that it complied with USPAP, leading to a valuation unsupported by the data.

### c)  *Intent to Mislead*

C&W argues that, even if the Appraisal contained misrepresentations, plaintiffs cannot prove that C&W made those misrepresentations with the requisite scienter.  Memo. Supp. Mot. Summ. J. at 52.  The Court disagrees.

"Scienter, or the maker's knowledge of the untrue character of his representation, is a key element in finding fraudulent misrepresentation."  *Ira G. Steffy & Son, Inc. v. Citizens Bank of Pa.*, 7 A.3d 278, 290 (Pa. Super. Ct. 2010) (citing Restatement (Second) of Torts §526, comment a.).   Under Pennsylvania law, scienter for fraud is satisfied upon a showing that "the false representation was made knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false."  *Warren Balderston Co. v. Integrity Trust Co.*, 170 A.282, 283 ( Pa. 1934).  A reckless representation involves more than negligence, "but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re ATI Technologies, Inc. Securities Litigation*, 216 F.Supp.2d 418, 428 (E.D.Pa. 2002).

Plaintiffs have presented evidence that C&W appraised River City in 2004 for a different client and concluded that the "As-Is Fair Market Value" of the Property was $13.8 million. PCSF ¶ 112, Ex. PSJX-73, Deposition of Gerald McNamara at 109:19–23.   At that time, C&W

31

determined that "the SEPTA right of way would hinder development of portions of the River City Property." *Id.* at ¶ 111, Ex. PSJX-73, Deposition of Gerald McNamara at 109:4 – 18. Absent engineering reports to show the cost of development, C&W concluded in 2004, the cost of developing two of the five parcels of River City was too speculative to consider as part of the appraisal. Resp. in Opp. to Mot. Summ. J., at 36. In the course of conducting the appraisal of the Property in 2006, plaintiffs have presented evidence that C&W did not seek to verify the feasibility of Rappoport's development plan and took Rappoport "at his word" with respect to the project's compliance with SEPTA's engineering requirements. Resp. in Opp. to Mot. Summ. J., at 36 – 37; PSJX-74, Deposition of Daniel McNeil at 221: 13 – 222:19. Plaintiffs have also presented evidence that C&W appraisers relied on information provided by Naselsky and Rappoport without taking any steps to verify that information, including the terms of the sale of the Property between R&F Penn and JFK Blvd. PSJX-74, Deposition of Daniel McNeil at 231: 22 – 232: 24.

The record contains evidence that C&W increased the appraised value of the Property after McNeil met with Naselsky, who expressed discontent over the $57 million value in the June 2006 Draft Appraisal. At that meeting, McNeil testified that Naselsky provided him with either a specific value in the range of $77 million or an expected range of values. Deposition of Daniel McNeil at 89:6–90:14. Moreover, the record contains evidence that, despite the significant change in the Property's appraised value, the July 2006 Appraisal made no changes to the Market Area Analysis or Market Analysis Section and no changes in the July 2006 Appraisal's determination of highest and best use of the Property. The July 2006 Appraisal did contain changes to the Land Residual Analysis, the purpose of which was to test the reasonableness of the C&W valuation. PSJX-74, McNamara Dep. at 257:6–22. McNamara testified as to the

reasonableness of those conclusions and conceded that development was not feasible based on the calculations set forth in the July 2006 Appraisal. *Id*. at 240:5–241: 18; 244:3 –244:9.

Based on the evidence in the record, the Court concludes that plaintiffs have raised a genuine issue of material fact with respect to whether C&W acted "knowingly, or in conscious ignorance of the truth, or recklessly without caring whether [its representations were] true or false." *Delahanty v. First Pa. Bank*, 464 A. 2d 1243, 1252 (Pa. Super. Ct. 1983).

### d) *Justifiable Reliance*

C&W argues that the Appraisal's Intended User Provision barred plaintiffs from relying on the Appraisal and accordingly, plaintiffs' claimed reliance on the Appraisal is unjustifiable *per se*. Mot. for Summary J. at 33. With respect to plaintiff Kilbride, C&W argues that judgment must be entered against Kilbride because it never received or reviewed the Appraisal and thus cannot have relied on the alleged misrepresentation. The Court first addresses whether Kilbride alone is barred from claiming reliance when it never received the Appraisal before turning to whether Busystore Limited and Bergfeld are barred from claiming justifiable reliance by the Appraisal's Intended User Provision

### i. *Whether Kilbride Justifiably Relied*

C&W seeks to dismiss Kilbride's claim for fraudulent inducement on the grounds that there is no evidence that Kilbride ever received the Appraisal or learned of its material terms from any source, before transmitting $12 million. C&W Reply at 8. Plaintiffs argue that reliance by a prospective investor like Kilbride was foreseeable. Alternatively, plaintiffs assert that Kilbride reasonably relied because Berger relied on the Appraisal and "misrepresentations made to an agent will support a fraud claim by the principal regardless of whether the principal was known at the time of the fraud." Resp. Opp. Mot. Summary J. at 11.

Even if the Court concluded that an investor entity like Kilbride's reliance on the C&W Appraisal was foreseeable, plaintiffs must still prove that Kilbride *actually* relied on the Appraisal.[4] *See e.g.*, *Taylor v. Nelson*, No. 02-CV-6558, 2006 WL 266052, at *19 – 20 (E.D. Pa. Jan. 31, 2006) (plaintiff had no knowledge of the appraisal until after she closed on the property)); *Scott v. LTS Builders LLC*, No. 10-CV-0581, 2012 WL 5207456, at *1 (M.D. Pa. Oct. 22, 2012) ("The record establishes that Plaintiffs never received a copy of the Report, so it is irrelevant that the Report may have authorized HSBC to give Plaintiffs a copy.")).  With respect to the funds given on behalf of Kilbride, Berger testified that he spoke with a representative of Kilbride, James Levy, about investing in the Property and Kilbride agreed to provide the requested funding.  PSJX-103, Berger Dep. 148:14–150: 23.  He stated that the discussion he had with Levy was "not very long" and that he described the project "in broad terms."  *Id.* 149:8–9, 18–19. Berger does not state that he provided Levy with the Appraisal or with the information contained in the Appraisal. The Court concludes that this evidence is insufficient to present a jury question as to Kilbride's claimed reliance on the Appraisal.  *See Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (an inference based on speculation or conjecture does not create a genuine factual dispute sufficient to defeat summary judgment)).  Accordingly the Court must determine whether an agency relationship existed between Berger and Kilbride such that Berger's knowledge of the Appraisal may be imputed to Kilbride.

C&W argues that there is no evidence that Berger was Kilbride's agent.  Plaintiffs cite *Berger v. Zeghibe*, 465 Fed. App'x.  174 at 181 (3d Cir. Feb. 23, 2012), in support of their

---

[4] Plaintiffs rely on *Woodward v. Dietrich*, 548 A.2d 301,309 (Pa. Super. Ct. 1998) for the proposition that "one who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he . . . has reason to expect to act . . . in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction."  The plaintiff in *Woodward*, however, relied on misrepresentations made by the seller of the property, as well as approvals obtained by the Municipal Authority. *Id.* at 305.  Unlike plaintiff in that case, plaintiffs in this case have not presented evidence that Kilbride was aware of the contents of the Appraisal.

assertion that "the evidence is sufficient to[sic] Berger was an agent for Kilbride." Memo. Opp'n. C&W Mot. for Summary J. at 13. In that case, the Third Circuit relied on Berger's testimony at trial that " 'it [was] understood' he was there 'on behalf of . . . [his] companies'" to conclude that a jury could reasonably conclude that Chawla acted together with Weinstein and Pine to injure Berger's entities. *Berger*, 465 Fed. App'x at 181.

Plaintiffs bear the burden of proving the existence of an agency relationship between Kilbride and Berger. *Walter v. Johnson*, 66 A.3d 782, 787 (Pa. Super. Ct. 2013). An agency relationship is created where the principal manifests that the agent shall act for him and the agent accepts the undertaking to act. *Volunteer Fire Co. v. Hilltop Oil Co.*, 602 A.2d 1348, 1352 (Pa. Super Ct. 1992). "The existence of an agency relationship may be inferred from the facts . . . [but] we do not assume agency by a mere showing that one person does an act for another." *Walter*, 66 A.3d at 787. While the determination of an agency relationship is usually a question of fact for the jury, courts have determined agency as a matter of law "when a party presents evidence insufficient to submit to the jury regarding an agency relationship, or lack thereof." *Luber v. Underwriters at Lloyds*, No. 92-CV-2200, 1992 WL 346467, at *12 (E.D.Pa. Nov. 13, 1992).

The Court concludes that the evidence is insufficient to establish that Berger acted as Kilbride's agent. Kilbride is a discretionary family trust established by Berger's father. When asked what his affiliation with Kilbride was, Berger stated: "I haven't got an affiliation. I'm just a potential beneficiary." PSJX-158, Berger Dep. as Corporate Rep. of Kilbride. Berger also testified that the directors have the authority to invest or loan funds on Kilbride's behalf. *Id.* And when asked why Kilbride agreed to wire those funds, Berger stated that "[a] beneficiary of the trust was looking for a loan and pursuant to that request, . . . it sent the funds." PSJX-158,

Berger Dep. as Corporate Rep. of Kilbride.[5]  Berger does not state that he was vested with any actual or implied authority to invest funds on behalf of Kilbride.  Instead, the evidence suggests that Berger sought a loan from his trustee to invest in River City.

Plaintiffs have not produced any evidence that Kilbride itself received or was provided information contained in the Appraisal, nor have they presented evidence that Berger acted as Kilbride's agent.  Absent such evidence, the Court grants C&W's Motion for Summary Judgment as to Kilbride's claim against C&W.

### ii.        Whether Busystore Limited and Bergfeld Justifiably Relied

The 2006 Appraisal's Intended User Provision stated: "This report was prepared for Cozen O'Connor, P.C. on behalf of its client J.F.K. Acquisition G.P., L.L.C. and is intended only for their specified use.  The Client together with its professionals, investors, and potential lenders may consider the appraisal without further permission."  Ex. P-93, at BERGER4210694.  C&W argues that the language of the provision limits reliance to individuals and entities who invested in, and acquired an ownership in, JFK.   Plaintiffs assert that there is no meaningful distinction between an investment in JFK itself and an investment in River City, because JFK was established for the purpose of purchasing River City and the only way to invest in River City was through JFK.

Plaintiffs have presented evidence, *inter alia*, that Naselsky asked C&W to expand the intended users section to include not just JFK, but "its professionals, investors, and potential lenders."  Ex. P-65.  The purpose of this expansion, according to JFK's attorney, was "to expand the scope of who could rely on the appraisal" because "[i]t was everyone's operating belief that the appraisal was for the use of the buyer, its investors and/or any of the lenders who might be

[5] By contrast, with respect to Busystore and Bergfield, Berger is a director and acted on behalf of both companies.

involved in the JFK transaction." Pls.' SOF at 129. And, contrary to C&W's assertion, the language of the Intended Users Section is not so clear as to put plaintiffs on notice that reliance on the Appraisal would be unreasonable. *Cf. Brushwitz v. Ezell*, 757 So.2d 423, 430 (Ala. 2000) ("The plaintiffs were fully capable of reading and understanding the document containing the disclaimer. Any reliance by them on the appraisal would have been unreasonable.")). Berger testified, for example, that he believed he was "joining a consortia that had negotiated a purchase"—the consortia consisting of in relevant part, JFK. PSJX-103, Berger Dep. at 344:3 – 344:10. The Court concludes that plaintiffs have presented sufficient evidence upon which to conclude that the purpose of the Appraisal—and the expansion its Intended Users Section—was to induce investment into the Property, through payment to JFK and as a consequence, that plaintiffs reliance was not unreasonable.

### e) Proximate Cause

C&W argues that Weinstein's fraud, not any fraud on the part of C&W, proximately caused plaintiffs' damages.

"Pennsylvania courts utilize the 'substantial factor' test from the Restatement (Second) of Torts to ascertain proximate cause. *Heeter v. Honeywell International, Inc.*, 195 F.Supp.3d 753, 758 (E.D.Pa. 2016) (citing *Whitner v. Von Hintz*, 263 A.2d 889, 89 –94 (Pa. 1970)). "Where a jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm, the fact that there is a concurring cause does not relieve the defendant of liability." *Powell v. Drumheller*, 653 A.2d 619, 622 (Pa. 1995). The substantial factor need not be the only factor responsible for bringing about the alleged harm. *Id.* "Indeed, '[t]wo or more causes may contribute to and be the proximate cause of an injury." *Simmons v. Simpson House, Inc.*, 224 F.Supp.3d 406, 420 (E.D.Pa. 2016) (citation omitted)). The court may only decide

proximate causation as a matter of law if it concludes that the jury could not reasonably differ as to the question of proximate cause. *Heeter*, 195 F.Supp.3d, at 758 (citing *Chetty Holdings Inc. v. NorthMarq Capital, LLC*, 556 Fed. App'x 118, 121 (3d Cir. 2014)); *see also Powell*, 653 A.2d, at 622 (The question of concurrent causation is normally one for a jury).

Plaintiffs have presented evidence that Berger relied, at least in part, on C&W's Appraisal. For instance, Berger testified at trial in *Berger III* that he would not have invested in River City without receiving C&W's Appraisal and that receipt of the Appraisal played a significant role in his decision to invest in the Property. And Berger did not agree to invest in River City until after receipt of the Appraisal from Chawla. Based on that evidence, the Court concludes that plaintiffs have demonstrated that there is a genuine issue of material fact as to whether the C&W Appraisal constituted a "substantial factor" in bringing about plaintiffs' harm.[6]

## V.    CONCLUSION

For the foregoing reasons, C&W's Motion to Exclude the Expert Testimony of Stephen D. Roach is granted in part and denied in part. That Motion is granted as to Roach's opinion on the subjective beliefs of the C&W appraisers who conducted the 2006 Appraisal and denied in all other respects. C&W's Motion to Exclude the Expert Testimony of Albert R. Hughes is denied. Finally, C&W's Motion for Summary Judgment is granted in part and denied in part. That Motion is granted as to plaintiff Kilbride and denied in all other respects.

---

[6] With respect to C&W's argument that Weinstein's fraud was the superseding cause of plaintiffs' loss, the Court agrees with plaintiffs that the question of whether Weinstein's actions were "so extraordinary as not to have been reasonably foreseeable" should be left to the jury. *See Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009).